Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------X
EMCOR GROUP, INC.                    :    Civil Action No.
                                     :    Docket 3:00-CV-2211 (AVC)
            Plaintiff,               :
                                     :    Judge Alfred V. Covello
v.                                   :
                                     :
INSURANCE COMPANY                    :
OF NORTH AMERICA                     :
                                     :
            Defendant,               :
                                     :    September 30, 2002
---------------------------------------------------X

## DISCLOSURE OF EXPERT WITNESS

Pursuant to FRCP 26(a)(2), the Plaintiff EMCOR Group, Inc. ("EMCOR") hereby discloses William C. Stewart, Jr., CPCU, AIC, RPA as an expert witness in the above-captioned matter. Attached hereto and incorporated herein as Exhibit A is a report prepared by Mr. Stewart. Attached hereto and incorporated herein as Exhibit B is a curriculum vitae for Mr. Stewart which identifies Mr. Stewart's qualifications including a list of all publications offered by Mr. Stewart in the preceding ten years and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Mr. Stewart is currently being compensated at the rate of $200.00 per hour for all

non-deposition/expert witness services and $2,500.00 per day for testimony plus expenses.

<div style="margin-left:40%">

THE PLAINTIFF,
EMCOR Group, Inc.

By: _____
Jeffrey J. Vita, Esq.
Saxe Doernberger & Vita, P.C.
1952 Whitney Avenue
Hamden, CT 06517
Tel: (203)287-8890
Fed. Bar No. ct 08036

</div>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-----------------------------------------------X
EMCOR GROUP, INC.                        :    Civil Action No.
                                              Docket 3:00-CV-2211 (AVC)
                Plaintiff,               :
                                              Judge Alfred V. Covello
v.                                       :

INSURANCE COMPANY
OF NORTHAMERICA                          :

                Defendant,               :
                                              September 30, 2002

-----------------------------------------------X

## CERTIFICATION

This is to certify that the foregoing was mailed, postage prepaid, on this the 30th day of September, 2002 to the following:

Thomas Leghorn, Esq. (ct22106)
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, NY 10017-5639
(212) 490-3000

Duncan B. Hume, Esq. (ct05581)
Hume & Associates
One Landmark Square
Stamford, CT 06901
(203) 348-7252

_____
Jeffrey J. Vita, Esq.

# EMCOR Group, Inc. v
# Insurance Company of North America
## A Report on Claims Handling

Report prepared by:
William C. Stewart, Jr., CPCU, AIC, RPA
William Stewart Associates, Inc.
1214 Del Mar Road
Lakewood, NJ 08701

## Overview and Summary

EMCOR Group, Inc. (Emcor) was insured by the Insurance Company of North America (INA) from October 1, 1992 to October 1, 1995 under three separate, consecutive, Commercial General Liability (CGL) insurance policies. All policies provided general liability and products-completed operations coverage. Aggregate limits in all policies for products-completed operations coverage were $3,000,000 and for general liability coverage were $2,000,000. All general liability and products-completed operations claims were subject to a per occurrence limit of $1,500,000.

While CGL policies generally contain a duty to defend, an endorsement, identified as endorsement 32, was added to all CGL policies insuring Emcor from October 1, 1992 to October 1, 1995 which purports to remove the duty to defend. However, INA entered into an agreement with Emcor (known to the parties as the Finite Agreement) making INA financially responsible for defense and indemnity obligations up to the policy limits for the period October 1, 1992 to October 1, 1995.

During the first policy period the costs of defending litigation were in addition to the policy limit (i.e. outside the limit). During the second and third policy periods defense costs reduced the policy limit (i.e. inside the limit).

Claims staff employed by ESIS, a third party claims administrator retained by Emcor, but owned by INA, engaged in a pattern and practice of miscoding claims to the detriment of Emcor. Claims that should have been coded to the higher products-completed operations aggregate limit, were instead improperly coded to the lower general liability aggregate limit.

INA and ESIS were advised of substantial miscoding of claims but did not change their practices. INA, as Emcor's insurer, was ultimately responsible for the proper coding of claims.

The combined affect of the miscoding of claims, and payment of defense costs from inside, as opposed to outside the policy limit, caused Emcor's general liability aggregate limits to become prematurely exhausted. This resulted in EMCOR having to fund claims for which it had insurance coverage and for which Emcor should have been defended and indemnified by its insurance carrier, INA.

INA disregarded the financial interests of its insured Emcor and by doing so has breached its fiduciary duty owed to its insured,

1

Emcor. The fact that INA has not corrected these coding mistakes when brought to INA's attention, represents a failure of INA to deal in good faith with its own insured.

## Preparation for Writing this Report

In preparing to write this report I have reviewed:

- Copies of general liability policies for the policy periods
  - October 1, 1992 – October 1, 1993
  - October 1, 1993 – October 1, 1994
  - October 1, 1994 – October 1, 1995
- 106 claim files pertaining to general liability insurance polices issued by INA to EMCOR
- Second Amended Complaint styled EMCOR Group, Inc. v. Insurance Company of North America brought in United States District Court for the District of Connecticut
- Copies of various correspondence

### General Liability Insurance Coverage of EMCOR

Emcor was insured by INA from October 1, 1992 through October 1, 1995 under three consecutive Commercial General Liability insurance policies. All three policies provide coverage on an occurrence basis. This means that for coverage to be afforded for a particular loss, it must occur within the policy period. Information on these three policies follows:

| Policy Number | Policy Dates | General Aggregate Limit | Products-Completed Operations Aggregate Limit |
|---|---|---|---|
| HDO G1 403379-8 | 10/1/92 – 10/1/93 | 2,000,000* | 3,000,000* |
| HDO G1 658518-A | 10/1/93 – 10/1/94 | 2,000,000* | 3,000,000* |
| HDO G1 658789-8 | 10/1/94 – 10/1/95 | 2,000,000* | 3,000,000* |

* all policies were subject to a per occurrence limit of 1,500,000.

All three policies contained an Insurance Services Office Commercial General Liability Coverage form CG 00 01. Policies in effect from 10/1/92 – 10/1/93 and 10/1/93 – 10/1/94 contained the November, 1988 edition of this coverage form. The policy in

2

effect from 10/1/94 to 10/1/95 contained the October, 1993 edition of this coverage form. With respect to portions of this coverage form that will be quoted in this report, the verbiage contained in both of these editions is identical.

The policies' language provides that any claim not occurring at the insured's premises or any claim where the insured is not working on, or in the process of completing work at a job, is a claim that falls under products-completed operations coverage. This conclusion is reached by reading appropriate portions of the Commercial General Liability Policy.

Referring to page 1 of this policy:

> "SECTION I – COVERAGES
>
> COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILTY
>
> 1. a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:
>
>    (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III)..."

Referring to Section III – LIMITS OF INSUANCE found on page 7 of the policy:

> "2. The General Aggregate Limit is the most we will pay for the sum of:
>
>    b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard."
>
> 3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."
>
> 5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:
>
>    a. Damages under Coverage A; and
>
>    b. Medical expenses under Coverage C

3

because of all "bodily injury" and "property damage" arising our of one "occurrence".

Finally, the definition of "Products-completed operations hazard" is found on page 11 of the coverage form.

"11.a. "Products-completed operations hazard" includes *all* "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession, or

(2) Work that has not been completed or abandoned.

b. "Your work" will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site has been completed.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete will be treated as completed." (emphasis added).

The nature of the insured's business is also an important factor in this claim handling analysis. For example, Emcor's subsidiary, Welsbach Electric is involved in many of the files I reviewed. Welsbach Electric is a company that installs, repairs, and maintains traffic signals in the New York City area. Welsbach typically repairs a traffic light, puts it to its intended use, and then leaves the scene. Therefore, due to the nature of Welsbach's business the vast majority of claims against Welsbach involve completed operations according to the definition of "products-completed operations hazard" in INA's policies.

From this review of coverage provided, unless Emcor was in the process of working at a site, any claim made against Emcor should be considered under its products-completed operations aggregate limit, not its general aggregate limit. In other words, based on the wording of the policies the default coverage limit is the products-completed operations aggregate limit.

4

*EMCOR v. INA*

## Review of Claim Files

### Improper Coding of Claims

A total of 106 claim files were reviewed (please refer to Appendix A). Each claim file was identified by a Case Number (far left column) intended to serve as a reference for easily locating the documentation contained in the claim file. For each claim the following information was gathered:

- Date of Loss
- Lawsuit or Claim Name
- Loss Location
- Description of Claim – Allegations Against Insured (i. e. claimant's or plaintiff's allegations)
- Insured Name
- Insured Involvement (based on file content/investigation)
- Evidence Relied on in Determining How Claim Should Have Been Coded (specific file documentation indicating that claim falls within the general liability aggregate limit or the products-completed operations aggregate limit.
- Other Notes (unusual circumstances)
- How Claim Should Have Been Coded (CO – Completed Operations, OP – Operations in Progress) – (claims that should have been coded as completed operations should fall under the products-completed operations Limit, and claims that should have been coded operations in progress should fall under the General Aggregate).

Of the 106 files reviewed, the following information was developed:

- 105 claims or 99% of all claims should have been coded as falling within the products-completed operations aggregate limit. This includes six claims that may have fallen under either the general liability aggregate or products-completed operations aggregate limit (see following discussion).
- 1 claim or less than 1% of all claims reviewed arose from operations in progress and therefore should have fallen under the general liability aggregate limit.

When reviewing, in depth, the six cases that could have been coded as either falling under the general liability aggregate limit or the products-completed operations aggregate limit, I note the majority of these involved Welsbach.

5

In all of these claims, Welsbach had received a call that a traffic signal was in need of repair but had not reached the scene nor had begun a repair. While it can be argued that the unrepaired traffic signal was work that had, using the policy definitions, "not been completed or abandoned" it can also be argued this work had not yet begun, because the insured was never at the scene, and therefore was not in progress. This is particularly true where there was a documented repair that was completed prior to the accident. Given this situation the policy language becomes ambiguous.

An insurance policy is a contract of adhesion. The insurer should have interpreted coverage in the way most favorable to its insured. INA should have coded all of these three questionable claims as falling under the products-completed operations aggregate limit. Therefore, a total of 105 claims should have been coded as falling under the products-completed operations aggregate, only 1 should have fallen under the general aggregate limit.

Given the fact that all claims were coded by INA as falling under the general aggregate, INA incorrectly coded the subject claims over 99% (105/106) of the time. This miscoding was detrimental to the financial interests of Emcor to whom INA owed a duty to protect with regard to claims covered by their Commercial General Liability policies.

## Notice to CIGNA/INA of Miscoded Claims

An audit was conducted of the claim files by American International Group Technical Services, Inc., (AIGTS) on April 16 and 17, 1998 encompassing review of 41 claim files. In AIGTS's report to CIGNA/INA, dated May 26, 1998 (Bates 000322) AIGTS stated the following:

> "Because separate aggregates exist for general liability and products/completed operations losses, one concern we have is the coding of the losses. As we explained at the time of our meeting, the prior carrier for this insured was subject to an audit to verify erosion of the primary coverage for 1992 – 93 years. At that time, it was determined that some of the claims coded as General Liability, should have fallen under the products/completed ops exposure and therefore, the aggregates did not properly exhaust. Unfortunately, we found a similar discrepancy in the files we reviewed at your offices."

While INA did change coding on at least some of the files identified by AIGTS, I saw no evidence of INA taking the initiative to review other files to correct mistakes or confirm that other files were improperly or properly coded.

### Affects of Putting Defense Costs Within the Policy Limit

During the first policy period, running from 10/1/92 – 10/1/93 defense costs did not reduce the policy limits. INA attached endorsement number 33 rev., effective 10/1/92, to Policy Number HDO G1 403379-8 in representation of this fact.

Forty-Nine of the claims reviewed occurred within the October 1, 1992 – October 1, 1993 policy period. Further, from my review, I noted that in numerous cases, the only expenses incurred by INA were defense costs. In many typical cases, Emcor would be impleaded by the City of New York into an action. A defense would be provided and once Emcor proved that it had no duty to maintain traffic lights, was not negligent, or had not performed work in a particular area, a successful summary judgment motion would be made and the case against Emcor dismissed.

Under policy numbers HDO G1 658518-A (October 1, 1993 – October 1, 1994) and HDO G1 658789-A (October 1, 1994 – October 1, 1995) defense costs reduced the policy limit as evidenced by Endorsement 33 made a part of these two policies. Once INA placed defense costs within the limit of liability they had an added duty to weigh the defense v. the settlement value of the claim so as not to waste Emcor's policy limit. I did not see any evidence of this in any of the files that I reviewed.

### Claim Evaluations

I did not see evidence of well thought out evaluations contained in any of the claim files reviewed. Any evaluations I saw were only adjuster computer screen notes. It is a practice of good faith claims adjusting to prepare a detailed claim evaluation of a claim before entering into settlement negotiations. A complete claim evaluation prepared by the claims adjusters should contain, at a minimum, the following information:

- Special damages (medical bills, lost wages, etc.)
- General damages (nature of injure, permanency, associated pain and suffering, impact on claimant's life)
- If applicable – Has claimant sustained a "serious injury" as defined by the New York No Fault Law?
- Assessment of insured's legal liability
- Settlement range

I did not see evidence of evaluations meeting the above criteria in any of the claims reviewed. Therefore, I believe many of these claims were overpaid.

7

In particular, I reviewed one claim styled Kemp v. Monogahela Power Co., et al. In a letter dated March 16, 1998 addressed to Sue Reinhard, Claim Manager, EMCOR Group, from defense attorney Avrum Levicoff of Brown and Levicoff, P.C. the following comments are made:

> "On March 12, 1998, at approximately 5:25 p.m., you called to ask me if I knew the above captioned case had been settled. Of course, I did not. Apparently, you were notified of the settlement by a letter dated March 11, 1998 from Anne M. Finley-Donohue, a CIGNA claim representative. The letter, of which I have now obtained a copy, reports that the case was settled for a payment of $469,398.40.
>
> As I indicated to you when you called, I was shocked to say the least. I had never before heard of Anne M. Finley-Donaue. I was unaware that CIGNA was making any efforts to settle the case, and in the settlement amount is, in my opinion, well in excess in amount of which the case should have settled. Based upon my several discussions with the plaintiff's attorney, I thought $400,000 would have settled the case. Moreover, in my opinion, the reasonable settlement value of the case is between $350,000 and $375,000."

Emcor and INA had established Claim Service/Field Operations Instructions to be followed in the administration of claims. Page two of the Claim Service/Field Operations Instructions state, "For settlement authority for claims over $25,000 claim service must contact location and EMCOR Group, Inc., Headquarters, Susan Reinhard, Claim Manager.

INA's settlement of the Kemp claim is unusual in two respects. First, the amount of the settlement is unusual. Second, INA's settlement with the plaintiff, without obtaining settlement authority form Emcor violates the Claim Service/Field Operations Instructions recited above. It is worth noting that the Kemp claim falls in the 1992 – 1993 policy year when defense fees were outside the policy limits.

## Conclusion

INA had a contractual, fiduciary duty to pay for Emcor's defense and indemnification and protect its insured, Emcor, which INA breached. By utilizing a pattern and practice of miscoding over 99% of all claims, and overpaying claims it owed, INA wrongfully accelerated exhaustion of its own insured's policy limits thus relieving INA of further obligations to its own insured. Placing defense costs for Emcor inside the policy limit only accelerated

this process. In conclusion, INA put its own financial interests above those of its insured, Emcor, and failed to act in good faith.

Exhibit B

# William C. Stewart, Jr., CPCU, AIC, RPA
Claims Training Services
A Service of William Stewart Associates, Inc.
1214 Del Mar Road
Lakewood, New Jersey 08701
voice: (732) 942-0411; fax: (732) 942-0412
www.claimstraining.com
e-mail: william.stewart@claimstraining.com

## Education

<u>Bachelor of Arts</u>, Political Science, May, 1977, Monmouth University, West Long Branch, NJ

<u>Certificate in General Insurance</u>, December, 1978
<u>Associate in Claims</u>, July, 1980
Insurance Institute of America, Malvern, PA

<u>Chartered Property Casualty Underwriter</u>, October, 1992, American Institute for Property Casualty Underwriters, Malvern, PA. Qualified through 2000 in Continuing Professional Development Program.

<u>Registered Professional Adjuster</u>, September, 2001, Registered Professional Adjusters, Inc., Napa, CA

## Experience

In November, 1996 Bill formed William Stewart Associates, Inc., a New Jersey based corporation operating as Claims Training Services, an organization dedicated to improving the skill and ability level of property casualty insurance professionals.

Prior to this he had worked with American Insurance Services Group as Director of Training for Property Claim Services and in 1994 he became Director of Claims Training Services.

In addition to writing training curricula Bill delivers in excess of 100 seminars annually at numerous locations throughout the United States and serves as guest speaker at many industry functions.

He has also taught extensively on the college level. From 1985-1995 he taught at Brookdale Community College, Lincroft, NJ, and from 1989-1994 served as Lecturer at Monmouth University, West Long Branch, NJ. At both schools he taught various property casualty insurance courses.

In 1994, Bill was invited to grade the Institute exam, AIC 36, Casualty Claims Adjusting and severed six years as a grader.

Prior to joining AISG, Bill worked for the Hanover Insurance Companies where he began his insurance career in 1977. During his fifteen years with Hanover he was a multi-line claims adjuster, casualty field adjuster, subrogation unit manager, casualty unit manager and training coordinator. He became a trainer in 1985. In 1991, he directed a company sponsored, state licensed, property casualty producer licensing school and school of continuing education. When he left Hanover in 1992 Bill was Manager of the company's New York Metro Education Services Department, a department that was accountable for the training and development of 1,300 employees.

## Published Work

The following have appeared in *Claims* Magazine, Seattle, Washington:

"There's Gold in Subro Hills: A Guide to the Mining of Subrogation Recoveries," May, 1993.

"What's in a Number? PCS Catastrophe Functions Chart the Fortunes of the Industry," August, 1993.

"Subrogation Schooling: Informed Vendors Can Help Find Hidden Recovery Opportunities," May, 1994.

"Disasters: From Prognostication to Preparedness," July, 1995.

"Workers' Comp Subrogation: Finding Cause Offsets Costs," September, 1996.

"Claims Training: Something Every Company Can Afford," February, 1999.

Author of Property Claims Services, a unit of ISO, HELP Bulletins, 1996 – present.

Contributing Author – AIC 36 Text Book – Insurance Institute of America, 2001.

Author – various Keir Notes for the Associate in Claims Program, Jack C. Keir, Inc.

## Awards

In November, 1994, Bill was presented with Allstate Insurance Company's Quality Excellence Award. This award was given in recognition of the value of the Property Loss Subrogation Seminar that Bill wrote and presented in over 50 Allstate locations. This seminar is credited by Allstate's management as improving subrogation recoveries of the company in 1994 alone by 4.38 million dollars. This represents a 23% increase over prior year. This company wide award is the highest honor an Allstate vendor can receive and was the first time this award had been presented by the Claims Department.

## Licensure

Licensed New Jersey Insurance Producer (9696156-IP), Authorities: Health, Property/Casualty.

Claims Training Services is an approved provider of adjuster continuing education in Delaware, Georgia, New Hampshire, New York, North Carolina, Oklahoma, Texas and Wyoming and Bill is an approved continuing education instructor.

## Expert Witness

Recognized as an expert in the areas of bad faith, subrogation and other claims issues.

## Professional Organization Memberships

Loss Executives Association
National Association of Subrogation Professionals
  (General Session Speaker at 2000 Conference – "How to Get More Back: A Negotiations Workshop for Subrogation")
Society of Insurance Trainers and Educators
  (1996-1998, Regional Director - New Jersey)
Society of CPCU (currently qualified in Continuing Professional Development Program)

## Personal

Married, two wonderful sons.
Hobbies: running, cycling, woodworking.