Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------X
EMCOR GROUP, INC.                            :    Civil Action No.
                                             :    Docket 3:00-CV-2211
                                             :    (AVC)
                  Plaintiff,                 :
                                             :    Judge Alfred V.
v.                                           :    Covello
                                             :
INSURANCE COMPANY OF NORTH AMERICA           :
                                             :
                  Defendant.                 :    October 1, 2004
---------------------------------------------------------X

## PLAINTIFF'S NOTICE OF DISCLOSURE OF SUPLEMENTAL EXPERT REPORT

Pursuant to FRCP 26(e), the Plaintiff EMCOR Group, Inc. ("EMCOR") hereby discloses a supplemental report of its expert, William C. Stewart, Jr., CPCU, AIC, RPA, in the above-captioned matter, a copy of which is attached hereto and incorporated herein as Exhibit A.

THE PLAINTIFF,
EMCOR Group, Inc.

By: _____
Heidi H. Zapp, Esq.
Saxe Doernberger & Vita, P.C.
1952 Whitney Avenue
Hamden, CT 06517
Tel: (203)287-8890
Fed. Bar No. ct 24655

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------X
EMCOR GROUP, INC.                 :     Civil Action No.
                                  :     Docket 3:00-CV-2211 (AVC)
              Plaintiff,          :
                                  :     Judge Alfred V. Covello
v.                                :
                                  :
INSURANCE COMPANY                 :
OF NORTH AMERICA                  :
                                  :
              Defendant,          :
                                  :     October 1, 2004
------------------------------------------------X

## CERTIFICATION

This is to certify that the foregoing was mailed, postage prepaid, on this the 1st day of October, 2004 to the following:

Thomas Leghorn, Esq. (ct22106)
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10601
914-323-7000

Duncan B. Hume, Esq. (ct05581)
Hume & Associates
One Landmark Square
Stamford, CT 06901-2620
(203) 348-7252

_____
Heidi H. Zapp, Esq.

Exhibit A

# EMCOR Group, Inc. v Insurance Company of North America
## A Report on Claims Handling

Report prepared by:
William C. Stewart, Jr., CPCU, AIC, RPA
William Stewart Associates, Inc.
42 Victoria Circle
Jackson, NJ 08527

# Amended Report

This report is an amended report from my original report that was produced during the course of this litigation. I have amended my report because additional information has been made known to me. More particularly, I have been provided with additional intersection history reports, the contents of which have been incorporated into this report.

In addition, I was asked to provide my opinion with respect to how four additional claims, which I had previously not reviewed should have been coded. Specifically, these additional claims are:

- Lomax v City of New York – D/L 2/11/93
- Lobosco, et al v City of New York – D/L 6/21/94
- Deming v Butler, et al – D/L 7/17/94
- Kull, et al v Assini, et al – D/L 9/22/95

After review of these claims I found that all or 100% of these additional four claims were improperly coded. All of these additional claims should have been coded as falling under the products/completed operations aggregate limit. These claims are included in the appendix of this report and statistics used in this report have been revised to show the impact of these additional four miscoded claims.

## Overview and Summary

EMCOR Group, Inc. (Emcor) was insured by the Insurance Company of North America (INA) from October 1, 1992 to October 1, 1995 under three separate, consecutive, Commercial General Liability (CGL) insurance policies. All policies provided general liability and products-completed operations coverage. Aggregate limits in all policies for products-completed operations coverage were $3,000,000 and for general liability coverage were $2,000,000. All general liability and products-completed operations claims were subject to a per occurrence limit of $1,500,000.

While CGL policies generally contain a duty to defend, an endorsement, identified as endorsement 32, was added to all CGL policies insuring Emcor from October 1, 1992 to October 1, 1995 which purports to remove the duty to defend. However, INA entered into an agreement with Emcor (known to the parties as the Finite Agreement) making INA financially responsible for defense

1

and indemnity obligations up to the policy limits for the period October 1, 1992 to October 1, 1995.

During the first policy period the costs of defending litigation were in addition to the policy limit (i.e. outside the limit). During the second and third policy periods defense costs reduced the policy limit (i.e. inside the limit).

Claims staff employed by ESIS, a third party claims administrator retained by Emcor, but owned by INA, engaged in a pattern and practice of miscoding claims to the detriment of Emcor. Claims that should have been coded to the higher products-completed operations aggregate limit, were instead improperly coded to the lower general liability aggregate limit.

INA and ESIS were advised of substantial miscoding of claims but did not change their practices. INA, as Emcor's insurer, was ultimately responsible for the proper coding of claims.

The combined affect of the miscoding of claims, and payment of defense costs from inside, as opposed to outside the policy limit, caused Emcor's general liability aggregate limits to become prematurely exhausted. This resulted in EMCOR having to fund claims for which it had insurance coverage and for which Emcor should have been defended and indemnified by its insurance carrier, INA.

INA disregarded the financial interests of its insured Emcor and by doing so has breached its fiduciary duty owed to its insured, Emcor. The fact that INA has not corrected these coding mistakes when brought to INA's attention, represents a failure of INA to deal in good faith with its own insured.

## Preparation for Writing this Report

In preparing to write this report I have reviewed:

- Copies of general liability policies for the policy periods
  - October 1, 1992 – October 1, 1993
  - October 1, 1993 – October 1, 1994
  - October 1, 1994 – October 1, 1995
- 110 claim files pertaining to general liability insurance polices issued by INA to EMCOR
- Second Amended Complaint styled EMCOR Group, Inc. v. Insurance Company of North America brought in United States District Court for the District of Connecticut
- Copies of various correspondence

2

## General Liability Insurance Coverage of EMCOR

Emcor was insured by INA from October 1, 1992 through October 1, 1995 under three consecutive Commercial General Liability insurance policies. All three policies provide coverage on an occurrence basis. This means that for coverage to be afforded for a particular loss, it must occur within the policy period. Information on these three policies follows:

| Policy Number | Policy Dates | General Aggregate Limit | Products-Completed Operations Aggregate Limit |
|---|---|---|---|
| HDO G1 403379-8 | 10/1/92 – 10/1/93 | 2,000,000* | 3,000,000* |
| HDO G1 658518-A | 10/1/93 – 10/1/94 | 2,000,000* | 3,000,000* |
| HDO G1 658789-8 | 10/1/94 – 10/1/95 | 2,000,000* | 3,000,000* |

* all policies were subject to a per occurrence limit of 1,500,000.

All three policies contained an Insurance Services Office Commercial General Liability Coverage form CG 00 01. Policies in effect from 10/1/92 – 10/1/93 and 10/1/93 – 10/1/94 contained the November, 1988 edition of this coverage form. The policy in effect from 10/1/94 to 10/1/95 contained the October, 1993 edition of this coverage form. With respect to portions of this coverage form that will be quoted in this report, the verbiage contained in both of these editions is identical.

The policies' language provides that any claim not occurring at the insured's premises or any claim where the insured is not working on, or in the process of completing work at a job, is a claim that falls under products-completed operations coverage. This conclusion is reached by reading appropriate portions of the Commercial General Liability Policy.

Referring to page 1 of this policy:

"SECTION I – COVERAGES

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILTY

1. a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those

3

> damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:
>
> (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III)..."

Referring to Section III – LIMITS OF INSUANCE found on page 7 of the policy:

> "2. The General Aggregate Limit is the most we will pay for the sum of:
>
> b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard."
>
> 3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."
>
> 5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:
>
> a. Damages under Coverage A; and
>
> b. Medical expenses under Coverage C
>
> because of all "bodily injury" and "property damage" arising our of one "occurrence".

Finally, the definition of "Products-completed operations hazard" is found on page 11 of the coverage form.

> "11.a. "Products-completed operations hazard" includes *all* "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> (1) Products that are still in your physical possession, or
>
> (2) Work that has not been completed or abandoned.
>
> b. "Your work" will be deemed completed at the earliest of the following times:
>
> (1) When all of the work called for in your contract has been completed.
>
> (2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site has been completed.

4

> (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete will be treated as completed." (emphasis added).

The nature of the insured's business is also an important factor in this claim handling analysis. For example, Emcor's subsidiary, Welsbach Electric is involved in many of the files I reviewed. Welsbach Electric is a company that installs, repairs, and maintains traffic signals in the New York City area. Welsbach typically repairs a traffic light, puts it to its intended use, and then leaves the scene. Therefore, due to the nature of Welsbach's business the vast majority of claims against Welsbach involve completed operations according to the definition of "products-completed operations hazard" in INA's policies.

From this review of coverage provided, unless Emcor was in the process of working at a site, any claim made against Emcor should be considered under its products-completed operations aggregate limit, not its general aggregate limit. In other words, based on the wording of the policies the default coverage limit is the products-completed operations aggregate limit.

## Review of Claim Files

### Improper Coding of Claims

A total of 110 claim files were reviewed (please refer to Appendix A). Each claim file was identified by a Case Number for internal use intended to serve as a reference for easily locating the documentation contained in the claim file. For each claim the following information was gathered:

- Date of Loss
- Lawsuit or Claim Name
- Loss Location
- Description of Claim – Allegations Against Insured (i.e. claimant's or plaintiff's allegations)
- Insured Name
- Insured Involvement (based on file content/investigation)
- Evidence Relied on in Determining How Claim Should Have Been Coded (specific file documentation indicating that claim

5

falls within the general liability aggregate limit or the products-completed operations aggregate limit.

- Other Notes (unusual circumstances)

- How Claim Should Have Been Coded (CO – Completed Operations, OP – Operations in Progress) – (claims that should have been coded as completed operations should fall under the products-completed operations Limit, and claims that should have been coded operations in progress should fall under the General Aggregate).

Of the 110 files reviewed, the following information was developed:

- 109 claims or more than 99% of all claims should have been coded as falling within the products-completed operations aggregate limit. This includes six claims that may have fallen under either the general liability aggregate or products-completed operations aggregate limit (see following discussion).

- 1 claim or less than 1% of all claims reviewed arose from operations in progress and therefore should have fallen under the general liability aggregate limit.

When reviewing, in depth, the six cases that could have been coded as either falling under the general liability aggregate limit or the products-completed operations aggregate limit, I note the majority of these involved Welsbach.

In all of these claims, Welsbach had received a call that a traffic signal was in need of repair but had not reached the scene nor had begun a repair. While it can be argued that the unrepaired traffic signal was work that had, using the policy definitions, "not been completed or abandoned" it can also be argued this work had not yet begun, because the insured was never at the scene, and therefore was not in progress. This is particularly true where there was a documented repair that was completed prior to the accident. Given this situation the policy language becomes ambiguous.

An insurance policy is a contract of adhesion. The insurer should have interpreted coverage in the way most favorable to its insured. INA should have coded all of these six questionable claims as falling under the products-completed operations aggregate limit. Therefore, a total of 109 claims should have been coded as falling under the products-completed operations aggregate, only 1 should have fallen under the general aggregate limit.

Given the fact that all claims were coded by INA as falling under the general aggregate, INA incorrectly coded the subject claims

6

over 99% (109/110) of the time. This miscoding was detrimental to the financial interests of Emcor to whom INA owed a duty to protect with regard to claims covered by their Commercial General Liability policies.

### Notice to CIGNA/INA of Miscoded Claims

An audit was conducted of the claim files by American International Group Technical Services, Inc., (AIGTS) on April 16 and 17, 1998 encompassing review of 41 claim files. In AIGTS's report to CIGNA/INA, dated May 26, 1998 (Bates 000322) AIGTS stated the following:

> "Because separate aggregates exist for general liability and products/completed operations losses, one concern we have is the coding of the losses. As we explained at the time of our meeting, the prior carrier for this insured was subject to an audit to verify erosion of the primary coverage for 1992 – 93 years. At that time, it was determined that some of the claims coded as General Liability, should have fallen under the products/completed ops exposure and therefore, the aggregates did not properly exhaust. Unfortunately, we found a similar discrepancy in the files we reviewed at your offices."

While INA did change coding on at least some of the files identified by AIGTS, I saw no evidence of INA taking the initiative to review other files to correct mistakes or confirm that other files were improperly or properly coded.

### Affects of Putting Defense Costs Within the Policy Limit

During the first policy period, running from 10/1/92 – 10/1/93 defense costs did not reduce the policy limits. INA attached endorsement number 33 rev., effective 10/1/92, to Policy Number HDO G1 403379-8 in representation of this fact.

Forty-three of the claims reviewed occurred within the October 1, 1992 – October 1, 1993 policy period. Further, from my review, I noted that in numerous cases, the only expenses incurred by INA were defense costs. In many typical cases, Emcor would be impleaded by the City of New York into an action. A defense would be provided and once Emcor proved that it had no duty to maintain traffic lights, was not negligent, or had not performed work in a particular area, a successful summary judgment motion would be made and the case against Emcor dismissed.

Under policy numbers HDO G1 658518-A (October 1, 1993 – October 1, 1994) and HDO G1 658789-A (October 1, 1994 – October 1, 1995) defense costs reduced the policy limit as evidenced by Endorsement 33 made a part of these two policies. Once INA placed defense costs within the limit of liability they

7

had an added duty to weigh the defense v. the settlement value of the claim so as not to waste Emcor's policy limit. I did not see any evidence of this in any of the files that I reviewed.

**Claim Evaluations**

I did not see evidence of well thought out evaluations contained in any of the claim files reviewed. Any evaluations I saw were only adjuster computer screen notes. It is a practice of good faith claims adjusting to prepare a detailed claim evaluation of a claim before entering into settlement negotiations. A complete claim evaluation prepared by the claims adjusters should contain, at a minimum, the following information:

- Special damages (medical bills, lost wages, etc.)
- General damages (nature of injury, permanency, associated pain and suffering, impact on claimant's life)
- If applicable – Has claimant sustained a "serious injury" as defined by the New York No Fault Law?
- Assessment of insured's legal liability
- Settlement range

I did not see evidence of evaluations meeting the above criteria in any of the claims reviewed. Therefore, I believe many of these claims were overpaid.

In particular, I reviewed one claim styled Kemp v. Monogalhela Power Co., et al. In a letter dated March 16, 1998 addressed to Sue Reinhard, Claim Manager, EMCOR Group, from defense attorney Avrum Levicoff of Brown and Levicoff, P.C. the following comments are made:

> "On March 12, 1998, at approximately 5:25 p.m., you called to ask me if I knew the above captioned case had been settled. Of course, I did not. Apparently, you were notified of the settlement by a letter dated March 11, 1998 from Anne M. Finley-Donohue, a CIGNA claim representative. The letter, of which I have now obtained a copy, reports that the case was settled for a payment of $469,398.40.

> As I indicated to you when you called, I was shocked to say the least. I had never before heard of Anne M. Finley-Donaue. I was unaware that CIGNA was making any efforts to settle the case, and in the settlement amount is, in my opinion, well in excess in amount of which the case should have settled. Based upon my several discussions with the plaintiff's attorney, I thought $400,000 would have settled the case. Moreover, in

8

my opinion, the reasonable settlement value of the case is between $350,000 and $375,000."

Emcor and INA had established Claim Service/Field Operations Instructions to be followed in the administration of claims. Page two of the Claim Service/Field Operations Instructions state, "For settlement authority for claims over $25,000 claim service must contact location and EMCOR Group, Inc., Headquarters, Susan Reinhard, Claim Manager."

INA's settlement of the Kemp claim is unusual in two respects. First, the amount of the settlement is unusual. Second, INA's settlement with the plaintiff, without obtaining settlement authority form Emcor violates the Claim Service/Field Operations Instructions recited above. It is worth noting that the Kemp claim falls in the 1992 – 1993 policy year when defense fees were outside the policy limits.

## Conclusion

INA had a contractual, fiduciary duty to pay for Emcor's defense and indemnification and protect its insured, Emcor, which INA breached. By utilizing a pattern and practice of miscoding over 99% of all claims, and overpaying claims it owed, INA wrongfully accelerated exhaustion of its own insured's policy limits thus relieving INA of further obligations to its own insured. Placing defense costs for Emcor inside the policy limit only accelerated this process. In conclusion, INA put its own financial interests above those of its insured, Emcor, and failed to act in good faith.

| Date of Loss | Lawsuit or Claim Name | Loss Location | Description of Claim - Allegations Against Insured | Insured Name | Insured Involvement (based on file content/investigation) | Evidence Relied on in Determining How Claim Should Have Been Coded | Other Notes | How Claim Should have been Coded (CO - Completed Operations, OP - Operations in Progress) |
|---|---|---|---|---|---|---|---|---|
| 10/22/1992 | Hans v. Budin Contracting Corp. | Shirley, NY | Allegedly insured improperly repaired and maintained traffic signal at intersection causing accident. | Budin Contracting Corp. | Complaint and insured statement indicates that insured had worked on intersection about a month prior to accident. | EMC 005651 - Complaint - allegation that insured had worked on traffic signal in the past, but no indication in complaint (or anyplace in file) that insured was working on traffic signal at the time of the accident. Traffic Signal Service Reports of Budin Contracting reflect that work had been performed on traffic signal on five separate occasions between 10/14/92 and the date of loss. | | CO |
| 11/1/1992 | Hayles-Nelson v. The City of New York, et al. | Bronx, NY | Insured allegedly failed to properly maintain traffic signal causing accident | Welsbach | Insured did not receive notice of problem with traffic signal until 2 hours after accident. | Affidavit of Charles Clarkston - employee of Welsbach - states records reflect no report of problem until 2 hours after accident occurred. Intersection history reports reflect that Welsbach had performed work at the intersection on four previous occasions prior to 11/1/92. The dates work was performed were 5/17/92, 6/24/92, 8/2/92 and 8/21/92. In all cases the repair was completed the same day. | | CO |
| 1/5/1992 | Daniel v. JWP, Inc. | Los Angeles, CA | Insured put Styrofoam cover over a vault opening. Claimant stepped on Styrofoam and fell into hole | JWP West | Insured put boards over Styrofoam, and someone removed boards. | It appears that the insured was still working at the scene on an ongoing basis when the accident occurred. This is probably an operations in progress claim. | | OP |
| 1/11/1992 | Newman v. Schwendener, et al. | Wheaton, IL | Insured failure to comply with Structural Work Act caused plaintiff to be injured. Claimant was making a delivery at the job site and stepped in 6 inch hole causing claimant to slip and fall and be injured. | JWP, Inc. | Adjuster report indicates insured was in charge of lighting. No previous complaints in file with respect to lighting. | EMC 022653 - Insured was in charge of lighting but no evidence in file that insured was performing any operation at the scene of loss when accident occurred. EMC 022600 - Adjuster notes - insured in charge of lighting but no allegations that anything was wrong with lighting - also no information that insured was working on lighting at the time of accident. | | CO |
| 1/26/1992 | Caspe v. The City of New York, et al. | New York, NY | Claimant was bitten by a dog that allegedly came in contact with an electrical hazard created by Welsbach | Welsbach | Insured was not under contract with the City of New York at this time. | EMC 018126 - Welsbach not under contract with the City at d/o/l. Contract was held by co-defendant Petrocelli. No indication that Petrocelli had worked at the scene. | | CO |

| Date of Loss | Lawsuit or Claim Name | Loss Location | Description of Claim - Allegations Against Insured | Insured Name | Insured Involvement (based on file content/investigation) | Evidence Relied on in Determining How Claim Should Have Been Coded | Other Notes | How Claim Should have been Coded (CO - Completed Operations, OP - Operations in Progress) |
|---|---|---|---|---|---|---|---|---|
| 1/26/1992 | Dickstein v. Petrocelli Electric Co., et al. | New York, NY | Insured allegedly negligently maintained streetlight | Weisbach | City expired on 12/31/90 and insured not even under contract with City on date of loss. | Motion for Summary Judgment - Weisbach's contract with the City was not renewed. | | CO |
| 11/29/1992 | Allstate Ins. Co. a/s/o Levy v. City of New York | New York, NY | This is a subrogation claim for property damage. Insured allegedly put plate in road that claimant vehicle hit | Weisbach | No involvement from insured, defense counsel furnished affidavit that insured did not work at location. Permit issued to insured, annexed to third party complaint was for a different location. | EMC 004901 - Affidavit (not in file - but referred to in letter from defense counsel) that insured had not worked at location referred to in letter from defense counsel. | | CO |
| 12/11/1992 | Clerge v. JWP Weisbach Electric Corp., et al. | Brooklyn, NY | Claimant contends malfunctioning traffic light. | Weisbach | Insured received call at 7:13 p.m. that traffic signal was not functioning but when insured arrived at scene there was a pole down. | EMC 004953 Weisbach not working at the scene at the time of loss - 8:00 p.m. Intersection history report reflects that Weisbach had been at the scene and completed a repair on 11/17/92. | | CO |
| 12/26/1992 | Freda v. Weisbach Electric Company | Queens, NY | Intersection accident allegedly caused by insured's failure to maintain traffic signals | Weisbach | Insured received a call and failed to respond within 2 hours required in contract and accident occurred. | Weisbach was not working on traffic at time of accident. No evidence supplied to demonstrate that this was an operation in progress. Intersection history report reflects that Weisbach had been at the scene and completed a repair on 12/01/92 and Weisbach had been at the scene and completed repairs on five separate occasions in the two month period preceeding 12/01/92. | | CO |
| 12/30/1992 | Uvaydova & Estate of Rafael Iskhakov v. JWP Weisbach Electric Corp., et al. | Queens, NY | Traffic signal operated improperly causing vehicle to collide with and kill pedestrian. | JWP Weisbach, Inc. | No involvement of insured. Insured records reflect no work performed at, nor calls received regarding loss scene from October, 1992 through date of loss. No calls would have been received prior to October as this is when insured's contract with the City began. | Affidavit of Edward Streger - Review of insured's records reflect that insured had not received any reports of problems at intersection from the beginning of contract in October, 1992 until the date of the accident. | | CO |
| 4/1/1993 | Jordan v. The City of New York, et al. | New York, NY | Insured allegedly caused defect in roadway at intersection of Union Square Park and 15th Street | Weisbach | Insured had worked at intersection over a year prior to accident, but work performed had been at the opposite side of intersection from where the accident occurred. | EMC 017105 - 6/14/95 letter from defense counsel, London and Fisher. Weisbach's work records reflect that Weisbach had not been at the intersection for over a year before accident occurred. | | CO |

2