IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------------X
EMCOR GROUP, INC.                            :     Civil Action No.
                                             :     Docket 3:00-CV-2211 (AVC)
          Plaintiff,                         :
                                             :     Judge Alfred V. Covello
v.                                           :
                                             :
INSURANCE COMPANY OF                         :
NORTH AMERICA                                :
                                             :
          Defendant.                         :     November 15, 2004
                                             :
---------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

The Plaintiff EMCOR Group, Inc. ("EMCOR"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and L. Civ. R. 56, respectfully submits this Memorandum of Law in support of its Motion for Partial Summary Judgment as to liability.[1] EMCOR's motion seeks a determination and declaration that forty-seven (47) of the one-hundred ten (110) cases identified in the complaint as being misclassified as general liability claims contain a work history record evidencing a completed repair prior to the alleged accident, and thereby constitute "completed operations" claims pursuant to the insurance policies issued by the Defendant Insurance Company of North America ("INA") as a matter of law.

---

[1] The instant action has been bifurcated into liability and damages phases. See order of the Honorable Judge Alfred V. Covello dated 12/16/03. Thus, this Motion relates to the liability phase only.

I. **FACTUAL BACKGROUND**

   A. *EMCOR's Insurance Program*

EMCOR is a large mechanical and electrical construction and facilities services firm with many wholly owned subsidiaries operating nationally and internationally. (See Affid. of Susan J. Reinhard, ¶ 5). EMCOR's principal place of business is located in Norwalk, Connecticut. (See Affid. of Susan J. Reinhard, ¶ 4). Between October 1, 1992 and October 1, 1995, the defendant Insurance Company of North America ("INA") issued three separate general liability insurance policies to JWP, Inc., the corporate predecessor to EMCOR. (See Affid. of Susan J. Reinhard, ¶ 7). Each of the three insurance policies issued by INA to EMCOR during this period contains separate aggregate limits for general liability claims and products-completed operations claims. (See Affid. of Susan J. Reinhard, ¶ 8). EMCOR specifically purchased insurance policies from INA which contained separate aggregate limits for general liability claims and completed operations claims because the nature of its work exposed it to these various types of claims. (See Affid. of Rex Thrasher, ¶ 9). The three insurance policies issued by INA are summarized as follows:

| Policy Number | Policy Period | General Liability Aggregate Limits | Products/ Completed Operations Aggregate Limits |
|---|---|---|---|
| HD0 G1 403379-8 | 10/1/92 - 10/1/93 | $2,000,000.00 | $3,000,000.00 |
| HD0 G1 658518-A | 10/1/93 - 10/1/94 | $2,000,000.00 | $3,000,000.00 |
| HD0 G1 658789-8 | 10/1/94 - 10/1/95 | $2,000,000.00 | $3,000,000.00 |

(See Affid. of Susan J. Reinhard, Exhibits 1-3, hereinafter the "INA Policies").

Subsequent to the issuance of the INA Policies, the parties entered into an agreement known by the parties as the "Finite Agreement" which further defined the rights and obligations of the parties with respect to the administration and payment of

2

claims. (See Affid. of Rex Thrasher, ¶ 5). The purpose of the Finite Agreement was to transfer risk from EMCOR to INA. (See Affid. of Rex Thrasher, ¶ 6). Specifically, pursuant to the Finite Agreement, EMCOR paid INA $22,500,000.00 as an advance payment of its obligations under the INA Policies. (See Affid. of Rex Thrasher, ¶ 7). In exchange for this lump sum payment, INA agreed to relieve EMCOR of its obligation to pay defense and indemnity (within the deductible amount) for both general liability claims and completed operations claims occurring between October 1, 1992 and October 1, 1995. (See Affid. of Rex Thrasher, ¶ 8). As a result of this risk transfer, INA is responsible for the payment of all defense fees and indemnity payments on all general liability claims and completed operations claims against EMCOR and its subsidiaries occurring between October 1, 1992 and October 1, 1995 until either: (1) the aggregate limits of one or all of the policies are exhausted; or (2) INA has paid out $32,500,000.00. (See Affid. of Rex Thrasher, ¶ 10). The Finite Agreement is an amendment to the Casualty Insurance Program Agreement which also incorporates the INA Policies. (See Affid. of Rex Thrasher, ¶ ¶13 & 14). Further, the parties agreed specifically that the Casualty Insurance Program Agreement would be governed by and construed in accordance with Pennsylvania law. (See Affid. of Rex Thrasher, ¶ 15).

  **B.** **_The Underlying Bodily Injury Actions_**

The 110 underlying actions, as alleged in the complaint, comprise a mix of traffic accident, slip and fall, and personal injury claims in which the plaintiffs allege bodily injury as a result of alleged negligent conduct by various EMCOR subsidiaries. (See Affid. of Susan J. Reinhard, Exhibits 6.1 - 6.47). The overwhelming majority of these claims involve EMCOR's wholly owned indirect subsidiary, Welsbach Electric

Corporation ("Welsbach"). Welsbach is a company that contracts with municipalities in and around the New York area to install, maintain, and repair all traffic signals, street lights, and pedestrian walk signals within the municipality for a specified time period. (See Affid. of Susan J. Reinhard, ¶ 18). A typical Welsbach contract provides that:

> "[t]his project is for the maintenance in good condition and proper working order . . . of all illuminated traffic control devices whose maintenance is a responsibility of the Bureau of Traffic Operations together with their foundations, post, supports, cable wiring, conduit, controllers, detectors, sensors, relays and all other associated equipment and specified signs. . . . "

(See Affid. of Susan J. Reinhard, Exhibit 4). Upon notification of an inoperative traffic signal or other light, Welsbach is required to respond to the malfunctioning traffic signal or other device, determine the malfunction, execute a repair, and return the traffic signal or other device to working order. (See Affid. of Susan J. Reinhard, ¶ 19). In the typical Welsbach claim, a plaintiff alleges bodily injury as a result of a defective traffic signal or other device installed, maintained, controlled and/or repaired by Welsbach.

### C.    *Background of the Present Action*

In the present action, EMCOR alleges that INA misclassified 110 underlying actions as general liability claims rather than completed operations claims pursuant to the definition in the INA Policies. (See Third Amended Complaint, ¶ 13). The proper classification of the underlying claims is critical to EMCOR's insurance coverage because the INA Policies contain separate aggregate limits for general liability claims and completed operations claims. (See Affid. of Susan J. Reinhard, ¶ 8). The misclassification of the 110 underlying actions caused the general liability aggregate limits for each of the INA Policies to exhaust prematurely, thereby requiring EMCOR to

commence paying defense and indemnity on all post-exhaustion general liability claims earlier than it should have. (See Third Amended Complaint, ¶ 15).

For purposes of the instant motion, EMCOR seeks partial summary judgment adjudicating that 47 of the 110 underlying actions constitute completed operations claims pursuant to the INA Policies as a matter of law. Each of these 47 claims comprises an identical fact pattern: Plaintiff alleges bodily injury as a result of a malfunctioning traffic signal, Welsbach's business records establish that a repair was completed on the affected traffic signal prior to the date of the accident, and the Welsbach personnel had left the scene prior to the accident (the "Welsbach Claims"). Based on the definition of products-completed operations hazard in the INA Policies, each of the 47 Welsbach Claims constitutes a completed operations claim and should have been classified accordingly.[2]

## II. LEGAL STANDARD

### A. *Summary Judgment*

"A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law." *Russell v. Eldridge*, 932 F.Supp.535, 537 (D.Conn. 1993) *citing Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "In a motion for summary judgment, the moving party must initially demonstrate that there are no material facts in dispute and '[a]ll reasonable inferences and any ambiguities are

---

[2] It should be noted that INA's own expert, Alfred J. Bodi, determined that the following seven claims, which are included in this Motion for Partial Summary Judgment, are products-completed operations claims:
1. Abramowitz
2. Garcia
3. Hendrickson
4. Jenkins
5. Palotsi & Pogorelsky
6. Pineda
7. Wright

5

drawn in favor of the non-moving party.'" *United Technologies Corp. v. American Home Assurance Company*, 989 F.Supp. 128, 134 (D.Conn. 1997) *citing Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990). Once the moving party has met its burden, the non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986). "A party opposing a properly supported motion for summary judgment may not rest upon the mere allegation or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B.   Choice of Law

A federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Mentor Ins. Co., Ltd. V. Brannkasse*, 996 F.2d 506, 513 (2d Cir. 1993). Accordingly, Connecticut's choice of law principles must be applied in this case.

"Connecticut law gives effect to an express choice of law by the parties to a contract provided that it was made in good faith." *A.B. Realty Corp. v. Metropolitan Life Insurance Co.*, 164 F.Supp.2d 296, 303 (D.Conn. 2001) *citing Elgar v. Elgar*, 238 Conn. 839, 845, 679 A.2d 937 (1996). "A contractual choice of law provision is enforceable under Connecticut's choice of law rules where (1) the state of the chosen law has a substantial connection to the parties or the transaction, and (2) application of the chosen state law would not be contrary to a fundamental policy of a state with a

materially greater interest in the transaction." *Elgar v. Elgar*, 238 Conn. 839, 850, 679 A.2d 937 (1996).[3]

### The Law of Pennsylvania, INA's Home State, Governs This Dispute

The Finite Agreement, which delineates the respective rights and obligations between EMCOR and INA in connection with the administration and payment of claims under the INA Policies, is an amendment to a separate agreement between the same parties known as the Casualty Insurance Program Agreement ("CIPA"). The CIPA broadly defines the insurance relationship between EMCOR and INA, and incorporates by reference the INA Policies. Pursuant to the express terms of the CIPA, EMCOR and INA agreed that Pennsylvania law would govern any dispute between them arising out of the CIPA. Specifically, section 7.04 A of the CIPA provides as follows:

> Except to the extent provided by §6.01, this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

The application of Pennsylvania law to this dispute satisfies the requirements of §187 of the Restatement Second. First, Pennsylvania law has a substantial connection to the parties involved as INA is incorporated in, and has its principal place of business in Pennsylvania. In addition, from 1996 through May, 1999, INA made payments in connection with the claims arising under the INA Policies to the third party administrator,

---

[3] Section 187 of the Restatement (Second) of Conflict of Laws (1971), provides in relevant part: "Law of the State Chosen by the Parties . . . (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either (a) the chosen state has no substantial relationship to the parities or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

ESIS, Inc. in Philadelphia, Pennsylvania. Similarly, EMCOR forwarded claim payments under the INA Policies to Philadelphia, Pennsylvania between 1997 and May, 1999.

Second, there is no state with a materially greater interest in this insurance coverage dispute than Pennsylvania. EMCOR is a holding company with many subsidiaries operating nationally. Accordingly, EMCOR's risks insured under the INA Policies can, and do, occur literally anywhere in the United States. Thus, there is no one state with a materially greater interest in this insurance dispute than Pennsylvania, INA's home state. Certainly, INA is not prejudiced by having its own state's law applied to this dispute with EMCOR.

## III. LEGAL ARGUMENT

### A. *Interpreting the INA Policies is a Question of Law to be Determined by the Court*

The principles governing the interpretation of an insurance contract in Pennsylvania are well established. *General Star National Insurance Co. v. Paley*, 1993 WL 89759 at *3 (E.D.Pa. 1993). "Interpretation of an insurance contract presents an issue of law for the court to decide." *State Automobile Insurance Association v. Young Men's Republican Club of Allegheny County, Inc.*, 663 F.Supp. 1077, 1081 (W.D.Penn. 1987) *citing Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 304, 469 A.2d 563, 566 (1983); *Vlastos v. Sumitomo Marine & Fire Insurance Co.*, 707 F.2d 775, 778 (3d Cir. 1983). The Pennsylvania Supreme Court has articulated the general principles for interpreting insurance polices under Pennsylvania law:

> The principles governing our interpretation of a contract of insurance are familiar and well settled. The task of interpreting a contract is generally performed by a court rather than by a jury. The goal of that task is . . . to ascertain the intent of the parties as manifested by the language of the

> written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

*Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983).

"When interpreting an insurance contract, 'the court must ascertain the intent of the parties as manifested by the language of the policy.'" *West American Insurance Co. v. Lindepuu*, 128 F.Supp.2d 220, 226 (E.D.Pa. 2000) *citing Visiting Nurse Assoc. of Greater Philadelphia v. St. Paul Fire & Marine Insurance Co.*, 65 F.3d 1097, 1100 (3d Cir. 1995). The terms of an insurance policy must be interpreted according to their plain meaning. *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir. 1991). Moreover, the court must not read ambiguity into an insurance policy where it does not exist but, instead, must review the policy keeping the intent of the parties in mind. *See West American Insurance Co.*, 128 F.Supp.2d at 226.

At issue, for purposes of this summary judgment motion, is the definition of the "completed operations hazard" under the INA Policies. When negotiating the implementation of these policies, INA was well aware of the nature of EMCOR's business. EMCOR is a holding company with many subsidiaries, all of whom are covered as insureds under the INA Policies. The work of one of EMCOR's subsidiaries, Welsbach, consists almost exclusively of completed operations type work. Its job is to service and maintain traffic signals, street lights and pedestrian walk signals in and around the New York area. INA was aware at the outset of its relationship with Welsbach that the majority of its work would involve completed operations. In addition,

INA was aware that the INA Policies issued to Welsbach provided separate aggregate limits for general liability claims and completed operations claims. Thus, Welsbach must not be deprived of the full value of its insurance, including completed operations coverage, purchased from INA.

### B. Any Ambiguities in Policy Language Must be Strictly Construed Against INA

"The determination of whether contract language is ambiguous is also a question of law." *Asplundh Tree Expert Company v. Pacific Employers Insurance Company*, 1992 WL 382373 at *11 (E.D.Pa. 1992). "A determination that any particular policy provision is ambiguous lies within the judge's province." *General Star National Insurance Co.*, 1993 WL 89759 at *3. "Insurance policies must be construed in a manner which is more favorable to coverage." *West American Ins. Co.*, 128 F.Supp.2d at 227. "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Marine Office of America Corporation v. Quarry Associates, Inc.*, 963 F.Supp. 1392 1395 (E.D.Penn. 1997).

In the case at bar, the definition of "products-completed operations" hazard is clear and unambiguous. However, if this Court determines that said language is ambiguous as applied to any of the 47 Welsbach Claims, then this Court must construe that ambiguity against INA and in favor of EMCOR.

### C. The 47 Welsbach Claims which are the Subject of this Motion Constitute Completed Operations Claims Under the INA Policies

Products-completed operations coverage is designed to protect those companies who are in the business of providing services outside of places they own or rent.

"Completed operations coverage is a service company's equivalent of product hazard coverage. Companies in the business of providing services or performing contracts at premises other than their own, e.g. construction contractors or repair services, purchase such coverage to insure against liability arising from the services they perform for their customers." *Federal Kemper Insurance Co. v. Jones*, 777 F.Supp. 405, 412 (U.S.D.Ct. Pa. 1991) *citing United States Fidelity and Guaranty Company v. Greater Essex Security, Inc.*, 248 N.J.Super. 105, 590 A.2d 262, 266-67 (1991) and *Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 764 (3d Cir. 1985). "The completed operations hazard provision provides coverage for businesses that perform services or maintenance . . . ." *Nautilus Insurance Company v. Don's Guns & Galleries, Inc.*, 2000 WL 34251061 at * 4 (S.D.Ind). Moreover, ". . . in important respects, completed work coverage provides broader coverage than ongoing operations coverage." *AIU Insurance Company v. St. Paul Fire and Marine Insurance Company*, 2004 WL 1234128 at *5 (C.D.Cal). In addition, the *AIU* Court held "[s]ince completed work coverage operates as a coverage provision, it must be interpreted broadly to protect the insured's reasonable expectations . . . ." *Id.* at *6. Welsbach is the quintessential embodiment of both the purpose and the need for which completed operations coverage was created.

EMCOR purchased products-completed operations coverage from INA knowing that, as a services company, it had significant exposure for liability resulting from off-site claims. (See Affidavit of Rex Thrasher, ¶ 10). As further evidence of the extent of EMCOR's need for products-completed operations coverage, EMCOR purchased a higher aggregate limit for its product-completed operations coverage ($3,000,000.00) than for its general liability coverage ($2,000,000.00). (See Affid. of Susan J. Reinhard,

11

¶ ¶ 9 & 10). Similarly, INA underwrote EMCOR's risk as a services company with completed operations exposure in connection with its sale of the INA Policies.

The INA Policies define "products-completed operations hazard" as follows:

    a.    "Products-completed operations hazard" includes *all* "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
        (1)    Products that are still in your physical possession; or
        (2)    Work that has not yet been completed or abandoned.
    b.    "Your work" will be deemed completed at the earliest of the following times:
        (1)    When all of the work called for in your contract has been completed.
        (2)    When all of the work to be done at the site has been completed if your contract calls for work at more than one site.
        (3)    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    c.    This hazard does not include "bodily injury" or "property damage" arising out of:
        (1)    The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by "loading or unloading" of it;
        (2)    The existence of tools, uninstalled equipment or abandoned or unused materials;
        (3)    Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations. (emphasis added).

(See Affid. of Susan J. Reinhard, ¶ 11). As applied to the 47 Welsbach Claims, a "completed operations" claim has 3 essential elements: 1. the bodily injury must

occur away from Welsbach's premises; 2. the bodily injury liability must arise out of Welsbach's "work"; and 3. Welsbach's "work" must have been "completed" prior to the accident.[4] For purposes of the 47 Welsbach Claims, Welsbach's "work" is deemed completed at the earlier of a) when Welsbach's work to be done at a particular traffic signal has been completed; or b) when Welsbach's work on a particular traffic signal has been put to its intended use by any person other than another contractor working on the same traffic signal. As long as Welsbach was not in the process of making a repair at the time of the accident, the completed operations coverage is triggered. There is no genuine issue of any material fact regarding the elements necessary to establish a completed operations claim as applied to the 47 Welsbach Claims. Each of these cases constitutes a completed operations claim as a matter of law.

    **i.    Each of the 47 Welsbach Claims involves bodily injury which occurred away from premises owned or rented by Welsbach.**

The first prong of the products-completed operations hazard is that the "bodily injury" occur away from premises owned or rented by the insured. Welsbach is a service company that contracts with various municipalities in the New York area to install, maintain and repair all traffic signals, streetlights and pedestrian signals within that designated area. (See Affid. of Susan J. Reinhard, ¶ 18). By the very nature of its work, Welsbach is performing services away from any premises owned or rented by Welsbach as the premises are owned by the relevant municipality. Upon notification, Welsbach reports to a specified traffic signal, streetlight, or pedestrian signal and

---

[4] It should be noted that the analysis herein of "completed operations" is not exhaustive; rather, it is based on the 47 cases submitted with this Motion. EMCOR's additional 63 cases which are not included herein contain different fact patterns, but also meet the definition of "completed operations" in the INA Policies.

conducts a repair. Upon completion of its work, Welsbach returns the light to its intended use. Each of the underlying 47 Welsbach Claims involved a traffic accident at an intersection involving a traffic signal where Welsbach had completed a repair prior to the occurrence of the accident. In each of these accidents, the plaintiffs alleged bodily injury as a result of Welsbach's work. As such, each of these 47 claims satisfies the first prong of the products-completed operations hazard; namely bodily injury occurring away from premises owned or rented by Welsbach.

      ii.    **The bodily injury alleged in each of the 47 Welsbach Claims arises out of Welsbach's work.**

The second prong of the products-completed operations hazard requires that liability for the "bodily injury" arise out of the insured's work. The phrase "arising out of" as used in the context of general liability insurance policies has consistently been interpreted broadly. It is well settled that "arising out of" does not require any particular causal connection between Welsbach's work and the resulting bodily injury - rather, it requires merely that the subsequent bodily injury flow from or originate in some minimally connected fashion to Welsbach's work. In addition, the minimal causal connection necessary between Welsbach's work and the accident giving rise to liability does not depend on Welsbach's fault. *See Acceptance Ins. Co. v. Syufy Enterprises*, 69 Cal. App. 4th 321, 329 (1999), citing *Casualty Ins. Co. v. Northbrook Property*, 150 Ill App. 3d 472 (1986). Finally, "[b]ecause 'arising out of' is a clause that limits coverage, it must be construed stringently against the insurer." *Old Republic Insurance Company v. Lumbermens Mutual Casualty Company*, 2004 WL 764817 at * 6 (E.D.Pa.).

In *Vitton Construction Co. v. Pacific Insurance Co.*, 110 Cal.App.4th 762 (2003), the California Appellate Court provided a thorough and well reasoned analysis of

"arising out of" and its relationship to insurance policy interpretation. In <u>Vitton</u>, a general contractor and its excess insurance carrier sued a subcontractor's insurer on the grounds that the general contractor was covered as an additional insured under the subcontractor's umbrella policy. In upholding coverage for the general contractor as an additional insured, the court reasoned as follows:

> California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." *Citing Acceptance Ins. Co. v. Syufy Enterprises*, 69 Cal.App.4th 321 (1999) (internal quotations omitted). Further, "the words are generally given their 'commonsense meaning' which has been 'understood to mean 'originating from' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to or having connection with . . . .'" Internal quotations omitted. *Citing Fibreboard Corp. v. Hartford Accident & Indemnity Co.*, 16 Cal.App.4th 492, 503 (1999) and *Continental Cas. Co. v. City of Richmond*, 763 F.2d 1076, 1080 (9th Cir. 1985).

*Vitton Construction Co.*, 110 Cal.App.4th at 766 (2003); *See also Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Insurance Company*, 220 F.3d 1, 7 (1st Cir. 2000); *Vitty v. D.C.P. Corp.*, 633 A.2d 1040, 1043 (N.J. App. Div. 1993); *Red Ball Motor Freight, Inc. v. Employers Mutual Liability Insurance Co. of Wisconsin*, 189 F.2d 374, 378 (U.S.Ct.App. 5th Cir. 1951); *Continental Casualty Company v. City of Richmond*, 763 F.2d 1076, 1080 (U.S.Ct.App. 9th Cir. 1985); and *Underwriters at Lloyd's of London v. Cordova Airlines, Inc.*, 283 F.2d 659, 664-65 (9th Cir. 1960).

Similarly, the California Appellate Court in *Syufy*, 69 Cal.App.4th 321, adopted a broad interpretation of "arising out of" in the context of a commercial general liability

insurance policy. In *Syufy*, an electrical contractor was performing work on a theater. *Id.* at 324. One of the contractor's employees was injured while climbing through a roof hatch owned and maintained by the theater. *Id.* Utilizing the "common-sense approach", the court required merely that the relationship between the injury and the work be incidental in order to satisfy the policy language. *Id.* at 328. Thus, the employee's injury clearly "arose out of" the work he was performing since he could not have done the work without passing through the hatch. *Id.* See also *Mid-Century Insurance Company of Texas v. Lindsey*, 997 S.W.2d 153 (Texas 1999) (gun in parked truck sufficiently connected with injury from gun that injury "arose out of" the use of the truck); and *Township of Springfield v. Ersek*, 660 A.2d 672, 676 PA 1995) (Pennsylvania court interpreted "arising out of" as causally connected with, not proximately caused by).

In the present case, the term "arising out of" as found in the completed operations definition of the INA Policies must be afforded its common sense meaning. "Arising out of" does not require that Welsbach's work be the direct cause of any resulting bodily injury. There is no such causal requirement in the policies. Rather, all that is required is that there be some minimal causal connection between Welsbach's work and the subsequent alleged bodily injury. In each of the cases at issue here, Welsbach has made a repair and returned the traffic signal to its intended use; subsequently, an accident has occurred resulting in bodily injury and Welsbach has been sued. The relationship between Welsbach's work and the plaintiff's alleged bodily injury is certainly more than incidental. Accordingly, under the definition of completed operations in the INA Policies and the broad interpretation required, the bodily injury

alleged in each of the Welsbach Claims arises out of Welsbach's work as a matter of law.

### iii. In each of the 47 Welsbach Claims, Welsbach had completed its work prior to the accident.

The third and final prong of the products-completed operations hazard requires that the "work" or repairs be "completed" or abandoned before the accident resulting in bodily injury occurs. "Completion" occurs at the earliest of the following times: (1) when all of the work called for in the contract has been completed; (2) when all of the work to be done at the site has been completed if the contract calls for work at more than one site; or (3) when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project. Applying this language to the Welsbach Claims, each traffic signal repair constitutes a separate site since the typical Welsbach contract requires that Welsbach maintain and repair all traffic signals within the municipality.

In each of the underlying cases, Welsbach had completed its repair of the traffic signal and returned the signal to its intended use prior to the accident. Therefore, Welsbach's "work" must be deemed to be completed pursuant to the express terms of the products-completed operations hazard definition.[5]

## IV. CONCLUSION

In each of the 47 Welsbach Claims, the evidence submitted herewith establishes conclusively that the alleged bodily injury has occurred away from Welsbach's

---

[5] Even temporary repairs can constitute "completed operations" pursuant to the policy definition. For example, the language specifies that "work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." Thus, even if Welsbach is required to return to the traffic signal site for further service or repair, as long as the signal had been returned to its intended use and Welsbach had left the scene prior to the accident, the claim constitutes a completed operation as a matter of law.

premises, has arisen out of Welsbach's "work", and Welsbach's "work" had been completed and the traffic signal returned to its intended use prior to the accident. There is a complete absence of any genuine issue as to any material fact regarding the elements necessary to establish coverage under the completed operations hazard of the INA Policies. Accordingly, partial summary judgment should enter in favor of EMCOR as a matter of law.

                                              THE PLAINTIFF,
                                              EMCOR Group, Inc.

By: _____
Jeffrey J. Vita, Esq.
Fed. Bar No. ct08036
Heidi H. Zapp, Esq.
Fed. Bar No. ct24655
Saxe Doernberger & Vita, P.C.
1952 Whitney Avenue
Hamden, CT 06517
(203) 287-8890

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------------X
EMCOR GROUP, INC.                         :    Civil Action No.
                                          :    Docket 3:00-CV-2211 (AVC)
              Plaintiff,                  :
                                          :    Judge Alfred V. Covello
v.                                        :
                                          :
INSURANCE COMPANY OF                      :
NORTH AMERICA                             :
                                          :
              Defendant.                  :    November 15, 2004
                                          :
---------------------------------------------------------------X

## CERTIFICATION

This is to certify that the foregoing was mailed, postage prepaid, on this the 15th day of November, 2004 to the following counsel of record:


Thomas Leghorn, Esq. (ct22106)
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY  10601
(914) 323-7000

Duncan B. Hume, Esq. (ct05581)
Hume & Associates
One Landmark Square
Stamford, CT 06901
(203) 348-7252

                                    _____
                                    Jeffrey J. Vita, Esq.
                                    Heidi H. Zapp, Esq.

19