IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------------X
EMCOR GROUP, INC.                    :    Civil Action No.
                                     :    Docket 3:00-CV-2211 (AVC)
            Plaintiff,               :
                                     :    Judge Alfred V. Covello
v.                                   :
                                     :
INSURANCE COMPANY                    :
OF NORTH AMERICA                     :
                                     :
            Defendant.               :    November 23, 2004
                                     :
--------------------------------------------------------- --X

## PLAINTIFF'S OPPOSITION TO INA'S MOTION TO STRIKE
## SUPPLEMENTAL REPORT OF EMCOR'S EXPERT WITNESS

The plaintiff EMCOR Group, Inc. ("EMCOR") hereby opposes the defendant Insurance Company of North America's ("INA") Motion to Strike the supplemental report of EMCOR's expert William C. Stewart. The supplemental report was disclosed to INA on or about October 1, 2004.[1] EMCOR opposes INA's Motion to Strike on the grounds that the supplemental report neither surprised nor prejudiced INA as the supplemental report did not alter or in any way change the substance or conclusions contained in Mr. Stewart's prior report, but merely expanded the information reviewed.

I.  **FACTS AND PROCEDURAL HISTORY**

EMCOR filed suit against INA in October of 2000 as a result of, among other things, INA's misclassification of one-hundred six (106) claims as general liability claims instead of products-completed operations claims, thereby

---

[1] Although the supplemental report was disclosed on October 1, 2004, the new intersection histories and four (4) additional claim files were provided to INA previously, on or about July 14, 2004.

prematurely exhausting EMCOR's general liability aggregate limits. A scheduling order was then entered by this Court. Subsequent to that filing, EMCOR and INA agreed to several extensions with respect to certain discovery deadlines contained therein. On September 30, 2002, EMCOR properly disclosed its expert witness, William C. Stewart. In conjunction with that disclosure, INA was supplied with Mr. Stewart's report and curriculum vitae in compliance with Fed. R. Civ. P. 26(a)(2).[2]

Following the discovery cutoff of November 30, 2003 and the depositions of each party's liability expert less than one year ago, EMCOR discovered a) additional intersection histories for several of the original 106 claims; and b) four (4) additional claims that were misclassified as general liability claims by INA. The additional intersection histories provided to INA and incorporated in Mr. Stewart's supplemental expert report in no way prejudice INA as they are similar to the many other intersection histories previously provided to INA. Further, the 4 additional misclassified claims consist of the same characteristics as many of the 106 original misclassified claims. Therefore, Mr. Stewart's supplemental expert report should not be stricken as it merely updates his initial report, and in no way alters or changes his initial conclusions and analysis. Instead, Mr. Stewart's supplemental expert provides INA with a complete report as required by Fed. R. Civ. P. 26(e). In all other respects the supplemental report is identical to the initial expert report.

---

[2] The current procedural posture of this case is that both parties recently filed motions for partial summary judgment and the briefing schedule related to said motions will be completed by December 20, 2004. Trial is expected in early 2005 but a trial date has not yet been set.

II. **ARGUMENT**

   A. **EMCOR'S DISCLOSURE OF STEWART'S SUPPLEMENTAL REPORT IS NOT PREJUDICIAL TO INA AS IT DOES NOT ALTER STEWART'S OPINIONS REGARDING THE UNDERLYING CLAIMS IN ANY MANNER BUT MERELY INCLUDES ADDITIONAL DOCUMENTS NECESSARY TO PROVIDE INA WITH A COMPLETE AND ACCURATE REPORT.**

EMCOR filed Mr. Stewart's original expert report on September 30, 2002 in accordance with the Scheduling Order. Since that date, further supporting evidence has been brought to EMCOR's attention. EMCOR immediately forwarded said information to Mr. Stewart for review and contemporaneously sent it to INA as part of its continuing duty of disclosure pursuant to Fed. R. Civ. P. 26(e). Despite INA's assertions to the contrary, the information included in the supplemental report does not alter Mr. Stewart's prior conclusions regarding the proper coding of the underlying claims; he merely incorporates further evidence that could be relied upon as additional support for his conclusions. As found in *McEachron v. Glans*, 1999 WL 33597331 at *2 (N.D.N.Y.), "[a]n expert witness may properly supplement a report 'to include information thereafter acquired . . ." *Citing* Fed.R.Civ.P. 26(e)(1).

INA relies heavily and inappropriately on *Wechsler v. Hunt Health System*, 2003 WL 22358807 (S.D.N.Y.) to argue that Mr. Stewart's supplemental report is somehow improper or prejudicial. INA cites to *Wechsler* allegedly for its decision to strike an expert's supplemental report. INA fails to mention that only portions of the expert's supplemental report were stricken as they "altered a formerly complete analysis, and not on the basis of any information acquired after Prague [the expert] submitted his original report." *Id.* at *15. The *Wechsler* Court held

that "Rule 26(e) of the Federal Rules of Civil Procedure requires a party to 'supplement or correct an expert report to include information thereafter acquired if ordered by the court or . . . if the party learns that in some material respect the information disclosed is incomplete or incorrect." *Id*. at *14. While the court did strike several portions of the supplemental report, it did so on the basis that the analysis and justifications were altered thereby causing prejudice to the defendants. However, the court did not strike the portion of the expert's supplemental report which added new documents. In fact, the court held "[t]hese are not new documents and defendants were on notice before receiving the supplemental report that Prague relied on such documents. Prague merely corrected an omission in his original report by adding them in his supplemental report, precisely as Rule 26(e) requires." *Id*. at *16.

Mr. Stewart's supplemental report in the present case is readily distinguishable from the supplemental report in *Wechsler*. The new information contained in Mr. Stewart's supplemental report altered neither the analysis nor conclusions contained in his original report. Rather, the new information merely provided additional support for the prior analysis and conclusions. Like the report in *Wechsler*, Mr. Stewart's report was supplemented by additional information, i.e. intersection histories, discovered by EMCOR. INA has been well aware for years that intersection histories were relevant to this case as it has received such histories from EMCOR on a majority of the underlying claims (particularly the Welsbach claims). As the additional intersection histories were relevant to

4

several of the 106 claims, EMCOR and Mr. Stewart were required to supplement the expert report to correct an omission in his original report.

Similarly, the other cases cited by INA in its Motion to Strike are easily distinguishable from the case at hand. Strangely, INA cites to *Williams v. Monarch Mach. Tool Co.*, 26 F.3d 228, 229-30 (1st Cir. 1994), as support for its argument to strike the supplemental report. *Williams* involves the untimely disclosure of an entirely new expert with new theories one month prior to trial. Despite this untimely disclosure, the trial court allowed the testimony of the new expert which was upheld on appeal. Presently, EMCOR is not seeking to add a new expert or to alter the existing reasoning or opinions of its expert; rather it merely offers additional intersection histories. INA also relies on *Keener v. United States*, 181 F.R.D. 639, 639 (D.Mont. 1998). In *Keener*, the defendant's supplemental expert report included new theories based upon the review of other experts and therapists and was disallowed. *Id* at 639. The *Keener* court held that "[s]upplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Id*. at 640. As stated above, Mr. Stewart's supplemental report does not contain any new theories or analysis. The reasoning adopted in both Williams and Keener undermines INA's argument.

Likewise, in *Bard v. Board of Education of the City of New York*, 2002 WL 188471 (S.D.N.Y. Feb. 2002), the court refused to allow the plaintiff to file an expert report as the deadline for expert disclosure had passed. The important distinction here is that in *Bard*, the plaintiff never filed an initial expert disclosure

or report. The reasoning of *Bard* actually supports rather than undermines Mr. Stewart's supplemental report. *Bard* further states ". . . disclosures made in the course of expert discovery must be supplemented or corrected where a party later realizes that those expert disclosures were materially incomplete or incorrect." *Id.* at *12. Finally, *Akeva, L.L.C. v. Mizuno Corporation*, 212 F.R.D. 306, (M.D.N.C. 2002) is distinguishable from the facts of the case at bar. In *Akeva*, the plaintiff attempted to submit a second report which deviated from the initial report wherein the expert had conducted an additional test and varied his opinion accordingly. *Id.* at 308. The court held "Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete, and, therefore, misleading." *Id.* In the present case, the additional intersection histories made the initial report regarding the underlying claims incomplete and therefore misleading. As the intersection histories were documents that were included where available in the initial report, the discovery of additional intersection histories subsequent to that disclosure demands that they be produced.

**B.   THE FORMAT AND CONTENT OF THE NEW INTERSECTION HISTORIES IS IDENTICAL TO THOSE PREVIOUSLY PRODUCED TO INA AND THEREFORE NO FURTHER DISCOVERY IS NECESSARY.**

INA complains that the allowance of Mr. Stewart's supplemental report will prejudice it as no further discovery may take place. (*See* INA Motion to Strike, p. 6). The additional intersection histories supplied to INA do not require such discovery. They were supplied to INA as additional support for Mr. Stewart's opinion and to complete the underlying claim files. The additional intersection

histories in no way alter Mr. Stewart's opinions as to the proper classification of the underlying claims. Further, at the time of Mr. Stewart's deposition, INA already possessed dozens of similar intersection histories and had the opportunity to question Mr. Stewart about said documents but chose not to do so. Instead, INA's counsel posed numerous hypothetical situations regarding a variety of factual settings. (*See* deposition transcr. of Stewart, pp. 148-161, attached hereto as <u>Exhibit A</u>.). The new intersection histories do not deviate conceptually from the old intersection histories and would not have altered Mr. Stewart's deposition testimony.

### C. THE 4 ADDITIONAL WELSBACH CASES INCLUDED IN STEWART'S SUPPLEMENTAL REPORT ARE FACTUALLY SIMILAR TO ALL OTHER WELSBACH CASES

With respect to the 4 additional claims, each of EMCOR's complaints filed in this action included a list of claims that it deemed were misclassified. The complaints each state that the misclassified claims include, but are not limited to, those cases identified on <u>Exhibit A</u> of the complaint. Therefore, INA was cognizant from the outset of this litigation that the list attached to the complaint was not an exhaustive one. Moreover, there is nothing in these 4 Welsbach cases that is factually distinct from the dozens of Welsbach claims previously submitted.[3] INA's argument that all of this information was "within defense counsel's possession since before the inception of this litigation," and therefore EMCOR should be precluded from offering it now is misdirected. (*See* INA Motion to Strike, p. 5). Although some of the underlying factual information was

---

[3] Alternatively, if the Court determines that INA should have an opportunity to question Mr. Stewart about the 4 new cases, then the appropriate remedy is to allow a limited redeposition of Mr. Stewart, not to strike his supplemental report.

7

within the defense counsel's possession, this fact is irrelevant because EMCOR's underlying defense counsel was not hired to perform a coverage analysis of the proper classification of the claims. INA is attempting to thrust its obligations upon EMCOR. As EMCOR's insurer, it is INA's job to accurately classify each of the claims and accurately exhaust the aggregate limits. EMCOR is in the construction business, not the insurance business. For years EMCOR paid INA significant premiums and relied on INA's expertise to properly classify claims. Much to its dismay, EMCOR has learned that INA did not do the job for which it was paid. It is disingenuous for INA to argue that EMCOR cannot pursue a valid claim now because it had the opportunity previously to perform a painstaking coverage analysis of each and every claim but did not. The law determines if EMCOR is entitled to pursue a claim, not INA. Since these 4 new claims are factually similar to the other Welsbach claims, INA is not prejudiced by their inclusion in the supplemental report.

### III.  CONCLUSION

In light of the foregoing, EMCOR respectfully requests that the Court deny INA's Motion to Strike.

THE PLAINTIFF
EMCOR GROUP, INC.

By_____
Jeffrey J. Vita (Federal Bar # ct08036)
Heidi H. Zapp (Federal Bar # ct24655)
Saxe Doernberger & Vita, P.C.
Attorneys for the Plaintiff
EMCOR Group, Inc.
1952 Whitney Avenue
Hamden, Connecticut 06517
(203) 287-8890

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------------X
EMCOR GROUP, INC.                              :    Civil Action No.
                                                              Docket 3:00-CV-2211 (AVC)
            Plaintiff,                  :
                                                              Judge Alfred V. Covello
v.                                                        :

INSURANCE COMPANY                         :
OF NORTH AMERICA
                                                          :
            Defendant.                :    November 23, 2004
                                                          :
---------------------------------------------------------- --X


## CERTIFICATION

This is to certify that the foregoing Plaintiff's Opposition to INA's Motion to Strike Supplemental Expert Report was mailed, postage prepaid, on this the 23rd day of November, 2004 to the following:

Thomas Leghorn, Esq. (ct22106)
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10601
(914) 323-7000

Duncan B. Hume, Esq. (ct05581)
Hume & Associates
One Landmark Square
Stamford, CT 06901-2620
(203) 348-7252

_____
Jeffrey J. Vita, Esq.

Page 146

1  A  Yes.
2  Q  Finally, I show you Exhibit-17. Will
3  you tell me what that is?
4  A  That is a specimen copy of a
5  commercial general liabilities declaration page,
6  insurance policy declaration page with coverage
7  form CG0001, edition date of 10-93 attached to
8  it.
9  Q  What was the purpose of you obtaining
10 these documents?
11 A  That policy there?
12 Q  Yes, which is Exhibit-17.
13 A  I believe when I had my initial
14 conversation with Mr. Vita on these claims before
15 he shared any documentation with me I just pulled
16 that policy out of my office library just to
17 review it.
18 MR. OELSNER: Before we take a break, can I
19 see those last --
20 MR. VITA: You asked about the blue tabs,
21 blue stickies. I asked Mr. Stewart and he
22 didn't, he put the white and yellow.
23 MR. OELSNER: I'm color blind. I thought
24 they were blue. Why don't we just mark this
25 document.

Page 147

1      (Stewart-18, a two-page document, was
2      marked for identification)
3  Q  Mr. Stewart, I'm going to show you a
4  two-page document which is now Stewart-18 which
5  your counsel just provided, and the first page is
6  a white page that has Alden, A-L-D-E-N versus
7  Welsbach Electric Corp. and it has a little
8  sticky that says, "number 3."
9      The second page is another document, also
10 has, this document is bates numbered EMC 002421,
11 also has a little tab. It's a white or gray tab.
12     Is that a tab that you placed on this
13 document?
14 A  Yes, it is.
15 Q  There were other portions of your file
16 that had similar types of tabs, correct?
17 A  That's correct.
18 Q  My only question is: What is the
19 significance to you of the tabbed documents?
20 A  Well, the colored tabs, the yellow tab
21 indicates the file number in my chart that I
22 created so that I could find it again if I needed
23 to.
24     The white tab, in this case the bates number
25 on it for identification, shows the documents or

Page 148

1  one of the documents that I relied on in
2  determining whether it was a completed operations
3  claim or not.
4  Q  Is that document then referenced in
5  your opinion report?
6  A  Generally speaking, yes.
7  Q  So you tabbed, is it correct to say
8  you tabbed the document that you believe was most
9  important with respect to that particular claim
10 in evaluating the proper code?
11 A  Yes. At the time I was reviewing it,
12 yes.
13 MR. OELSNER: That's what I meant. We'll
14 take a couple minutes break.
15     (Recess observed.)
16 MR. OELSNER: Back on the record.
17 Q  Mr. Stewart, I'm going to give you a
18 fact pattern, and after I do that I would like
19 you to give me your opinion whether it's a
20 completed operations claim, general liability
21 claim or based upon the facts I gave you, you
22 can't tell one way or another.
23     We will first assume that the policy
24 involved is the same, has the same wording as the
25 general liability policy issued by EMCOR to INA,

Page 149

1  the three policies at issue in this case, okay?
2  A  Ahum.
3  Q  Welsbach is first notified of a
4  defective signal at the intersection after the
5  plaintiff's accident.
6      One of the signals was originally not
7  working at the time of the collision, the
8  repairman noted that this was a Con Edison, that
9  there was a Con Ed power failure in the area
10 causing the signal outage, the next day the
11 Welsbach repairman found an alternate source of
12 power and returned the power to the signal, and
13 Welsbach performed prior repairs to the signal in
14 question.
15     Prior repairs included a signal malfunction,
16 a broken external visor on the light, and an
17 improperly flashing walk, don't walk sign.
18     After each repair it functioned properly,
19 the repairs were completed five days before
20 plaintiff's accident, and that's the fact pattern
21 before you.
22     In your opinion is that a products completed
23 operations or general liability claim?
24 A  Products completed operations claim.
25 Q  And the basis for your opinion?

JEAN E. DOLAN AND ASSOCIATES                (Pages 146 to 149)

EXHIBIT A

Page 150

1  A   We had been there previous to the
2  scene and worked on it.
3  Q   Let me give you the next fact pattern.
4  Again, the policy at issue has the same wording
5  as the INA policies, okay?
6      Plaintiff drives through a flashing red
7  signal causing a collision with a car driving
8  perpendicular into the intersection.
9      Plaintiff claimed she stopped at the
10 intersection observing a flashing red light and
11 went through the intersection.
12     Three eye witnesses say the plaintiff went
13 through the intersection without stopping.
14 Plaintiff alleges Welsbach was negligent in the
15 ownership, operation, maintenance or control of
16 the roadway because of the flashing light.
17     It's Welsbach's position that it performed
18 work at the traffic signal in question an hour
19 prior to the accident. The condition that they
20 worked on was a flashing light and when Welsbach
21 completed the repair the light was working again.
22     However, within an hour later the flash mode
23 was on at the time of the accident.
24     Again, based upon those facts can you tell
25 me if you would classify the claim as general

Page 151

1  liability or completed operations?
2  A   Completed operations.
3  Q   And the reason?
4  A   We had been to the scene previous and
5  worked on it.
6  Q   Again, assuming the policy language is
7  the same as the INA policy at issue in this case,
8  if the allegations involved a defective traffic
9  light, and there had been a prior service call on
10 the light by Welsbach, is there ever a
11 circumstance that you can think of where a claim
12 arising from that traffic light would be a
13 general liability claim?
14 A   Not that I can think of.
15 Q   What about a situation where the;
16 again, the policy at issue is the same as INA's
17 policy here, the accident arises out of a
18 defective traffic light, Welsbach worked
19 previously on the traffic light but at the time
20 of the accident Welsbach was also working on the
21 traffic light, under that circumstance would it
22 be a general liability or completed operations
23 claim?
24 A   That's a rough one. In my opinion you
25 have both, potentially, and in that situation I

Page 152

1  believe you need to consult your insured on the
2  coding of it because you may affect the insurer's
3  policy limits, and must code it in a way that is
4  most favorable to your insured.
5  Q   Why do you believe under those factual
6  circumstances you must code it in a way most
7  favorable to the insured?
8  A   Because I think you have an obligation
9  where your policy may be considered ambiguous,
10 where it could potentially go either way, to
11 always interpret your policy in a way that's most
12 favorable to the insured.
13 Q   Are you stating that the definition of
14 a completed operations claim and general
15 liability policy is ambiguous?
16 A   No, I'm not saying that at all. What
17 you gave me as a fact pattern, a basis for a
18 completed operations claim because they had been
19 there before, but also stated there was an
20 ongoing operation in progress, so I saw elements
21 of both.
22 Q   Let me alter the fact pattern
23 slightly, and to the fact pattern, I'll have the
24 Court Reporter read it back if you don't remember
25 it, with respect to the policy there are separate

Page 153

1  aggregate limits for general liability and for
2  products completed operations, okay?
3  A   Correct.
4  Q   The limits are the same, assume
5  2,000,000 for one 2,000,000 for the other. We'll
6  also assume that the impairment on the aggregate,
7  whether general liability or completed operations
8  is exactly the same.
9      Under those circumstances would the claim
10 described in the prior question be a general
11 liability or completed operations claim?
12 A   I still feel it has the elements of
13 both, and I do think you need to involve the
14 insured in that.
15 Q   Why would you involve the insured on
16 that?
17 A   Because I believe in that particular
18 case where you have elements of both, you are
19 working on it but had been there before, and I
20 don't know without having the policy in front of
21 me exactly the verbiage in the policy on coding
22 that, I feel that since it makes no difference to
23 the carrier how the claim should be coded they
24 should involve their insured in the process.
25 Q   Under that situation how would you

Page 154

1 suggest the insured be involved?
2  A  I probably would call the insured or
3 walk to the insured's broker and tell them that
4 we have this claim and how would they like us to
5 code it.
6  Q  When you were coding claims for, while
7 you were with Hanover had you ever asked an
8 insured how they would code the claim, the claim
9 being general liability or completed operations?
10  A  Although I cannot recall specific
11 circumstances I believe that there were times
12 that there were, the insured was involved in the
13 coding process.
14  Q  Do you recall a specific instance as
15 we sit here today?
16  A  I just said, no, I don't.
17  Q  I'll ask you this hypothetical, and
18 the policy is a general liability policy of the
19 type that was issued by INA to JWP and the fact
20 pattern is this: A town enters into a contract
21 with the county for snow removal during a snow
22 storm, there's a two-car accident on a county
23 road, no snow clearing operations actually in
24 progress at the scene or at the time of the
25 accident, under the fact pattern I just gave you

Page 155

1 can you tell me whether in your opinion that
2 would be coded as a completed operations or
3 general liability claim or I didn't give you
4 enough facts upon which to tell one way or the
5 other?
6  A  You haven't given me enough facts.
7  Q  What facts would you need to know to
8 classify the claim as general liability or
9 completed operations?
10  A  What was the nature of the accident?
11  Q  Let's add to the hypothetical that the
12 accident was caused by a lack of snow cleaning on
13 the road.
14      With that information can you now classify
15 the claim as general liability or completed
16 operations or you still can't?
17  A  Still can't.
18  Q  On the next hypothetical you can again
19 assume the policies in question were the same as
20 the ones issued to JWP by INA, the insured is
21 cleaning out the hull of a ship in preparation
22 for loading oil, the insured left rags it used to
23 perform this function in the tank which later got
24 caught in the suction valve causing damages, the
25 rag should have been removed when the cleaning

Page 156

1 operation was finished, under those facts can you
2 classify the claim for damage to the ship as a
3 general liability or completed operations claim?
4  A  May I ask something to clarify the
5 question?
6  Q  Sure.
7  A  Had the ship hull been put to its
8 intended use?
9  Q  Yes.
10  A  Completed operations claim.
11  Q  Again, similar policy, same policy as
12 the ones issued by INA to JWP and the fact
13 pattern is the following: Fuel oil was delivered
14 to an incorrect address and into the wrong fuel
15 tank, and its presence resulted in fire damage of
16 the premises.
17      Under those circumstances, that fact
18 pattern, can you tell me whether you would
19 classify it as a general liability, or completed
20 operations claim or I didn't give you enough
21 facts one way or the other?
22  A  I would need one more fact.
23  Q  Which is?
24  A  Did we leave the scene?
25  Q  You can assume that we left the scene,

Page 157

1 that the insured left the scene.
2  A  Operations claim.
3  Q  And if the insured had not left the
4 scene?
5  A  And the fire started, they're putting
6 the fuel in?
7  Q  Correct.
8  A  In that case it would be an operations
9 in progress claim.
10  Q  Operations in progress, you mean --
11  A  General liability.
12  Q  A final fact pattern, again, the
13 policies are the same as the ones issued by INA
14 to JWP, the insured constructs a swimming
15 facility based upon specific plans and
16 specifications with respect to certain equipment,
17 contrary to the specifications the insured used
18 an aluminum handle of an incorrect length and the
19 incorrect length leads to the accident in
20 question, under that hypothetical can you tell me
21 whether it's a completed operations, general
22 liability claim or I did not give you enough
23 facts to classify it one way or another?
24  A  Please rephrase your hypothetical.
25  Q  The insured constructs a swimming

Page 158

1  facility, under the contract --
2     A    Swimming pool?
3     Q    Swimming pool, pursuant to specific
4  plans and specifications and contrary to the
5  specifications the insured substitutes a
6  telescopic aluminum handle instead of a 16-foot
7  aluminum handle, and that change results in the
8  accident in question, with that clarification
9  could you tell me whether in your opinion it's a
10 completed operations, general liability claim or
11 I haven't given you enough facts?
12    A    You haven't given me enough facts.
13    Q    Again, assume the policies involved
14 are the same as at issue to JWP by INA and here's
15 the fact pattern:  Plaintiff and another driver
16 collide in an intersection, both drivers claim
17 they had a green light, Welsbach had been
18 notified earlier of an all out condition and
19 failed to respond timely under its contract with
20 New York City, witnesses observe the Welsbach
21 repairman fixing the light at the time of the
22 accident, Welsbach was sued by New York City.
23    Welsbach's position is that it responded 6
24 1/2 hours after the first call notifying them
25 about this problem, the technician found the red

Page 159

1  signal controlling traffic, the contact was out,
2  and the repairman indicated that, indicated an
3  accident occurred at the intersection while he
4  was completing the repairs, and the history of
5  the intersection shows that Welsbach had
6  previously made numerous repairs to the traffic
7  signal, under that hypothetical can you tell me
8  whether you would classify this claim as a
9  general liability, completed operations or you
10 can't?
11    A    Completed operations.
12    Q    Why is that?
13    A    Because we had previously been there.
14    Q    Again, you can assume again the
15 policies involved are the same as the ones INA
16 issued to JWP, and here's the fact pattern:
17 Plaintiff falls when a raised computer floor in
18 which he was standing collapsed causing him
19 injury.
20    The plaintiff claims that the contractor and
21 the EMCOR entity Forest Electrical Corporation
22 were negligent without giving specific grounds in
23 the complaint for the negligence.
24    Forest Electricals' position is that it
25 performed various electrical work at the building

Page 160

1  in question during the period in which plaintiff
2  was injured, Forest did not have any
3  responsibility for the maintenance or
4  installation of the raised computer floor which
5  allegedly caused the injuries.
6     Now, based upon that fact pattern would you
7  classify the claim as completed operations,
8  general liability or I didn't give you enough
9  information to do so?
10    A    One question, were we working at the
11 scene at the time this happened?
12    Q    You have to assume the facts as I just
13 read to you.
14    A    I don't have enough information.
15    Q    Tell me what facts you would need to
16 know in order to classify the claim under the
17 facts I just gave you as general liability or
18 completed operations?
19    A    I would want to know if there was a
20 complaint, and I believe you said there was a
21 complaint.
22    We want to see the allegations in the
23 complaint. I also would want to know if we were
24 still actively involved working at the scene at
25 the time this occurred or if we had completed our

Page 161

1  operation and left.
2     I would also want to know if the facility
3  that we had been working on had been put to its
4  intended use.
5     Q    Would you need to know whether there
6  was a causal connection between Forest's work and
7  the accident?
8     A    No.
9     MR. OELSNER:  I have no further questions.
10    MR. VITA:  Mr. Stewart would like the
11 opportunity to read and sign the transcript.
12
13
14    (Whereupon the deposition was concluded
15 at 4:00 p.m. for the day.)