IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------------X

EMCOR GROUP, INC.                    :    Civil Action No.
                                     :    Docket 3:00-CV-2211 (AVC)
                Plaintiff,           :
                                     :    Judge Alfred V. Covello
v.                                   :
                                     :
INSURANCE COMPANY                    :
OF NORTH AMERICA                     :
                                     :
                Defendant.           :    December 6, 2004
                                     :
------------------------------------------------------- --X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO INA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff EMCOR Group, Inc. ("EMCOR") submits this Memorandum of Law in opposition to the Motion for Partial Summary Judgment dated November 15, 2004 filed by defendant Insurance Company of North America ("INA")[1]. In support thereof EMCOR represents as follows.

## I.    PRELIMINARY STATEMENT

This is an insurance coverage dispute.  As the Court is by now aware, EMCOR alleges that INA misclassified one-hundred and ten (110) claims as general liability claims rather than completed operations claims in order to shift

---

[1] INA mentions in its Brief that it seeks partial summary judgment on the following counts:  breach of contract, bad faith, breach of fiduciary duty, and declaratory judgment. (See INA's Memo. of Law, p. 2). However, INA offers evidence only as to EMCOR's claim for breach of contract regarding the misclassification issue.  Thus, INA's motion and requested relief should be limited to the breach of contract claim only.

the obligation for defense and indemnity onto the financial shoulders of EMCOR.

INA's misclassification of claims had a ripple effect, first causing the premature

exhaustion of EMCOR's general liability aggregate limits, and then causing

EMCOR to begin paying defense and indemnity on claims before it should have,

due to the improper exhaustion. [2] Thus, the central dispute between EMCOR and

INA stems not from whether there is any coverage for the 110 underlying claims,

but whether these claims should have properly been coded as products-

completed operations claims rather than general liability claims.

INA's Motion for Partial Summary Judgment should be denied because

INA has not established as a matter of law undisputed facts showing the claims

fall within the general liability aggregate.  To the contrary, as a matter of law, the

evidence submitted by EMCOR establishes that:

1.    In the 30 claims included on INA's Exhibit "A,"
       either EMCOR completed a repair prior to the
       accident creating a genuine issue of material
       fact in dispute; or the allegations against EMCOR
       in the underlying actions are sufficient by themselves
       to satisfy the completed operations hazard as a
       matter of law;

2.    In the 18 claims included on INA's Exhibit "B,"
       the bodily injury alleged "arose out of" EMCOR's
       completed work as a matter of law; or there exist
       disputed issues of material fact regarding the
       connection between EMCOR's completed work and
       the alleged bodily injury;

---

[2] INA mentions that only 106 claims were improperly coded out "of the hundreds and hundreds of claims submitted for coverage under the three policies" (See INA's Memo. of Law, p. 1), implying that since many claims were properly classified, EMCOR should not be upset over the improper classification of claims.  This statement is outrageous and exemplifies INA's arrogant behavior.  If INA misclassified only one claim which caused EMCOR's general liability aggregate limits to exhaust prematurely, shifting the financial burden onto EMCOR for defense and/or indemnity, this suit would be necessary and justified and INA would be required to correct its erroneous coding.

3.     In the 6 claims included on INA's Exhibit "C," EMCOR
       was not engaged in ongoing work at the time of
       the accident, but instead had completed a prior
       repair; or there exist disputed issues of material
       fact regarding whether EMCOR was engaged in
       any ongoing work at the time of the accident;

4.     In those claims included on INA's Exhibit "A,"
       "B," and "C," INA has not sustained
       its burden of proving that EMCOR's work had
       not yet been completed at the time of the accident
       as required by the terms of the products-completed
       operations hazard;

5.     EMCOR is not judicially estopped from pursuing
       INA for misclassification of claims because the
       issue of aggregate exhaustion was never litigated
       in any prior action between INA and EMCOR, and
       the affidavit submitted by EMCOR in the underlying
       action indicating that the aggregate limits of one
       particular INA policy were exhausted was based on
       information provided by INA and relied on in good
       faith by EMCOR; and

6.     The substantive law of Pennsylvania, and not New York,
       applies to this complex insurance coverage dispute
       because the operative agreement between the parties
       contains a Pennsylvania choice of law provision.

Accordingly, for all of these reasons, INA's Motion for Partial Summary Judgment

must be denied in its entirety.

## II.    COUNTER - STATEMENT OF FACTS

### The CIPA and Finite Agreements

Certain salient facts are glaringly omitted from INA's Statement of Facts.[3]

The insurance relationship between EMCOR and INA consisted not only of the 3

separate general liability policies issued by INA to EMCOR between October 1,

1992 and October 1, 1995 (the "INA Policies"), but also of the operative

---

[3] For a thorough discussion of the background of this dispute, see EMCOR's Motion for Partial Summary Judgment and Memorandum of Law dated November 15, 2004 (doc. nos. 157 and 158).

agreement known as the Casualty Insurance Program Agreement ("CIPA") (See Exhibit G) including an amendment known as the Finite Agreement. (See Exhibit G.3). Despite INA's attempts, the INA Policies cannot be analyzed in isolation. The CIPA includes the Finite Agreement and incorporates the INA Policies, and collectively these documents define the rights and obligations of the parties. INA conspicuously ignores the legal effect of the Finite Agreement because it significantly altered the financial aspects of EMCOR's insurance program. For example, while endorsement #33 of the INA Policies purportedly makes EMCOR (f/k/a JWP, Inc.) responsible for defense payments (See INA's Memo. of Law, p. 5), the Finite Agreement reverses the purported effect of endorsement #33 and redistributes the obligation to pay Allocated Loss Adjustment Expenses, which include defense fees and costs, for all losses under the INA Policies back to INA. Paragraph 3 of the Finite Agreement states in relevant part that:

> After the effective date of this Amendment,
>
>> a.    the INSUREDS [EMCOR] shall be relieved of their obligation to reimburse the COMPANY [INA] for:
>>
>>> 1.)    with respect to losses incurred during the period October 1, 1992 to September 30, 1995, Paid Losses and Allocated Loss Adjustment Expenses (ALAE) pursuant to §2.02 of each of these Agreements, (See Exhibit G.3).

"Paid Losses" refer to indemnity payments and "Allocated Loss Adjustment Expenses" include, but are not limited to, defense fees and costs. As a result of the Finite Agreement, INA was responsible for defense and indemnity payments

for all claims under the INA Policies.[4]   INA's failure to mention the Finite Agreement and its impact on this dispute is purposefully misleading.

### Nature of Welsbach's Work

Welsbach is a wholly owned indirect subsidiary of EMCOR that is involved in traffic signal maintenance, streetlighting maintenance, and related construction in and around the City of New York. (See Exhibit E, Affid. of Alena Cross, ¶ 4 and Exhibit F, Affid. of Scot Placanica, ¶ 4). Welsbach has been engaged in these activities in and around the New York area since 1985. (See Exhibit E, Affid. of Alena Cross, ¶ 4). Pursuant to these various contracts, Welsbach is required to keep in good repair the traffic signal and streetlight systems. This work includes preventive routine maintenance performed at least once per year for various items such as lens cleaning, controller maintenance, and painting. (See Exhibit E, ¶ 8, Affid. of Alena Cross, and Exhibit F, Affid. of Scot Placanica, ¶ 9). In addition, pursuant to these various contracts, Welsbach was required to do excavation work in and around the sidewalk and roadway areas to repair underground conduit and wiring, or to repair or replace traffic signal posts and/or streetlight posts and foundations. (See Exhibit E, ¶ 9(c), Affid. of Alena Cross). Welsbach performs all of its work off-site, and not on premises owned or rented by Welsbach. Also, Welsbach performs both temporary and permanent repairs depending upon the circumstances, and then leaves the location. In situations

---

[4] Although not a central issue in this Motion for Partial Summary Judgment, INA also misrepresents its right to settle any claim or suit within the deductible at its sole discretion. (See INA Memo. of Law, p.5). Again, INA fails to mention the Claims Service/Field Operations Instructions, page 2, first paragraph, which state "for settlement authority for claims over $25,000.00 claim service must contact location and EMCOR Group, Inc., headquarters, Susan Reinhard." (See Exhibit H).

where Welsbach performs a temporary repair, they return the item being repaired to its intended use and subsequently will return to make a permanent repair within a certain period of time. (See Exhibit F, Affid. of Scot Placanica, ¶10). In connection with its work, EMCOR maintains intersection histories showing the dates of repair, the arrival time and departure time, as well as daily time sheets reflecting a general description of the work performed at each location.

### ESIS

INA contends that ESIS, Inc. was an independent third party administrator hired by EMCOR to investigate, adjust and otherwise administer EMCOR's claims. (See INA's Memo of Law, p. 5). INA fails to mention, however, that ESIS, Inc. is and has always been a wholly owned subsidiary of INA's parent company, formerly CIGNA and now ACE USA. ESIS and INA historically have shared office space, letterhead, and even personnel. For example, Ms. Ann Marie Marson, supposedly the ESIS team leader for the EMCOR account, was a paid INA/CIGNA/ACE employee up to her departure from the company in 2003. (See Exhibit L, Depo. of Ann Marie Marson, pp. 166-167). Ms. Marson indicated that while conducting her duties in connection with the EMCOR account, she often utilized letterhead of both INA and ESIS as well as business cards showing her as an employee of both corporate entities. (See Exhibit L, Depo. of Ann Marie Marson, pp. 165-166). Throughout EMCOR's dispute with INA, ESIS has been nothing more than an extension of INA.

In addition, INA contends that ESIS was responsible for the classification of claims as either general liability claims or completed operations claims. (See

6

INA Memo of Law, pp 5-6). This argument is transparent, however, because INA, as EMCOR's insurer, is responsible for the accurate exhaustion of the aggregate limits, and therefore is ultimately responsible for the proper classification of EMCOR's claims. (See Exhibit M, Depo. of Virginia Lloyd, pp. 142-143). ESIS is not an insurance company, but rather is merely a claims administrator. INA's attempt to thrust upon ESIS its obligation to correctly classify these claims and thereby accurately impair the aggregate limits of the INA Policies is misguided.

III.    **ARGUMENT**

1.    **NEW YORK LAW DOES NOT APPLY TO THIS DISPUTE BECAUSE THE CIPA CONTAINS A PENNSYLVANIA CHOICE OF LAW PROVISION.**

INA attempts to rely solely on the significant relationship test for the proposition that New York substantive law should apply to this case, completely ignoring the relevant and governing CIPA document. Connecticut follows the Restatement (Second) Conflict of Laws which implements the significant relationship test unless there exists a controlling choice of law provision. "Connecticut law gives effect to an express choice of law by the parties to a contract provided that it was made in good faith." *A.B. Realty Corp. v. Metropolitan Life Insurance Co.*, 164 F.Supp.2d 296, 303 (D.Conn. 2001) *citing Elgar v. Elgar*, 238 Conn. 839, 845, 679 A.2d 937 (1996). "A contractual choice of law provision is enforceable under Connecticut's choice of law rules where (1) the state of the chosen law has a substantial connection to the parties or the transaction, and (2) application of the chosen state law would not be contrary to a

fundamental policy of a state with a materially greater interest in the transaction." *Elgar v. Elgar*, 238 Conn. 839, 850, 679 A.2d 937 (1996).[5]

INA avoids any mention of the CIPA, despite the undisputed fact that it is the operative agreement between the parties regarding their respective rights and obligations. The terms of the CIPA, Finite Agreement and INA Policies collectively define the insurance relationship as the CIPA is amended by the Finite Agreement and incorporates by reference the INA Policies. (See Exhibit G., Bates Stamp #000029 and Exhibit G.1, Bate Stamp #000049). Therefore, the Pennsylvania choice of law provision also extends to disputes arising out of the Finite Agreement and the INA Policies. INA now refuses to acknowledge that it agreed to be governed by Pennsylvania law when it executed the CIPA in 1996.

The application of Pennsylvania law to this dispute satisfies the requirements of §187 of the Restatement Second regarding choice of law provisions. First, Pennsylvania law has a substantial connection to the parties involved as INA is incorporated in, and has its principal place of business in Pennsylvania. In addition, from 1996 through May, 1999, INA made payments in connection with the claims arising under the INA Policies to the third party administrator, ESIS, Inc. in Philadelphia, Pennsylvania. Similarly, EMCOR

---

[5] Section 187 of the Restatement (Second) of Conflict of Laws (1971), provides in relevant part: "Law of the State Chosen by the Parties . . . (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either (a) the chosen state has no substantial relationship to the parities or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

forwarded claim payments under the INA Policies to Philadelphia, Pennsylvania between 1997 and May, 1999.  Most importantly, both parties agreed to be governed by Pennsylvania law in the event of a dispute with respect to the CIPA.  Who is required to make payments is directly addressed by the CIPA.  The dispute regarding miscoded claims which prematurely deplete the aggregate limits is directly governed by the CIPA and therefore, by Pennsylvania law.

Second, there is no state with a materially greater interest in this insurance coverage dispute than Pennsylvania.  EMCOR is a holding company with many subsidiaries operating nationally.  Accordingly, EMCOR's risks insured under the INA Policies can, and do, occur literally anywhere in the United States.  Thus, there is no one state with a materially greater interest in this insurance dispute than Pennsylvania, INA's home state.  Certainly, INA is not prejudiced by having its own state's law applied to this dispute with EMCOR.

INA cannot reasonably contest this choice of law provision as it is incorporated in, and has its principal place of business in Pennsylvania, and consequently has significant contacts with Pennsylvania.  Further, when INA initially issued the Policies it did so with the knowledge that claims under the INA Policies could arise in any state in this country.  No one state would have a greater interest in its laws applying than any other state.  INA's and EMCOR's mutual agreement to apply Pennsylvania law was in fact to avoid forum shopping and to provide the parties with a reliable and consistent application of the law so as to create predictability.  It is crystal clear from the CIPA that the intent of both

parties was to have Pennsylvania's substantive law apply to this coverage dispute. To decide otherwise would violate the parties' clearly expressed intent.

## 2.    INA BEARS THE BURDEN OF PROVING THAT THE WORK OF EMCOR'S SUBSIDIARY WAS NOT COMPLETED.

"It is a general rule of insurance that while policies of insurance will be construed most strongly against the insurer, the insured must show that a claim falls within coverage provided by the policy." *Miller v. Boston Insurance Co.*, 420 Pa. 566, 570 (1966). It is equally well settled that "[a] defense based on an exception or exclusion in a policy is an affirmative one, and the burden is cast upon the [party asserting that defense] to establish it." *Armon v. Aetna Casualty and Surety Co.*, 369 Pa. 465, 469, 87 A.2d 302, 304 (1952). *See also Bowers v. Great Eastern Casualty Company*, 260 Pa. 147, 148-49, 103 A. 536; *Weissman v. Prashker*, 405 Pa. 226, 233 (1961). "The burden of proving an exception to a risk is on the insurer. . . The object of an exception is to exclude that which would otherwise be included, to take special cases out of a general class. By 'exception' . . . is meant an exclusion of one or more of the risks otherwise generally insured against." *Young v. American Fidelity Ins. Co.*, 2 Conn.App. 282,286, 479 A.2d 244 (1984).

"Generally, exceptions, limitations, and exclusions to insurance policies require narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms. If an insurer intends to restrict or limit coverage, it must use clear and unambiguous language in doing so, otherwise the insurance policy will be liberally construed in favor of the

insured. The burden is on the insurer to prove facts which bring a case within the specified exception." *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 89 P.3d 573 (2004) *citing Marquis v. State Farm Fire & Casualty Co.*, 265 Kan. 317, 327, 961 P.2d 1213 (1998) (internal quotations omitted).

INA asserted in the Third Special Defense of its Third Amended Answer, dated February 9, 2004 (doc. no. 106) that EMCOR's claim is barred in whole or in part by the terms, exclusions, conditions and limitations contained in the INA Polices. Having specifically pled this, INA now has the burden of proving that the underlying claims fall within any such exception excluding coverage.

The products-completed operation definition in the INA Policies very clearly states in relevant part:

a. "Products-completed operations hazard" includes *all* "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" *except*:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. (emphasis added).

The exception contained in this clause shifts the burden onto INA to prove that the claims do not fall within the products-completed operations hazard because EMCOR's subsidiary's work had not yet been completed or abandoned. INA attempts to foist this burden upon EMCOR. Based on the broad interpretation which gives rise to completed operations coverage, the very narrow and limited exception to such coverage, and INA's failure as a matter of law to sustain its

burden that the claims fall within the exception, said claims should be covered as products-completed operations claims.

### 3.  THE ALLEGATIONS OF THE COMPLAINTS IN THE UNDERLYING ACTIONS BY THEMSELVES TRIGGER THE COMPLETED OPERATIONS HAZARD.

INA had a duty to reimburse EMCOR for defense fees and costs under the INA Policies. (See Exhibit G.3, Finite Agreement). A duty to defend is triggered by the allegations within the four corners of the complaint. *American Mutual Liability Ins. Co. v. Neville Chemical Co.*, 650 F.Supp. 929, 931 (W.D. Pa. 1987) *citing Pacific Indemnity v. Linn,* 766 F.2d 754, 760 (3d. Cir. 1985). "Under Pennsylvania law, an insurance company is obligated to defend an insured whenever the complaint filed by the injured party may potentially come within the policy's coverage." *Id. See also Baldt Inc. v. American Universal Ins. Co.*, 599 F. Supp. 955, 957 (E.D.Pa. 1985). "However, it is not a specific cause of action in the complaint which triggers a duty to defend, but rather the factual allegations in the complaint which trigger this duty." *Allstate Ins. Co. v. Sanchez,* 2003 U.S. Dist. LEXIS 15553 at *9 (E.D. Pa. 2003). In determining whether an action must be defended, the claims stated in the complaint must be taken as pleaded, even if they are demonstrably groundless, false or fraudulent. *Allstate Ins. Co. v. Rymal,* 1999 U.S. Dist. LEXIS 810 at *3 (E.D. Pa. 1999)*; American Contract Bridge League v. Nationwide Mut. Fire Ins. Co.,* 752 F.2d 71,75 (3d. Cir. 1985). An insurer can generally cease its defense only when it can confine the possibility of recovery to claims outside the policy's coverage. *American Mutual, supra,* at 931.

To guide the insurer in making its coverage determination, "… the factual allegations of the complaint are taken to be true and the complaint is to be liberally construed with all doubts as to whether the claims may fall within the coverage of the policy to be resolved in favor of the insured." *Mark I Restoration SVC. v. Assurance Co. of America*, 248 F.Supp.3d. 379, 400 (E.D. Pa. 2003); and *Unionamerica Ins. Co. Ltd. v. J.B. Johnson*, 806 A2d. 431, 433-34 (Pa. Super. Ct. 2002).

In determining coverage, INA was required to look at the four corners of the complaint, assume the allegations to be true, and compare the allegations to the language of the INA Policies. If the complaint alleged facts that even potentially triggered coverage under the completed operations provision, then INA was obligated to reimburse EMCOR for those defense costs from that aggregate limit. While INA did reimburse EMCOR for the costs associated with the 110 underlying claims, it did so from the wrong aggregate.

INA paid the defense fees and indemnity payments associated with the 110 underlying actions from the $2,000,000 general liability aggregate limit rather than the $3,000,000 products-completed operations aggregate limit. If the complaint determines coverage, it necessarily follows that the allegations dictate the aggregate limit from which the costs and expenses should be deducted. The allegations in the complaints frame the issue of whether the claim falls within the completed operations exposure. Each of the claims listed in INA's Exhibits "A," "B," and "C" allege that an EMCOR subsidiary performed work off-site (i.e. not on premises they own or rent) in a negligent fashion that resulted in the plaintiff

sustaining bodily injury. None of these complaints allege bodily injury during the course of EMCOR's ongoing work. By the very nature of EMCOR's off-site work and the plaintiff's allegations of bodily injury arising out of EMCOR's completed work, these cases fall within the products-completed operations exposure. Unless INA can identify an ongoing operation at the time of the accident, or show that the facts allege work in progress at the time of the accident, these claims fall within the completed operations hazard as a matter of law.

4.  **THERE EXIST GENUINE ISSUES OF MATERIAL FACT IN DISPUTE AS TO THE CLAIMS LISTED IN INA'S EXHIBIT "C" SINCE EMCOR'S WORK WAS NOT ONGOING AT THE TIME OF THE ACCIDENTS**

INA contends that six (6) claims at issue do not fall within the completed operation hazard because EMCOR was involved in ongoing work at the time of the accident.[6] At a minimum, there are genuine issues of material fact in dispute as to whether these claims involved ongoing work.[7] Again, in each of these 6 claims, the complaints allege that EMCOR's negligent work resulted in bodily injury. Moreover, there are no allegations that EMCOR was on site at the time of the accidents.

In <u>Alden</u>, INA does not actually state that EMCOR's subsidiary was on the scene at the time of the accident. In fact, EMCOR's subsidiary's portion of the work was completed at the time of the accident. The date of loss was 4/29/1993

---

[6] INA originally had eight (8) claims in its Exhibit "C," but EMCOR recently filed a Notice of Filing Amended Exhibit A to its Third Amended Complaint wherein it deleted 3 claims from its list of misclassified claims, 2 of which (<u>Cyrus</u> and <u>Costello</u>) were included among the 8 claims listed on INA's Exhibit "C".

[7] <u>See</u> EMCOR's Exhibit's A and C for a complete factual analysis of each of these claims and those material facts in dispute which demonstrate that these claims satisfy the completed operations hazard. EMCOR's Exhibits A and C correspond directly to INA's Exhibits "A" and "C." EMCOR intentionally omits an Exhibit B because the basis for the claims listed in INA's Exhibit "B" is purely legal, and therefore does not require a factual comparison.

and it is undisputed that EMCOR's subsidiary was last at the scene and completed its repair on 10/28/1992. (See Exhibit C). In Kargbo, a person fell on a wet floor and sued Welsbach. Again, it is not alleged that Welsbach was in the process of making a repair at the time of the plaintiff's fall. The evidence establishes Welsbach had completed repairs to a steam valve which allegedly burst causing water to drip on the floor. A cleaning crew (not an EMCOR subsidiary) subsequently cleaned the floor. Welsbach had completed its repair and left the scene when the plaintiff allegedly slipped and fell. (See Exhibit C). Therefore, both Alden and Karbo constitute completed operations claims as a matter of law.

In Gartenberg, INA incorrectly concludes that because the power was out to a traffic light and Welsbach erected stop signs, that this was an ongoing operation. Instead, the facts show that Welsbach was only required to place stop signs due to the fact that there was a power outage. Welsbach was not obligated to restore power, and had completed its work prior to the accident. After placing the stop signs, the intersection was returned to its intended use. Subsequently, when the power was restored, Welsbach effectuated a permanent repair. (See Exhibit C). In Silver, it is clear by INA's own statements that Welsbach had completed a temporary repair, returned the intersection to its intended use, and subsequently an accident occurred. Similarly, Gannon involved another temporary repair/ installation of cable by EMCOR's subsidiary Forest Electric Co. ("Forest") prior to the accident. (See Exhibit C). Based on the express terms of the INA Policies, temporary repairs, under certain circumstances, constitute

completed operations.    As found in the definition of products-completed operations, "work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." Thus, in cases where Welsbach has completed a temporary repair and left the scene prior to the accident, the facts trigger the completed operations provision. At a minimum, there exist disputed issues of material fact regarding the status of Welsbach's work at the time of the accident, precluding the entry of partial summary judgment in INA's favor.

Finally in Thercier, INA claims that Welsbach was on the scene of the accident at the time of the accident. (See INA's Memo of Law, Exhibit "C"). Welsbach's intersection history at that location for the month of July, 1995 indicates that the last repair made by Welsbach during that month was July 27, 1995, one day prior to the date of loss. (See Exhibit C).  Accordingly, as a matter of law, Thercier should have been classified as a completed operation.

At a minimum, since there exist genuine issues of material fact in dispute with respect to these 6 claims, INA's Motion for Partial Summary Judgment as to these claims must be denied.

5.    **THOSE CLAIMS LISTED IN INA'S EXHIBIT "A" WHERE EMCOR WAS PREVIOUSLY AT THE SITE AND COMPLETED A REPAIR PRIOR TO THE ACCIDENT CONSTITUTE COMPLETED OPERATIONS CLAIMS.    ALTERNATIVELY, AT A MINIMUM, THERE EXIST GENUINE ISSUES OF MATERIAL FACT IN DISPUTE PRECLUDING THE ENTRY OF PARTIAL SUMMARY JUDGMENT IN INA'S FAVOR.**

As a matter of law, those cases in INA's Exhibit "A" where EMCOR completed a repair prior to the accident constitute completed operations.

> (3) When that part of the work done at a job
> site has been put to its intended use
> by any person or organization other than
> another contractor or subcontractor working
> on the same project.
>
> Work that may need service, maintenance,
> correction, repair or replacement, but which is
> otherwise complete, will be treated as completed.

Thus, since the Welsbach contracts require Welsbach to maintain and repair all streetlights within a geographic area, as soon as Welsbach completes its inspection of a given streetlight and leaves the premises, its work at that site has been completed. Also, following the inspection, the streetlight has been put to its intended use since there is no evidence of ongoing work and the streetlight is being utilized for its intended purpose. Welsbach's evidence of its work at each of these sites satisfies the completed operations provision language.

With respect to the traffic signal maintenance contracts, all lenses, glassware and reflectors in an illuminated traffic control device are required to be cleaned and inspected at least once per year. In addition, Welsbach is required to lubricate, calibrate, and clean all controllers at least once every twelve months as part of a scheduled routine maintenance program. (See Exhibit F, Affid. of Scot Placanica, ¶ 9A and 9B). Again, pursuant to these requirements, Welsbach had been at the sites in 27 of these cases and performed routine maintenance work at least once per year prior to the date of loss. Like the streetlight maintenance work cited above, the traffic signal maintenance work performed at each site has been completed prior to the loss, and therefore satisfies the completed operations provision.

Alternatively, there exist genuine issues of material fact with respect to those claims listed on INA's Exhibit "A," wherein INA claims that EMCOR was "never at the site." In every claim on that list, the complaint against EMCOR, like the other complaints, alleges that EMCOR's subsidiary performed some type of work improperly at that location resulting in bodily injury. (See Exhibit A). Thus, all of the complaints for the claims listed in INA's Exhibit "A" fall squarely within the completed operations aggregate based on the allegations in the complaints.

> **a.** **In 27 of the 30 cases listed in INA's Exhibit "A," Welsbach had a contract with the City of New York pursuant to which it completed work prior to the accidents.**

In addition to the allegations contained in the underlying complaints, the relevant EMCOR subsidiary, typically Welsbach, has actually been at 27 of the 30 sites to perform some work prior to the accidents. (See Exhibit A).[8]  For example, with respect to the streetlight maintenance contracts between Welsbach and the City of New York, Welsbach is required to visually inspect each maintained lighting unit at least once every ten days, including an inspection for any obvious defects. (See Exhibit E, Affid. of Alena Cross, ¶ 9(a)). The products-completed operations hazard contained in the INA Policies provides in relevant part that:

> "Your work" will be deemed completed at the earliest of the following times:
>
> (1)  When all of the work called for in your contract has been completed.
> (2)  When all of the work to be done at the site has been completed  if your contract calls for work at more  than one site.

---

[8] In the remaining 3 cases, the complaints, like all of the other complaints, allege Welsbach's work caused the bodily injury and there was no ongoing work at the time of the accident. (See Exhibit A).

   **b.**  ***In 21 of the 30 cases, in addition to the allegations against EMCOR and the contracts with the City of New York, Welsbach also has documentary evidence of a completed repair prior to the accident.***

In addition to the routine scheduled maintenance discussed above, as well as the allegations of completed work, in the following 21 cases, Welsbach has submitted documentary evidence conclusively establishing that Welsbach completed a repair at the site prior to the loss: <u>Alexander</u>, <u>Asher</u>, <u>Carbo</u>, <u>Edwards</u>, <u>Jean</u>, <u>Jordan</u>, <u>Moran</u>, <u>Royal Ins.</u>, <u>Aarne</u>, <u>Cantero</u>, <u>Ensler</u>, <u>Joseph</u>, <u>Gager</u>, <u>Howard</u>, <u>Rosario</u>, <u>Teichman</u>, <u>Hands</u>, <u>Patterson</u>, <u>Randall</u>, <u>Rosner</u>, and <u>Trilleras</u>. (<u>See</u> Exhibit A).  Such evidence has not been refuted by INA.  There is absolutely no evidence in any of these cases that Welsbach was involved in ongoing construction activities at the time of the loss.  Accordingly, these cases constitute completed operations cases as a matter of law, and INA's Motion for Partial Summary Judgment as to these cases must be denied.

  **6.**  **INA MISCONSTRUES THE PRODUCTS-COMPLETED OPERATIONS HAZARD TO REQUIRE PROXIMATE CAUSE BETWEEN EMCOR'S WORK AND THE BODILY INJURY.**

INA's contention that the bodily injury must be proximately caused by EMCOR's work in order to trigger a completed operation is legally incorrect.  INA completely misconstrues the definition of products-completed operations.  INA reads a requirement of proximate cause into the definition where one does not exist.  The policy definition of product-completed operations states in relevant part:

    a.  "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you

own or rent and **arising out of** "your product"
or "your work" except:

(1)    Products that are still in
       your physical possession;
       or

(2)    Work that has not yet been completed
       or abandoned. (emphasis added).

The definition merely requires that the "bodily injury" "arises out of" EMCOR's

"work." This is not a proximate cause standard.

As discussed at length above, Pennsylvania law applies to this coverage

dispute and Pennsylvania interprets "arising out of" in insurance policies to

require merely an incidental relationship between the work and the injury.

Pennsylvania law does not require proximate cause between EMCOR's work and

the subsequent bodily injury. However, even if New York law were applied to this

dispute, New York law requires a "but for" causal connection, not proximate

cause. *See Mount Vernon Fire Insurance Company v. Creative Housing Ltd., et

al.*, 88 N.Y. 2d 347 (1996).

In *Creative Housing*, the New York Court of Appeals sanctions the "but

for" causational test in determining whether the occurrence is covered or

excluded from insurance coverage. In *Creative Housing*, the plaintiff was

criminally assaulted in an apartment building owned and managed by the

defendant Creative Housing, Ltd. *Id* at 349. The underlying plaintiff sued

Creative Housing alleging negligent supervision, management and control of the

premises. *Id*. Creative Housing sought defense and indemnification from its

insurer Mount Vernon Fire Insurance Co. under a policy that included an

exclusion for claims based on assault and battery. *Id*. at 350. The exclusion provided:

> It is agreed that no coverage shall apply under this policy for any claim, demand or suit **based on** Assault and Battery, and Assault and Battery shall not be deemed an accident whether or not committed by or at the direction of the insured. *Id*. (emphasis added).

The court determined that "there is no significant difference between the meaning of the phrases "based on" and "arising out of" in the coverage or exclusion of an insurance policy. *Id* at 352. The court then applied a "but for" causation test to determine coverage: if no cause of action would exist but for the assault, the claim is based on assault and the exclusion applies. *Id* at 350. Thus, since the negligence claim against the owner could not be established without proving the underlying assault, the exclusion applied. *Id* at 352. The *Creative Housing* court adopted an extremely expansive interpretation of "based on" as they precluded coverage for a negligent supervision claim due to the underlying assault. *See also Silva v. Utica First Ins. Co.*, 755 N.Y. S. 2d. 433 (2003) (utilizing the "but for" test in insurance coverage action); and *Watkins Glen Central School District, et al. v. National Union Fire Ins. Co., et al.*, 732 N.Y. S. 2d 70 (2001) (employing the "but for" test when analyzing the nature of the underlying conduct to determine whether occurrence is covered or excluded from coverage).

Similarly, in the case at bar, the "arising out of" language contained in the completed operations hazard should be expansively interpreted: if no cause of action would exist but for EMCOR's (Welsbach's) traffic signal or streetlight

contract with the City of New York, the claim arises out of EMCOR's work and the completed operations coverage is triggered.

Moreover, the cases that INA cites as support for its notion that Welsbach's work must proximately cause the injuries are readily distinguishable from the case at bar. For example, in *Empire Insurance Company v. Schliessman*, 306 A.D.2d 512, 763 N.Y.S.2d 65 (2d Dept. 2003), the court denied coverage for injuries sustained in helping a child off of a truck. The truck was parked at the time and had absolutely nothing to do with the resulting injuries. Similarly, in *Lumbermen's Mutual Casualty Co. v. Logan*, 88 A.D.2d 971, 451 N.Y.S.2d 804 (2d Dept. 1982), the court denied coverage under an automobile policy for injuries related to a fall in an icy parking lot. There, the court held that the fall was not within the ambit of the policy as it neither arose from the intrinsic nature of the motor vehicle, as such, nor did the vehicle itself, produce the injury. *Id.* at 971. In the cases involving EMCOR's subsidiaries, the work done by the subsidiaries is directly involved in the resulting injuries - the malfunctioning traffic signal causes an automobile accident, or the improperly paved sidewalk or roadway causes a person to trip and fall. Certainly at a minimum, the allegations against EMCOR arise out of EMCOR's completed work.

In *Farm Family Casualty Insurance Co. v. Trapani*, 301 A.D.2d 740, 753 N.Y.S.2d 198 (3d Dept. 2003), the insured hit a utility pole which, upon impact, caused sparks. A seventy-five year old woman saw the sparks, ran and fell, sustaining injuries. In concluding that the vehicle was causally connected to the

injuries, the Court held "the impact of the car with the utility pole was not a cause so remote in either time or space from respondent's injuries as to preclude recovery as a matter of law." This reasoning suggest a more intermediate causation analysis than would be required by proximate causation.

In *USAA v. Aetna Casualty & Surety Company*, 75 A.D.2d 1022 (4th Dept. 1980), a child was injured by a spitball while riding in a car. The claim was submitted to both the automobile and homeowners' insurers. As the operation of the automobile had absolutely nothing to do with the injury, coverage was denied under the automobile policy. Although the homeowners policy did not provide coverage for bodily injury arising out of the ownership, maintenance, operation, use of a motor vehicle, the court determined that the phrase "arising out of" had to be interpreted in the same manner under both policies, and therefore the homeowners insurer had to defend the claim. Since it was denied under the automobile policy the same interpretation of the phrase "arising out of" caused it to be covered under the homeowners policy.

Finally, in *Wausau Underwriters Insurance Company v. St. Barnabas Hospital*, 145 A.D.2d 314, (1st Dept. 1988), a woman fell at a hospital while being brought in by an ambulance service. The ambulance service attempted to submit the claim to its automobile insurer. While the court mentions proximate cause, it continues to state that "[t]he use of Future's ambulette was in no way involved in causing Ms. Allen's injuries." *Id.* at 315. The decision indicates that if the ambulance had been in some way involved in producing Ms. Allen's injuries,

23

then coverage might have been applicable.  Again the court does not require proximate causation, but applies a more intermediate standard.

These cases cited by INA do not require that the covered activity be a proximate cause to the injury; rather the covered activity merely must have a connection with the resulting injury.[9]

### 7.  THE BODILY INJURIES IN THE CLAIMS LISTED IN INA'S EXHIBIT "B" EXPRESSLY 'ARISE OUT OF' EMCOR'S WORK AS THEY ALL ARE CAUSALLY CONNECTED TO EMCOR'S WORK.

The claims listed in INA's Exhibit "B" fall within the products-completed operation definition contained in the INA Policies as the injuries "arise out of" EMCOR's work and occurred away from premises owned or rented by EMCOR. EMCOR does not dispute the case law cited by INA that states that "arising out of" means "connected with, had their origins in, grew out of, flowed from, or were incident to." *See Covenant Insurance Co. v. Sloat*, 2003 WL 21299384 at *10 (Conn. Super.); *Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Insurance Company*, 220 F.3d 1, 7 (1st Cir. 2000); *Beretta U.S.A. Corporation v. Federal Insurance Company*, 17 Fed. Appx. 250, 2001 WL 1019745 at *2 (4th Cir. (Md.)); *Hogle v. Hogle*, 167 Conn. 572, 577, 356 A.2d 172, 174 (Conn. 1975); *United Services Automobile Association v. Kaschel*, 84 Conn.App. 139,145, 851 A.2d 1257, 1261 (Conn.App. 2004).  Further, the phrase "arising out of" is widely

---

[9] INA also cites *Kimmins Industrial Service Corporation v. Reliance Insurance Company*, 19 F.3d 78, 82 (2d Cir. 1994), for the postulation that "though other courts dealing with 'arising out of' clauses have not expressed their rulings in terms of proximate causation, a review of the fact patterns reveals that the 'arising out of clause has been held applicable where the injury was proximately caused by the specified condition, but not where there was no such proximate causation."  In fact, the fact patterns of the cases cited do not appear to require proximate causation in the tort sense but merely a causal connection.  These cases indicate not that the injury be a direct result of the condition but that there be a relationship not too temporal in time or space so as to be connected with the condition in order to sustain the coverage.

interpreted to indicate a minimal, incidental causal connection. *See Coregis Insurance Co. v. American Health Foundation, Inc.*, 241 F.3d 123, 128 (2d Cir. 2001); *Holy Trinity Church of God in Christ v. Aetna Casualty & Surety Co.*, 214 Conn. 216, 224 FN 5, 571 A.2d 107, 112 FN 5 (Conn. 1990); and *American Medical Response v. New Hampshire Insurance*, 1997 WL 139452 at *3 (Conn.Super.). What INA fails to address, however, is the significant distinction between the proximate causation requirement in a tort case and the minimal, incidental causation requirement in an insurance coverage action.

These cases underscore how broadly the term "arising out of" is construed by the courts. There is no requirement of proximate cause in a coverage case as INA suggests. All of the complaints in the underlying actions allege that the EMCOR subsidiary performed its work negligently, thereby causing injury. This exposure was the very risk for which EMCOR purchased products-completed operations coverage from INA. INA cannot, as a matter of law, establish that these claims have no causal connection to EMCOR's work. The allegations in these complaints place these claims squarely within the completed operations coverage and satisfy the required minimal "arising out of" causal connection. INA's assertions that "under the broadest causation analysis, the claims at issue in this case do not have injuries that were in any sense 'connected with,' 'grew out of,' 'flowed from,' or were 'incident to' the insured's work or product" is absurd. These claims all stem from, flow from, or are connected with the work that the EMCOR subsidiary performed, or was alleged to have performed. For instance, the car accidents all allege that the accident was caused by a

malfunctioning traffic signal; the trip and fall claims all allege that the accident was the result of the EMCOR subsidiaries' negligent excavation or maintenance work.    Clearly, the accidents either have some connection or allege some connection with EMCOR's work, and therefore are properly within the scope of coverage afforded by the products-completed operations hazard.

   8.    **EMCOR'S ASSERTION IN A SINGLE AFFIDAVIT THAT THE GENERAL LIABILITY AGGREGATE LIMITS OF A SINGLE POLICY WERE EXHAUSTED WAS BASED ON INFORMATION PROVIDED BY INA, AND THEREFORE, EMCOR IS NOT JUDICIALLY ESTOPPED FROM ASSERTING THAT CERTAIN CLAIMS CONSTITUTE COMPLETED OPERATIONS.**

   INA's argument that EMCOR is judicially estopped from asserting that the claims submitted for coverage under the 1993-1994 and 1994-1995 INA Policies are completed operations is completely without merit.    The elements of judicial estoppel require first, that the party against whom estoppel is asserted must have argued an inconsistent position in a prior proceeding and second, the prior inconsistent position must have been adopted by the Court in some manner. *Selected Risks Ins. Co. v. Kobelinski*, 421 F.Supp. 431, 434 (E.D. Pa. 1976); *Bates v. Long Island Railroad Company*, 997 F.2d 1028, 1038 (2d Cir. 1993).

   In four underlying matters in which both INA and EMCOR were involved, INA argues that certain statements made by EMCOR, or lack thereof, provide the foundation for a claim of judicial estoppel. (See INA's Memo of Law, pp 8-10). EMCOR has never taken an inconsistent position either with respect to the exhaustion of aggregate limits or the proper classification of EMCOR's claims. The four cases identified by INA are as follows:

- *The Port Authority of New York and New Jersey, et al. v. Insurance Company of North America, et al. ("Port Authority");*
- *Lehrer McGovern Bovis, et al. v. Forest Electric, Inc., et al. ("Lehrer McGovern");*
- *HRH Construction Corp., et al. v. Forest Electric, Inc., et al. ("HRH"); and*
- *Structure Tone, Inc. v. JMP Forest Electric, et al. ("Structure Tone").*

First, INA contends that in the *Port Authority* action, Susan Reinhard on behalf of EMCOR asserted that the general liability aggregate limits of the 1994-95 policy were exhausted, and did not argue that the claims whose costs impaired the general aggregate limit were improperly classified as general liability claims. Ms. Reinhard made this assertion after receiving an exhaustion notice from INA as well as a loss run purportedly showing the aggregate exhaustion (See Exhibit D, ¶ 4(c), Affid. of Susan J. Reinhard). Thus, EMCOR relied upon the accuracy of the information from its insurer, INA, that the general liability aggregate limit for one of its insurance policies was properly exhausted. It is INA's responsibility to determine proper aggregate exhaustion, not EMCOR's. INA's argument essentially attempts to penalize EMCOR for its reliance in good faith on the information provided by INA. This argument is at best disingenuous.

In the other 3 actions, INA argues that EMCOR simply failed to protest INA's claims that the general aggregate limits of the 1993-94 and the 1994-95 policies were exhausted. It should be noted that in each of the 4 actions, INA submitted an affidavit affirming that the general liability aggregate limits were exhausted. (INA Memo. of Law, pp. 8-10).

What makes INA's argument misleading and irresponsible is the fact that recently, in the deposition of INA's 30(b)(6) witness Stephen Snyder, INA indicated for the first time that the general liability aggregate limits of the 1993-94 and 1994-95 INA Policies are actually *no longer exhausted.* (See Exhibit D.8, Depo. of Stephen Snyder, pp. 96, 187-188). In its Rule 56 (a)(1) Statement of Undisputed Facts, INA represents that the general aggregate limits for the 1992-93, 1993-94, and 1994-95 policies are all exhausted. (See INA's Rule 56(a)(1) Statement, ¶¶ 17, 18 and 19). However, INA fails to mention in its Statement of Undisputed Facts that its own 30(b)(6) witness directly contradicted two of these three statements in his recent deposition in June of 2004. Thus, INA is misleading the Court by leaving out significant details of the background of this insurance coverage dispute.

INA maintains as an alternate basis for its claim of judicial estoppel that in the 4 underlying actions EMCOR did not argue that the claims whose costs impaired the aggregate limit were improperly classified. Although EMCOR was investigating the classification of many claims at that time, EMCOR had no way of determining whether (a) any of these claims would eventually be recoded; or (b) whether the recoding of these claims would ultimately affect the exhaustion level of the general liability aggregate limits. The proper classification of these claims was not an issue in any of the 4 underlying claims and therefore was not litigated. Here we are many years later and still INA has not rectified the coding problems that exist with one-hundred and ten underlying actions and for which EMCOR has been forced to expend significant attorneys fees and costs in

pursuing the proper classification of these claims. As it stands right now, based on the prior notices of aggregate exhaustion, EMCOR has been paying all post exhaustion general liability claims since approximately 1998. (See Exhibit D.2, D.6, D.7). For this Court to penalize EMCOR for relying in good faith on information provided by its own insurer would be a serious injustice, and significantly prejudicial to EMCOR's rights under the three relevant INA Policies.

## IV.    CONCLUSION

For the foregoing reasons, EMCOR submits that: a) all of the cases on INA's Exhibit "A," "B," and "C" constitute completed operations claims as a matter of law; b) the facts alleged trigger the completed operations coverage; and/or c) there exist genuine issues of material fact in dispute regarding the proper classification of these claims. Accordingly, INA's Motion for Partial Summary Judgment must be denied in its entirety.

THE PLAINTIFF,
EMCOR Group, Inc.

By: _____
Jeffrey J. Vita (Federal Bar # ct08036)
Heidi H. Zapp (Federal Bar # ct24655)
Saxe Doernberger & Vita, P.C.
1952 Whitney Avenue
Hamden, Connecticut 06517
(203) 287-8890

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------X

EMCOR GROUP, INC.                     :        Civil Action No.
                                                      Docket 3:00-CV-2211 (AVC)

                        Plaintiff,          :
                                                      Judge Alfred V. Covello

v.                                                 :

INSURANCE COMPANY
OF NORTH AMERICA                      :

                        Defendant,       :
                                                      December 6, 2004

-------------------------------------------------------X

## CERTIFICATION

    This is to certify that the foregoing was mailed, postage prepaid, on this

the 6th day of December, 2004 to the following:

Thomas Leghorn, Esq. (ct22106)
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY  10601
914-323-7000

Duncan B. Hume, Esq. (ct05581)
Hume & Associates
One Landmark Square
Stamford, CT 06901-2620
(203) 348-7252

Joseph B. Burns, Esq. (ct00403)
1 State Street
Hartford, CT 06103
(860) 549-1000

                                              Jeffrey J. Vita, Esq.