# CASUALTY INSURANCE PROGRAM AGREEMENT

This Casualty Insurance Program Agreement (hereinafter "this Agreement") is effective on the date specified in Exhibit A and is among the INSURED, the REINSURER and the COMPANY identified in Exhibit A.

WHEREAS, the INSURED is or will be the Named INSURED under the policy(ies) of insurance listed on Exhibit A hereto, issued or to be issued by the COMPANY (which together with all endorsements thereto, and extensions and renewals thereof, are hereinafter referred to as the "Policies"); and

WHEREAS, the Policies may have been or may be written under various plans including:

A. Policies issued in accordance with a deductible rating plan (hereinafter a "Deductible Policy");
B. Policies issued in accordance with a paid loss premium collection plan (hereinafter a "Paid Loss Premium Collection Policy");
C. Policies issued in accordance with a retrospective rating plan (hereinafter a "Retro Policy"); and
D. Policies which are reinsured by the REINSURER under Article 3 of this Agreement (hereinafter a "Reinsured Policy").

NOW, THEREFORE, the parties agree as follows:

## ARTICLE 1. DEFINITIONS.

§1.01. "Allocated Loss Adjustment Expense" or "ALAE" means such claim expenses, costs and any interest incurred in connection with the investigation, administration, adjustment, settlement or defense of any claim or lawsuit that the COMPANY, under its accounting practices, directly allocates to a particular claim, including applicable subrogation expense. Such expenses include, but are not limited to, attorneys' fees for claims in suit, court costs and related costs such as filing fees, premiums on bonds paid for by the company in accordance with provisions of the Policy, the costs of medical examinations, expert medical or other testimony, laboratory services and x-rays, autopsies, stenographic services, witnesses and summonses and copies of documents; but shall not include the salaries and traveling expenses of the COMPANY's employees, or the COMPANY's overhead and adjusters' fees. Subrogation expenses shall be applied first to reduce the related subrogation or salvage recovery. If the cost of attempting to recover the salvage, or reimbursement, or recovery exceeds the related salvage, reimbursement, or recovery (or there is no related salvage, reimbursement, or recovery), the excess costs shall be pro-rated between the COMPANY and the INSURED and/or the REINSURER in direct proportion to the ratio that the salvage, reimbursement or recovery would have benefited the COMPANY, the INSURED, and/or the REINSURER had the action or activity been successful. With respect to the use of outside claims adjustors, with client approval, ESIS/INA may meet its obligations by engaging, at its discretion and on the client's behalf, the services of persons or firms outside of ESIS/INA's organization. The client's liability for such outside services will be limited to the ESIS/INA fee schedule for those services.

§1.02. "Interest Charge" means the amount of interest payable at the monthly rate of one and one-half percent (1.5%) on any amount payable by the INSURED or the REINSURER to the COMPANY under this Agreement, but not paid by the Required Payment Date. The Interest Charge shall begin to accrue for any such unpaid amount on the day next following the Required Payment Date.

§1.03. "Needed Expense" means the amount the COMPANY determines it needs to cover its expenses to administer the INSURED's casualty insurance program pursuant to the Policies as outlined in the exhibits.

§1.04. "Paid Losses" means all amounts the COMPANY pays for losses under the Policies excluding any payment of Allocated Loss Adjustment Expenses.

§1.05. "Required Payment Date" means a date not later than ten (10) business days after receipt by the Insured of the COMPANY's invoice for any amount billed by the COMPANY under this Agreement or the Policies.

§1.06. "Unallocated Loss Adjustment Expenses" means such claim expenses, costs and any interest incurred in connection with the investigation, administration, adjustment, settlement or defense of any claim or lawsuit that the COMPANY, under its accounting practices, does not directly allocate to a particular claim, including the salaries and traveling expenses of the COMPANY's employees, and the COMPANY's overhead and adjusters' fees.

§1.07. "Ultimate Losses" means all amounts the COMPANY pays for losses, plus the amount the COMPANY estimates it will pay for losses, plus future loss development as estimated by the COMPANY under the Policies, including the amount of losses incurred but not reported as estimated by the COMPANY. In determining the amount of Ultimate Losses, the COMPANY shall apply insurance loss reserving and loss development factors as developed by the COMPANY. Ultimate losses may include allocated loss expense, as estimated by the COMPANY, under some coverages for some or all coverage periods.

§1.08. "Estimated Premium" means the COMPANY's initial estimate, at the time of policy issuance, of the premium for the policy period based on historical and projected exposure amounts multiplied by applicable rates and adjusted for any applicable modifiers and factors included in a particular rating plan.

§1.09. "Adjustable Residual Market Assessment" means assessments to cover the costs to provide insurance to risks in the involuntary insurance market which are charged against insurance companies on a basis which is adjusted annually or periodically based on the business the insurer writes in the voluntary market in the state, rather than on a fixed percentage of premiums written by the insurer in the state for a certain type of types of coverage.

§1.10. "Loss Conversion Factor" means a percentage which is applied to losses and allocated loss adjustment expenses to collect estimated unallocated loss adjustment expenses.

## ARTICLE 2. PAYMENTS BY THE INSURED

§2.01.  Payment of Needed Expenses and Estimated Premium

A.  **Initial Payment.** The INSURED shall pay to the COMPANY the initial Needed Expenses and Estimated Premium for the Policies at such time and in such an amount as set forth in Exhibit B.

B.  **Recalculation.** The COMPANY will recalculate the Needed Expenses and Estimated Premium in accordance with Paragraphs C and D below, at the following times:
1.  upon completion by the COMPANY of any recalculation of premium for the Policies due to audit; or
2.  If applicable, 18 months after the effective date of a Policy and, if applicable, annually thereafter, with respect to the following components:
    a.  the general and administrative expense (COMPANY expenses) plus
    b.  the insurance charge, plus
    c.  the premium taxes, plus
    d.  variable expenses, not including any adjustable residual market assessments.
3.  30 months after the effective date of the workers' compensation Policies with respect to the adjustable residual market assessments as provided in paragraph E below.

C.  **Payment Adjustments.** If the amount of the recomputed Needed Expense and Estimated Premiums exceeds the amount of Needed Expense and Estimated Premiums payments made previously by the INSURED to the COMPANY, the INSURED shall pay the excess to the COMPANY by the Required Payment Date. If Needed Expense and Estimated Premiums payments made previously by the INSURED to the COMPANY exceeds the recomputed Needed Expense and Estimated Premiums, the COMPANY shall return the excess to the INSURED within fifteen (15) business days after the INSURED and the COMPANY mutually agree on the amount of such excess recomputation.

D.  **Premium Taxes.** The premium taxes will be based on state distribution of premiums, applicable state tax rates and any additional tax liability imposed by the amounts of residual market assessment which are accounted for as premium on the COMPANY's financial reports under applicable laws and regulations. The premium taxes are initially estimated as an average rate and are subject to changes in premiums, applicable state tax rates and any additional tax liability imposed.

E. **Residual Market Assessments.**

1. The amount of the initial adjustable residual market assessment charge is included in Exhibit C and as part of Boards, Bureaus, Assessments in Exhibit B. The initial deposit assessment charge stated in Exhibit C shall be determined by applying the initial residual market assessment rate to the amount of the INSURED's premiums for each respective state listed in Exhibit C (less the amount of the residual market assessment which is included in the applicable state premium taxes).

2. The residual market assessment charge is based on the premiums written in the respective individual states. The state residual market assessment rate may be either fixed or adjustable depending upon the agreement between the COMPANY and the INSURED or the COMPANY and the REINSURER. The residual market assessment rate to be applied for the State of Texas. shall be obtained from the annual Texas Workers Compensation Insurance Facility Summary and for all other states from the annual Management Summary prepared by the National Council on Compensation Insurance (hereinafter the "Management Summary" and "NCCI" respectively) using the most recent data as listed for the applicable policy year. If the NCCI or the State of Texas shall discontinue publication of its Management Summary or Workers' Compensation Insurance Facility Summary respectively, the COMPANY will use the residual market assessment rate charged to the COMPANY to implement or continue the procedures for calculating residual market assessment charges.

3. Residual market assessment charges constitute premiums on the COMPANY's financial reports under applicable state insurance laws and regulations. The initial determination of the residual market assessment charge and any redetermination of the residual market assessment charge shall be adjusted in order to include additional state premium taxes that shall apply to such premiums.

4. The residual market assessment charge shall be based on:
   (a) estimated premium or
   (b) audited premium most recently determined by the COMPANY at the time of the residual market assessment charge redetermination or
   (c) if applicable, the most recent retrospective premium adjustment available at the time of the residual market assessment charge redetermination

5. The adjustment shall be made 30 months after the effective date of the Policy promptly following the COMPANY's receipt of the documents referred to in §2.01.E.2.

6. The COMPANY will redetermine the residual market assessment charge by applying the amount of the most recent annual residual market assessment rate for the applicable states (less the amount included in the applicable state premium taxes for each state respectively) to the amount of the applicable premiums as set forth in 1 and 2 above. The resulting premium shall be subject to any additional state premium taxes that may apply.

## §2.02. Paid Losses

A. Each month the COMPANY shall bill the INSURED for the amount of Paid Losses (as shown in Exhibit A-2) up to the loss retention limit shown in Exhibit E plus Allocated Loss Adjustment Expenses paid during the preceding month, both increased by the Loss Conversion Factor, if any, shown in Exhibit D. The INSURED will pay such amounts to the COMPANY by the Required Payment Date.

B. The COMPANY shall have the right to require the INSURED to pay within five (5) business days after receipt of a special invoice the amount of a Paid Loss and/or related Allocated Loss Adjustment Expenses which equals or exceeds the Extraordinary Loss Payment Threshold stated in Exhibit F.

## §2.03. Unallocated Loss Adjustment Expenses

The INSURED shall pay to the COMPANY Unallocated Loss Adjustment Expenses through either a loss conversion factor (LCF) or a fee per claim as provided in Exhibit D. If payment is on a fee per claim basis, the INSURED shall pay to the COMPANY the Unallocated Loss Adjustment Expense Deposit as provided in Exhibit D. Once the Unallocated Loss Adjustment Expense Deposit is exhausted, the COMPANY shall bill the INSURED for Unallocated Loss Adjustment Expenses on additional claims at the composite rate per claim shown in Exhibit D.

**§2.04. INSURED's Paid Loss Deposit Fund**

A. On the effective date of this Agreement, the INSURED shall pay to the COMPANY the amounts shown in Exhibit F to establish and initially fund a Paid Loss Deposit Fund. Such amount shall represent the COMPANY's estimate of the average amount the COMPANY will pay under the Policies during a sixty (60) day period for both the amount of (a) Paid Losses within the retention limit shown in Exhibit E, and (b) paid Allocated Loss Adjustment Expense, both increased by the Loss Conversion Factor, if applicable; provided, however, that the minimum required amount of the Paid Loss Deposit Fund shall be $1000.

B. Six months after the effective date of this Agreement and after each calendar quarter thereafter, the COMPANY shall recalculate the required amount of the Paid Loss Deposit Fund in accordance with 2.04A above; provided, however, the minimum required amount of the Paid Loss Deposit Fund shall be the greater of (1) $1000 or (2) the required amount as adjusted pursuant to §2.06.A., if any. If the required amount of the Paid Loss Deposit Fund exceeds the current amount in the Paid Loss Deposit Fund, the COMPANY will bill the INSURED for the amount of the excess and the INSURED shall pay such amount by the Required Payment Date. If the required amount of the Paid Loss Deposit Fund is less than the current amount in the Paid Loss Deposit Fund, the COMPANY shall pay to the INSURED the amount of the difference. All Paid Loss Deposit Fund Adjustments will be accompanied by supporting documentation.

**§2.05. Conversion of Retro Policies and Paid Loss Premium Collection Policies**

A. Commencing after a mutually agreed upon conversion date (no later than 78 calendar months from policy inception) for a Retro Policy or a Paid Loss Premium Collection Policy, as specifically labeled on the attached exhibits, upon request by the COMPANY, the INSURED will pay to the COMPANY the amount of the then unpaid Ultimate Losses and Allocated Loss Adjustment Expenses under the Policy as determined by the COMPANY increased by (1) the Loss Conversion Factor as a part of the overall Retro Premium Calculation or Paid Loss Premium Collection Plan calculation or (2) the estimated unpaid Unallocated Loss Adjustment Expense. After making such payment to the COMPANY, the INSURED will no longer be obligated to make monthly payments under Section 2.02 of this Agreement for Paid Losses and Allocated Loss Adjustment Expense or under Section 2.03 for Unallocated Loss Adjustment Expenses related to that Policy.

B. Annually thereafter, the total amount of Ultimate Losses plus Allocated Loss Adjustment Expense for that particular Retro Policy (or Paid Loss Premium Collection Plan calculation) will be determined by the COMPANY. With respect to the overall Retro Premium calculation (or Paid Loss Premium Collection Plan calculation), if the total amount of Ultimate Losses plus Allocated Loss Adjustment Expense increased by the Loss Conversion Factor is greater than such total as previously paid by the INSURED, the COMPANY shall bill the INSURED for the amount of the difference. If the total amount of Ultimate Losses plus Allocated Loss Adjustment Expense increased by the Loss Conversion Factor is less than such total as previously paid by the INSURED, the COMPANY shall return to the INSURED the amount of the difference. The above recalculations will continue until terminated by mutual agreement of the COMPANY and the INSURED.

**§2.06. INSURED's Failure to Pay.**

A. If the INSURED fails to fully and promptly pay
   1. the Needed Expenses and Estimated Premiums as provided in §2.01;
   2. the Paid Losses and Allocated Loss Adjustment Expense as provided in §2.02;
   3. the Unallocated Loss Adjustment Expenses as provided in §2.03.
   4. the initial or the recalculated required amount of Paid Loss Deposit Fund as provided in §2.04;
   5. the premium adjustments as provided in §2.05; or
   6. any other amounts payable by the INSURED to the COMPANY under this Agreement or the Policies,

   then
   a. the INSURED shall be liable to the COMPANY for the Interest Charge on such payment;
   b. the COMPANY, at its discretion, shall be entitled to draw on the Letter of Credit or other security established by the INSURED under Article 3 of this Agreement
      1) in full or
      2) in an amount needed to fund the payment or payments.
   c. the COMPANY shall have the right to increase the required amount of the Paid Loss Deposit Fund to an

amount not less than $1,000 and not more than 200% of the total amount of the Paid Losses up to the retention and Allocated Loss Adjustment Expenses for the preceding quarter both increased by the loss conversion factor. if applicable; and

d.  the COMPANY may exercise any other right which it may have at law or in equity.

B.  If the INSURED pays less than the full amount due the COMPANY under this Agreement and the Policies, the payment shall be allocated first to collateral as provided in §5.02 of this Agreement, then to reimburse the Paid Loss Deposit Fund, then to other amounts owed to the COMPANY other than premiums, then to premiums for the policies referenced in the exhibits to this agreement and then finally to premium for Owners and Contractors Protective Liability policies. Such failure to pay the full amount owed to the COMPANY justifies the COMPANY cancelling current policies for non-payment of premium.

## §2.07.  Salvage/Subrogation.

The COMPANY will pay or credit the INSURED up to the amount of the INSURED's interest for amounts attributable to salvage, reimbursement obtained, or recovery made by the COMPANY relating to the Policy, after deducting the actual cost (excluding COMPANY salaries and office expenses) of obtaining such salvage or reimbursement or making such recovery, and after the COMPANY has been reimbursed up to the amount of its interest. However, if salvage, reimbursement, or recovery is made, the actual cost involved in obtaining such salvage, reimbursement, or recovery shall be pro-rated in direct proportion to the salvage, reimbursement or recovery made by the COMPANY and the INSURED respectively. If the cost of attempting to recover the salvage, reimbursement, or recovery exceeds the related salvage, reimbursement, or recovery (or there is no related salvage, reimbursement, or recovery), the excess costs shall be pro-rated between the COMPANY and the INSURED in direct proportion to the ratio that the salvage, reimbursement or recovery would have benefitted the COMPANY and the INSURED had the action or activity been successful.

## ARTICLE 3. REINSURED POLICIES

§3.01.  **Business Reinsured.**  The COMPANY hereby cedes and the REINSURER hereby reinsures the Policies listed in Exhibit H for the reinsurance coverage provided in Exhibit H.

§3.02.  **Reinsurance Premium.**  The COMPANY shall pay the REINSURER a reinsurance premium equal to the premium received by the COMPANY under the Policy less return premium (determined in accordance with applicable manual rates, appropriate experience modifications and premium discount factors) minus the COMPANY's ceding commission as stated in Exhibit H.

§3.03.  **Reports and Payments**

A.  Reports

1.  Within ten (10) days after each Policy premium payment is received by the COMPANY. the COMPANY shall report such premium and the ceding commission to the REINSURER. The reinsurance premium shall be reconciled with the following items to the extent that such items were not previously reconciled:
    a.  the amount of the initially required level of the Paid Loss Deposit Fund;
    b.  the amount necessary to establish or maintain the adjusted required level of the Paid Loss Deposit Fund; and
    c.  that portion of the REINSURER's liability under §3.01 of this Agreement represented by Paid Losses, paid Allocated Loss Adjustment Expense and Unallocated Loss Adjustment Expense.

2.  The REINSURER's liability hereunder will extend beyond the time that the COMPANY is receiving premiums under the reinsured Policies, the termination of the reinsured Policies and the termination of this Agreement. Following such events, the reconciliations may involve only a computation of the REINSURER's liability to the COMPANY, if any, and the COMPANY shall issue a report or statement no more frequently than monthly or less frequently than annually.

3.  Upon termination of the reinsured Policy, the earned premium under the Policy will be  computed in

accordance with the applicable rules, rates, rating plans, premiums and minimum premiums, and the actual ceding commission payable by the COMPANY will be established. If the earned premium as finally determined is different from the premium that was utilized to establish the reinsurance premium hereunder, or if the actual ceding commission payable by the COMPANY is different from the estimated ceding commission used to establish the reinsurance premium hereunder, all prior reconciliations will be recalculated utilizing the actual earned premium or the actual ceding commission.

B.   Payments. If the amount the REINSURER owes the COMPANY exceeds the amount the COMPANY owes the REINSURER under the invoice, report or reconciliation, the REINSURER shall pay the excess amount so owed on or before the Required Payment Date. If the amount the COMPANY owes the REINSURER exceeds the amount the REINSURER owes the COMPANY, the COMPANY shall make the payment within fifteen (15) business days of the acceptance of the recalculation by the INSURED.

## §3.04. REINSURER's Paid Loss Deposit Fund

A.   The REINSURER shall provide the COMPANY with funds to establish and maintain a Paid Loss Deposit Fund to provide a source of funds for payment of REINSURER's liability under this Agreement. The required level of the Paid Loss Deposit Fund as of the date of this Agreement is stated in Exhibit F. The COMPANY shall have the right to adjust the required level of the Paid Loss Deposit fund 6 months after the effective date of this Agreement and quarterly thereafter. The adjusted required level of the Paid Loss Deposit Fund will be a sum which, subject to §3.05.B. below, is not greater than 1½ months of average Paid Losses and paid Allocated Loss Adjustment Expenses for the preceding 3 months increased by the Loss Conversion Factor, if any, stated in Exhibit D.

B.   If the COMPANY becomes obligated to pay amounts representing the REINSURER's liability under this Agreement that exceed the then-current level of the Paid Loss Deposit Fund, the REINSURER, within 10 business days after receipt of a written demand by the COMPANY, shall forward funds to the COMPANY sufficient to cover such amounts greater than the REINSURER's Paid Loss Deposit Fund balance. The REINSURER will be credited for the forwarding of such funds (less any interest paid) in a subsequent invoice, report or reconciliation.

C.   In the event of a Paid Loss and/or paid Allocated Loss Adjustment Expense in the amount equal to or greater than the Extraordinary Loss Payment Threshold stated in Exhibit F, the COMPANY shall have the right to require the REINSURER to pay immediately to the COMPANY the amount of such Paid Loss and/or paid Allocated Loss Adjustment Expense.

## §3.05. Payment by the REINSURER

A.   Any payment the REINSURER is required to make or any funds the REINSURER is required to provide under the terms of this Agreement will be payable in the currency of the United States of America and will be paid or provided on or before the Required Payment Date that the COMPANY sends to the REINSURER for any such payment or funds.

B.   If the REINSURER fails to fully and promptly pay to the COMPANY on or before the time required by this Agreement:
   1.   the Paid Losses, Allocated Loss Adjustment Expense and Unallocated Loss Adjustment Expenses as provided in §3.01 and Exhibit H;
   2.   the initial or the recalculated required amount of Paid Loss Deposit Fund as provided in §3.04;
   3.   any other amounts payable by the REINSURER to the COMPANY under this Agreement,

   then

   a.   the REINSURER shall be liable to the COMPANY for the Interest Charge on such payment;
   b.   the COMPANY shall have the right to increase the required amount of the Paid Loss Deposit Fund to an amount not less than $1,000 and not more than 100% of the total amount of the Paid Losses and Allocated Loss Adjustment Expenses for the preceding quarter both increased by the loss conversion factor, if applicable; and

000021

c. the COMPANY shall be entitled to draw on the Letter of Credit or other security established by the REINSURER under Article 3 of this Agreement
   1) in full or
   2) in an amount needed to fund the payment or payments.
d. the COMPANY may exercise any other right which it may have at law or in equity.

## §3.06. Rights of REINSURER

A. **Right to Associate.** The REINSURER shall have the right but not the obligation to associate, at the REINSURER's own expense, with the COMPANY and its representatives in the defense of any claim, suit or proceeding involving this reinsurance. Except as otherwise specifically provided for herein, the REINSURER's liability shall follow that of the COMPANY under the Policy. All settlements by the COMPANY of claims involving this reinsurance shall be unconditionally binding on the REINSURER. However, any fines or penalties levied upon the COMPANY resulting from errors committed solely by the COMPANY and in which the REINSURER and/or the INSURED did not contribute to in any way shall not be the responsibility of the REINSURER.

B. **Copies of Policies.** At the request of the REINSURER, the COMPANY shall furnish the REINSURER a copy of the Reinsured Policies and all endorsements thereto. The COMPANY shall make available for inspection by the REINSURER at reasonable times any of its records relating to this reinsurance or claims in connection therewith.

C. **Salvage/Subrogation.** The COMPANY will pay or credit the REINSURER up to the amount of the REIN-SURER's interest for amounts attributable to salvage, reimbursement obtained or recovery made by the COMPANY relating to the Policy, after deducting the actual cost (excluding COMPANY salaries and office expenses) of obtaining such salvage or reimbursement or making such recovery, and after the COMPANY has been reimbursed up to the amount of its interest. However, if salvage, reimbursement, or recovery is made, the actual cost involved in obtaining such salvage, reimbursement, or recovery shall be pro-rated in direct proportion to the salvage, reimbursement or recovery made by the COMPANY and the REINSURER respectively. If the cost of attempting to recover the salvage, reimbursement, or recovery exceeds the related salvage, reimbursement, or recovery (or there is no related salvage, reimbursement, or recovery), the excess costs shall be pro-rated between the COMPANY and the REINSURER in direct proportion to the ratio that the salvage, reimbursement or recovery would have benefitted the COMPANY and the REINSURER had the action or activity been successful.

## §3.07. Taxes

A. The COMPANY will be liable for all taxes on premiums received under the reinsured Policies.

B. The REINSURER will, in addition to its liability under §3.01, be liable for all taxes on reinsurance premiums hereunder.

## §3.08. Errors and Omissions.
Inadvertent delays, errors or omissions made by COMPANY or REINSURER in connection with this Agreement or any transaction hereunder shall not relieve the other party from any liability which would have attached, had such delay, error or omission not occurred, provided that such error or omission will be rectified as soon as possible after discovery.

## §3.09. Insolvency

A. All reinsurance made, ceded, renewed or otherwise becoming effective hereunder shall be payable by the REINSURER on the basis of the liability of COMPANY under the reinsured Policies without diminution because of the insolvency of COMPANY.

B. In the event of insolvency of COMPANY, the liquidator or receiver or statutory successor of COMPANY shall give written notice to the REINSURER of the pendency of any claim against the insolvent COMPANY under the Policy within a reasonable time after such claim is filed in the insolvency proceeding. During the pendency of any such claim the REINSURER may investigate and interpose, at its own expense, in the proceeding where

any such claim is to be adjudicated any defense or defenses which it may deem available to the COMPANY or its liquidator or receiver or statutory successor. The expense thus incurred by the REINSURER as the assuming insurer shall be chargeable subject to court approval against the insolvent COMPANY as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to COMPANY solely as a result of the defense undertaken by the REINSURER as the assuming insurer.

C.   All reinsurance made, ceded, renewed or otherwise becoming effective hereunder shall be payable by the REINSURER to COMPANY or to its liquidator or receiver or statutory successor.

## §3.10.   Reinsurance Cancellation

A.   This Article 3 of this Agreement may be canceled by the COMPANY
1.   by giving ninety (90) days prior written notice to the REINSURER; or
2.   by giving the REINSURER ten (10) days notice, if the REINSURER fails to pay the COMPANY any amounts due under this Agreement, ; or
3.   by giving the REINSURER notice of immediate termination or termination as of a specified date, if the REINSURER becomes insolvent, generally fails to pay its debts as they come due, or files a voluntary petition in liquidation, rehabilitation, receivership or conservatorship, or if an involuntary liquidation, rehabilitation, receivership or conservatorship petition or complaint is filed against the REINSURER.

B.   The REINSURER shall have the right to cancel Article 3 of this Agreement by giving a number of days prior written notice to the COMPANY which shall be not less than thirty (30) days more than the longest prior notice of cancellation required by any Named Insured or Insured under the Policy.

C.   In the event that this Agreement is terminated, the REINSURER shall be paid a pro rata portion of the reinsurance premium to which it would have been entitled had this Agreement not been cancelled.

D.   The REINSURER's obligations under this Article shall survive the termination of the Policy, the termination of this Article and the termination of this Agreement. The REINSURER's liability under §3.01 hereof will continue with respect to losses incurred prior to the effective date of termination of this Article, and the REINSURER will pay the COMPANY for Paid Losses, paid Allocated Loss Adjustment Expenses and Unallocated Loss Adjustment Expense.

## ARTICLE 4. PROGRAM AGGREGATE

## §4.01.   Program Aggregate

A.   The *"Program Aggregate Payments"* means with respect to a policy period, the sum of:
1)   the Paid Losses which the REINSURER pays the COMPANY as reinsurance under Article 3, plus
2)   the Paid Losses which the INSURED pays under Deductible Policies, not exceeding the limits of the INSURED's deductible as provided in the Deductible Endorsements attached to the Deductible Policies, plus
3)   the Paid Losses which the INSURED pays under the Retro Policies and Paid Loss Premium Collection Policies, not exceeding the INSURED's loss limit as provided in the Retrospective Rating Endorsement attached to such policies.
Allocated Loss Adjustment Expense and Unallocated Loss Adjustment Expense shall not be considered in determining the amount of the Program Aggregate Payments.

B.   If the Program Aggregate Payments equal or exceed the Program Aggregate Limit specified in Exhibit E for a policy period, the INSURED shall be relieved of any further obligation to pay amounts which otherwise would be within the limits of the INSURED's loss retention as provided in the endorsements to the Policies and Exhibit E; and the REINSURER shall be relieved of any further obligation to pay losses under Article 3. The Program Aggregate Limit shall not limit the Allocated Loss Adjustment Expenses or Unallocated Loss Adjustment Expenses payable by the INSURED or the REINSURER.

C.   Until such time as the Program Aggregate Payments equal or exceed the Program Aggregate Limit, the INSURED

11193

shall continue to pay Paid Losses even if such payments under the policy exceed the aggregate deductible limit or the maxium retrospective premium under the Policy.

## ARTICLE 5. COLLATERAL

### §5.01. Obligations Under the Insurance Program.

A. The "INSURED's Obligations Under the Insurance Program" shall mean all amounts the INSURED is and will be obligated to pay to the COMPANY under the Policies or under this Agreement, including the following:

   1. amounts that the INSURED is or will become obligated to pay to the COMPANY; and
   2. amounts for which the INSURED is or will become obligated to reimburse the COMPANY.

   To the extent that payment is based on losses, the obligation shall be calculated based on Ultimate Losses.

B. The "REINSURER's Obligations Under the Insurance Program" shall mean all amounts the REINSURER is and will be obligated to pay to the COMPANY and is or will become obligated to reimburse the COMPANY under this Agreement. To the extent that payment is based on losses, the obligation shall be calculated based on Ultimate Losses.

### §5.02. Collateral

A. **Collateral Requirement.**

   1. As security for the payment of the INSURED's Obligations Under the Insurance Program, the INSURED has provided and shall provide the COMPANY with collateral and shall maintain such collateral in an amount and form acceptable to the COMPANY and, if applicable, from a financial institution or other entity acceptable to the COMPANY.

   2. As security for the payment of the REINSURER's Obligations Under the Insurance Program, the REINSURER has provided and shall provide the COMPANY with collateral and shall maintain such collateral in an amount and form acceptable to the COMPANY and, if applicable, from a financial institution or other entity acceptable to the COMPANY.

   3. Such collateral shall be provided to the COMPANY, c/o CIGNA Special Risk Facilities, 1601 Chestnut Street (11TLP), Philadelphia, PA 19103, Attn: Collateral Manager.

B. **Amount of Collateral.**

   1. The initial amount of the collateral securing the INSURED's Obligations Under the Insurance Program on the effective date of this Agreement is the amount stated in Exhibit G.

   2. The initial amount of the collateral securing the Obligations of the REINSURER on the effective date of this Agreement is the amount stated in Exhibit G.

   3. If, at any time, the amount of the INSURED's Obligations Under the Insurance Program shall increase as a result of the COMPANY's revised estimate of Ultimate Losses, the INSURED, not later than thirty (30) days after its receipt of written request from the COMPANY, shall provide the COMPANY with additional collateral to secure the increased amount of the INSURED's Obligations Under the Insurance Program as so redetermined by the COMPANY.

   4. If, at any time, the amount of the REINSURER's obligations under the Insurance Program shall increase as a result of the COMPANY's revised estimate of Ultimate Losses, the REINSURER shall, not later than thirty (30) days after its receipt of written request from the COMPANY, provide the COMPANY with additional collateral to secure the increased amount of the REINSURER's obligations.

   5. Prior to each annual anniversary of this Agreement, the amount of the INSURED's Obligations Under the Insurance Program shall be reviewed and redetermined by the COMPANY. The required amount of the collateral shall be adjusted effective as of each such anniversary date to be equal to the amount of the INSURED's Obligations Under the Insurance Program as so redetermined by the COMPANY. The INSURED

shall provide any needed increases in the amount of the security within thirty days after the date shown on the COMPANY's written request for additional required security. The COMPANY shall return any excess in the amount of the security, if warranted, within thirty days after providing the INSURED with written notification of the reduction.

6. Prior to each annual anniversary of this Agreement, the amount of the REINSURER's Obligations Under the Insurance Program shall be reviewed and redetermined by the COMPANY. The required amount of the collateral shall be adjusted effective as of each such anniversary date to be equal to the amount of the REINSURER's obligations as so redetermined by the COMPANY. The REINSURER shall provide any needed increases in the amount of the security within thirty days after the date shown on the COMPANY's written request for additional required security. The COMPANY shall return any excess in the amount of the security, if warranted, within thirty days after providing the REINSURER with written notification of the reduction.

7. The INSURED and, if applicable, the REINSURER, shall maintain the Collateral in amounts acceptable to the COMPANY until the COMPANY determines that there is no longer any need for such security. The INSURED and, if applicable, the REINSURER recognize that the COMPANY may continue to require the collateral as security for the payment of the INSURED's Obligations Under the Insurance Program and, if applicable, the collateral as security for the payment of the REINSURER's Obligations under the Insurance Program after any cancellation, non-renewal, conversion or replacement of the Policies.

C. **Replacement Collateral.**

1. If the collateral provided will expire or terminate, the party that is required to provide the collateral shall provide replacement collateral to the COMPANY in the amount of the collateral terminating or expiring, not later than thirty (30) days prior to the expiration or termination of the collateral.

2. If there is a material deterioration in the financial condition of the issuer of the collateral or if the issuer becomes subject to a receivership, insolvency or bankruptcy proceeding or if the issuer, or its receiver or other successor denies liability with respect to such collateral, the party that is required to provide the collateral shall provide replacement collateral to the COMPANY in the amount of such collateral within ten (10) days following receipt of a demand from the COMPANY that the collateral be replaced.

3. Such replacement collateral shall be effective immediately upon the expiration of the existing collateral and in an amount and form acceptable to the COMPANY and from a financial institution or other entity acceptable to the COMPANY. If the INSURED fails to provide the COMPANY with replacement collateral in the amount of the terminating or expiring collateral as required above, the COMPANY will be entitled to draw on or foreclose any collateral provided under this Agreement without regard to the nature of the collateral or any obligation to marshall assets.

D. **Foreclosure.**

1. Any collateral provided by or on behalf of the INSURED, whether before or after the effective date of this Agreement, to secure the INSURED's Obligations Under the Insurance Program, shall secure all such obligations and the REINSURER's Obligations Under the Insurance Program. Any collateral provided by or on behalf of the REINSURER, whether before or after the effective date of this Agreement, to secure the REINSURER's Obligations Under the Insurance Program, shall secure all such obligations and the INSURED's Obligations Under the Insurance Program. If the INSURED or the REINSURER fails to pay or perform any part of such obligations, including failure to provide the COMPANY with replacement collateral or additional required collateral, the COMPANY shall have the right to draw on or foreclose any and all of the collateral. Before drawing or foreclosing on the collateral, the Company shall provide notice to the INSURED or, if applicable, to the REINSURER of its intent.

2. The COMPANY shall have the right, but not the duty, to apply any or all of the collateral to the INSURED's Obligations Under the Insurance Program or the REINSURER's Obligations Under the Insurance Program in each instance where such obligations for any reason (including insolvency or bankruptcy) are not fulfilled without regard to the nature of the collateral or any obligation to marshall assets. Such application shall not be construed as a waiver of the duty of the INSURED or the REINSURER

to fulfill their respective obligations or constitute a fulfillment of such obligations for the purpose of curing any breach of those obligations. Nothing in this Agreement will constitute a waiver of any other rights the COMPANY may have in each instance where the INSURED or the REINSURER fail to fulfill their respective obligations.

E. **Letters of Credit.** Without limiting the COMPANY's right to determine the acceptability of collateral, any letter of credit shall be irrevocable, clean, unconditional and without any reference to this Agreement or any other agreement, and shall provide that it will automatically renew for successive one-year periods unless the issuer gives to the COMPANY not less than sixty (60) days written notice prior to the expiration date set forth in the letter of credit or any anniversary of such expiration date.

If the INSURED or REINSURER substitutes one or more letters of credit for cash collateral on hand, the cash collateral held by the COMPANY will be released contemporaneously with the delivery of the letter(s) of credit in an amount equal to the face amount of the substitute letter(s) of credit, provided that the letter(s) of credit are in amounts and forms and are issued by banks acceptable to the COMPANY.

## ARTICLE 6. Arbitration

§6.01:

A. As a condition precedent to any right of action hereunder, any dispute between the COMPANY and the REINSURER or between the COMPANY and the INSURED arising out of this Agreement shall be submitted to the decision of a board of arbitration consisting of two (2) arbitrators and an umpire, meeting in a mutually agreed upon location by the COMPANY and the REINSURER or the COMPANY and the INSURED, as the case may be.

B. The members of the board of arbitration shall be active or retired disinterested officials of insurance or reinsurance companies, or disinterested, active or retired members of the risk management community or insurance brokerage community. Each party shall appoint its arbitrator and the two arbitrators shall choose an umpire before instituting the hearing. If the respondent fails to appoint its arbitrator within sixty (60) days after being requested to do so by the claimant, the latter shall also appoint the second arbitrator. If the two arbitrators fail to agree upon the appointment of an umpire within four (4) weeks after their nominations, each of them shall name three (3), of whom the other shall decline two (2) and the decision shall be made by drawing lots. If a dispute involves all three parties to this Agreement, the INSURED and the REINSURER shall be entitled to select only one arbitrator and the COMPANY shall select the other arbitrator.

C. The claimant shall submit its initial brief within twenty (20) days from appointment of the umpire. The respondent shall submit its brief within twenty (20) days thereafter and the claimant may submit a reply brief within ten (10) days after filing of the respondent's brief.

D. The board shall make an award with regard to the custom and usage of the insurance and reinsurance business. The board shall issue its award in writing based upon a hearing in which evidence may be introduced without following strict rules of evidence but in which cross examination and rebuttal shall be allowed. The board shall make its award within sixty (60) days following the termination of the hearings unless the parties consent to an extension. A decision by the majority of the members of the board shall become the award of the board and shall be final and binding upon all parties to the proceeding.

Either party may apply to the United States District Court for the Eastern District of Pennsylvania for an order confirming the award; and a judgment of that Court shall thereupon be entered upon the award. If such an order is issued, the attorneys' fees of the party so applying and court costs will be paid by the party against whom confirmation is sought.

E. Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the umpire. The remaining costs of the arbitration proceedings shall be allocated by the board.

## ARTICLE 7. GENERAL

**§7.01. Notices.** Any notice required or permitted to be given under this Agreement shall be in writing, in English, and shall be deemed duly given if delivered personally, by registered, certified or express mail in a sealed envelope postage prepaid, or by telegraph charges prepaid or by the express carrier charges prepaid, telex or facsimile transmissions, to the party for whom it is intended at the address provided in Exhibit A or such other address as the recipient may designate from time to time.

**§7.02. Warranties.** Insurance COMPANY of North America warrants that it is empowered and authorized to execute this Agreement on behalf of its affiliated insurance companies listed below.

**§7.03. Successors and Assigns.** All the terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns, whether so expressed or not; provided, however, that no party hereto shall assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the other parties hereto.

**§7.04. Interpretation.**

**A.** Except to the extent provided by §6.01, this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**B.** If there is any conflict between the terms of this Agreement and the terms of the Exhibits attached hereto, the terms of the Exhibit shall prevail.

**§7.05. Severability.** Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions and without affecting the validity or enforceability of such provision in any other jurisdiction.

**§7.06. Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute but one and the same instrument.

**§7.07. Prior contracts.** This Agreement supersedes all prior discussions between the parties and replaces the documents listed in Exhibit A.

**§7.08. Amendment and Termination of Agreement.**

**A.** Cancellation of the Policies or any Policy by either the INSURED or the COMPANY will not terminate this Agreement. The INSURED's Obligations under this Agreement will continue after any cancellation, non-renewal or replacement of the Policies. The premium for such Policy or Policies shall be determined in accordance with those provisions of the Endorsements to the Policies and Policy conditions relating to cancellation.

**B.** This Agreement shall terminate when all the parties have fulfilled their obligations hereunder.

**C.** The COMPANY and the INSURED may agree to terminate or amend their respective rights and obligations to each other without the agreement of the REINSURER. The COMPANY and the REINSURER may agree to terminate or amend their respective rights and obligations to each other without the agreement of the INSURED.

**D.** All representations and warranties made in this Agreement shall survive the termination of this Agreement and shall continue in full force and effect until all obligations of the parties hereunder have been discharged in full.

IN WITNESS WHEREOF, this Casualty Insurance Program Agreement has been executed by the parties hereto, to be effective on the date first written above.

THE INSURED:

JWP, Inc.

By: _____

Name:    Rex Thrasher

Title:    Director of Risk Management

Date:    9/8/94

THE COMPANY:

Insurance Company of North America,
Pacific Employers Insurance Company, and
Delaware Reinsurance Company

By: _____

Name:    Robert Lorer

Title:    Branch Casualty Manager

Date:    9/5/54

THE REINSURER:

Defender Indemnity Limited

By: _____

Name:    Rex Thrasher

Title:    Chairman of the Board of Defender Indemnity
Limited

Date:    9/8/94

MSW93049.024

| EXHIBIT A. | To Casualty Insurance Program Agreement | | LISTING OF INSURANCE POLICIES |
|---|---|---|---|
| EFFECTIVE: | October 1, 1993 | | |
| INSURED: | JWP Inc. | | |
| REINSURER: | Defender Indemnity Limited | | |
| Companies: | Insurance Company of North America | (INA) | |
| | Pacific Employers Insurance Companies | (PEIC) | |
| | Delaware reinsurance Company | (DRC) | |

**1. This Agreement covers the following policies:**

| Period of Coverage | Policy # | Program Type | | Line of Business | | Insurer |
|---|---|---|---|---|---|---|
| 10/1/92-93 | ISA HO 502195-9 | High Deductible Program | (HDP) | Auto Liability | (AL) | INA |
| | HDO G1 403379-8 | High Deductible Program | (HDP) | General Liability | (GL) | INA |
| | WLR C2 044318-2 | High Deductible Program | (HDP) | Workers' Compensation | (WC) | PEIC |
| | WLR C2 044390-A | High Deductible Program | (HDP) | Workers' Compensation | (WC) | DRC |
| | RSC C2 044317-0 | Captive Program | (CAP) | Workers' Compensation | (WC) | INA |
| 10/1/93-94 | ISA HO 634887-7 | High Deductible Program | (HDP) | Auto Liability | (AL) | INA |
| | HDO G1 658418-A | High Deductible Program | (HDP) | General Liability | (GL) | INA |
| | WLR C4 024417-7 | High Deductible Program | (HDP) | Workers' Compensation | (WC) | PEIC |
| | RSC C4 024416-5 | Captive Program | (CAP) | Workers' Compensation | (WC) | INA |

**2. This Agreement amends and replaces the following Agreements:**

a. Reinsurance Agreement effective October 1, 1992 between Insurance Company of North America and Defender Indemnity Limited;

b. Workers' Compensation Deductible Funding Agreement effective October 1, 1992 between JWP, Inc. and Pacific Employers Insurance Company and Delaware Reinsurance Company;

c. Agreements for Workers' Compensation Residual Market Assessments--1992 Deductible WC Programs between JWP, Inc. and Pacific Employers Insurance Company relating to policy no. WLR C2 044318-2;

d. Agreements for Workers' Compensation Residual Market Assessments--1992 Captive Programs between JWP, Inc. and Insurance Company of North America relating to policy no. RSC C2 044317-0;

e. Workers' Compensation, Automobile Liability and General Liability Program Aggregate Agreement effective October 1, 1992 among JWP, Inc., Defender Indemnity Limited and Insurance Company of North America on behalf of itself and its affiliated insurance companies, Pacific Employers Insurance Company and Delaware Reinsurance Company;

f. Collateral Agreement effective October 1, 1992 among JWP, Inc., Defender Indemnity Limited and Insurance Company of North America on behalf of itself and its affiliated insurance companies, Pacific Employers Insurance Company and Delaware Reinsurance Company.

g. All binders relating to the Policies. However, with regard to policy coverages, the binder supercedes the agreement for the 10/1/92-93 term and the proposals supercede the agreement for the 10/1/93-94 term and all successive renewals.

3. Summary of Payments by Insured.

| 10/1/92-93 | First Installment Due: 10/1/92 | Installment #2 Due 1st day of each month | Installments #3—6 Due 1st day of each month | Installment #7 Due 1st day of each month | Installment #8—11 Due 1st day of each month | Installment #12 Due 1st day of each month | Installments #13—25 Due 1st day of each month |
|---|---|---|---|---|---|---|---|
| Estimated Premium and Needed Expenses (Exhibit B) | $ 3,010,515 | $ 276,680 | $ 276,680 | $ 434,876 | $ 434,870 | $ 434,870 | $ 0 |
| Unallocated Loss Adjustment Expense Deposit (Exhibit D) | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 |
| Paid Loss Deposit Fund (Exhibit F) | $ 150,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Collateral (Exhibit G) | $ 4,250,000 | $ 1,166,250 | $ 1,158,375 | $ 1,158,375 | $1,158,375 | $ 579,187 | |
| TOTAL | $ 7,430,515 | $ 1,462,930 | $ 1,455,055 | $ 1,613,251 | $1,613,245 | $1,034,057 | $ 20,000 |

| 10/1/93-94 | First Installment Due: 10/1/93 | Installment #2 Due 1st day of each month | Installments #3—12 Due 1st day of each month | Special Install Due on the 1st Day of the 4th week of each month starting with the 11/1/93 installment |
|---|---|---|---|---|
| Estimated Premium and Needed Expenses (Exhibit B) | $1,443,215 | $ 157,770 | $ 167,770 | N/A |
| Paid Loss Deposit Fund (Exhibit F) | $ 70,000 | $ 0 | $ 0 | $0 |
| Collateral (Exhibit G) | $ 979,621 | $ 489,823 | $ 489,823 | $ 489,823 |
| TOTAL | $ 2,492,836 | $647,593 | $657,593 | $489,823 |

000030

| EXHIBIT A. to Casualty Insurance Program Agreement | LISTING OF INSURANCE POLICIES |
|---|---|
| EFFECTIVE: October 1, 1993<br>INSURED: JWP Inc.<br>REINSURER: Defender Indemnity Limited<br>COMPANY: Insurance Company of North America    (INA)<br>Pacific Employers Insurance Company    (PEIC)<br>Delaware Reinsurance Company    (DRC) | |

4. All notices and other communications relating to this Agreement shall be addressed as follows:

If to the INSURED, then to:

> JWP Inc.
> Royal Executive Park
> Six International Dr.
> Rye Brook. NY  10573
> Attention:  Rex Thrasher

If to REINSURER, then to:

> Defender Indemnity Limited
> c/o JWP, Inc.
> Royal Executive Park
> Six International Dr.
> Rye Brook, NY  10573
> Attention:  Rex Thrasher

If to COMPANY, then to:

> Insurance Company of North America
> 175 Water Street
> New York. NY 10038
> Facsimile:  (212) 709-8450
> Attn: Casualty Dept.
> Casualty Manager

5. Monthly billing will include payment of:
   Paid Losses limited to the applicable retention, plus
   Allocated Loss Adjustment Expenses, plus
   Loss Conversion Factor (LCF) payments, if any (See Exhibit D)
   However. Paid Losses, paid Allocated Loss Adjustment Expenses for October 1993 through March 1994 pertaining to losses incurred during the 10/1/93-94 period will be paid out of the collateral.  Such amounts paid after March 31, 1994 will be billed to the INSURED and/or the REINSURER on a monthly basis as set forth in §2.03.

Initial Blocks/Date

RT    9/8/94    RL    9/6/94

000031

| EXHIBIT B. | To Casualty Insurance Program Agreement | | | | ESTIMATED PREMIUM AND NEEDED EXPENSES |
|---|---|---|---|---|---|
| EFFECTIVE: | October 1, 1993 | | | | |
| INSURED: | JWP Inc. | | | | |
| Companies: | Insurance Companies of North America (INA) | | | | |
| | Pacific Employers Insurance Companies (PEIC) | | | | |
| | Delaware Reinsurance Company (DRC) | | | | |

| Policy Number | Estimated Premium | Needed Expenses | Estimated Premium Base | | Adjustment Factor |
|---|---|---|---|---|---|
| 10/1/92-93 | General Liability and Auto Liability Policies - High Deductible | | | | |
| HDO G1 403379-8 | | | | | |
| Information Services Premium | $ 93,600 | Incl. | 148,642,009 payroll | | .06297 per $100 payroll |
| Contracting Premium | $ 530,400 | Incl. | 440,444,181 payroll | | .12042 per $100 payroll |
| Total Premium | $ 624,000[1] | Incl. | 589,086,190 payroll | | SEE ABOVE |
| ISA HO 502195-9 | | | | | |
| Total Premium | $ 610,800[1] | Incl. | 2,986 power units | | $204.55 per power unit |
| Total | $ 1,234,800[2] | Incl. | | | |
| WLR C2 044318-2 WLR C2 044317-0 | Workers' Compensation Policy - Deductible | | | | |
| Company Expenses General and Admin. Exp.[1] | | $ 756,210 | Estimated total WC payroll including captive and deductible of $471,242,731 | | minimum & adjustable upwards at .22924 per $100 payroll |
| Insurance Charge[1] | | $ 693,500 | Estimated total WC payroll including captive and deductible of $471,242,731. Info. Svs. payroll $140,142,186 Contracting payroll $331,100,545 | | minimum & adjustable upwards at .1065 per $100 payroll in information services payroll and .25543 per $100 in contracting payroll |
| Excess of Aggregate | | $ 10,000 | Estimated total WC payroll including captive and deductible of $471,242,731 | | not subject to adjustment |
| Non Subject Charges[6] | | AUDIT | | | |
| Boards, Bureaus, Assessments | | $ 350,022[3] | | | Percentage of referenced policies premium |
| Premium Taxes | | $ 228,721[1] | | | Subject to any changes in state tax rate structures |
| Total | $2,434,294[3] | $ 2,038,453 | | | |

000032

EXHIBIT B.   To Casualty Insurance Program Agreement
EFFECTIVE:   October 1, 1993
INSURED:     JWP Inc.
Companies:   Insurance Companies of North America          (INA)
             Pacific Employers Insurance Companies         (PEIC)
             Delaware Reinsurance Company                  (DRC)

**ESTIMATED PREMIUM AND NEEDED EXPENSES**

| Policy Number | Estimated Premium | Needed Expenses | Estimated Premium Base | Adjustment Factor |
|---|---|---|---|---|
| 10/1/92-93 | | Workers' Compensation Policies - Captive Program | | |
| RSC C2 044317-0 Company Expenses General and Admin. Exp.[1] | | $ 324,090 | Estimated total WC payroll including captive and deductible of $471,242,731 | minimum & adjustable upwards at .1065 per $100 payroll |
| Insurance Charge[1] | | $ 301,500 | Estimated total WC payroll including captive and deductible of $471,242,731 Info. Svs. payroll $140,142,186 Contracting payroll $331,100,545 | minimum & adjustable upwards at .1065 per $100 in Information Services payroll and .25543 per $100 in contracting payroll |
| Excess of Aggregate[2] | | $ 0 | Estimated total WC payroll including captive and deductible of $471,242,731 | not subject to adjustment |
| Non Subject Charges[6] | | AUDIT | | |
| Boards, Bureaus, Assessments | | $ 119,408[3] | | Percentage of referenced policies premium |
| Premium Taxes | | $ 250,995[4] | | Subject to any changes in state tax rate structures |
| Total | $ 3,804.888[5] | $ 995,993 | | |

1.   All countersignature fees will be paid by Producer. No commission will be payable by the COMPANY to the Producer.

   Insurance Charges and Company Expenses for Workers' Compenation included in initial Needed Expenses and Total Premium for Automobile and General Liability are minimum and adjustable upwards. Additional Insurance Charge and Company Expenses for Workers' Compensation and Total Premiums for Automobile and General Liability will be waived at audit for up to a 20% increase in Estimated Premium Base. If the premium base determined upon audit is more than 20% greater than the original estimated premium base for the policy period, the Insurance Charges, Company Expenses and Total Premiums shall be increased by a percentage amount equal to the percentage increase in the premium base less 10 percentage points.

2.   Automobile and General Liability premiums are minimum and adjustable upwards based on the premium and exposure after the sale of Enviro-Gro Technologies for policy period 10/1/92 - 93.

3.   For WLR C2 044390-A/WLR C2 044318-2

   The initial expenses amount includes a 12.2% estimated Texas Residual Market Factor. The initial expense amounts do not include any charges for the New York Second Injury Fund. At audit, and annually thereafter, the charge will be billed to the Insured at 18% of paid indemnity losses in the state of New York.

   Boards and Bureaus are .9% of deductible premium adjustable at audit. Fixed Residual Market Assessments are 12.45% of fixed states deductible premium adjustable at audit. Adjustable states are 20.13% of adjustable states deductible premium adjustable as per agreement (excl. TX, including FL, MA)

For RSC C2 044317-0

Boards and Bureaus are .6% of discounted standard premium adjustable at audit. Fixed Residual Market Assessments are 2.39% of fixed states discounted standard premium adjustable at audit. Adjustable states are 4.6% of adjusted states discounted standard premium and adjustable as per agreement (NJ only)

4.    For WLR C2 044318-2 WLR/C2 044390-A

The premium Taxes are payable in advance based on estimates using an average tax rate of 10.10% applied to deductible premium and are adjustable at audit.

For RSC C2 044317-0

The premium Taxes are payable in advance based on estimates using a tax rate of 4.85% applied to discounted standard premium and are adjustable at audit.

5.    For WLR C2 044318-2/WLR C2 044390-A

Based on estimated discounted standard premium (including estimated experience modifications) of 11,259,902 for the states of AK, AR, CO, CT, DE, DC, FL, GA, IL, IA, KS, KY, MD, MI, MN, NH, NM, NY, NC, PA, SC, TN, TX, VA, LA, MA and on an estimated deductible policy premium of $2,434,294.

6.    Non-subject charges and various state assessments will be collected at audit.

| Policy Number | Estimated Premium | Needed Expenses | Estimated Premium Base | Adjustment Factor |
|---|---|---|---|---|
| 10/1/93-94 | General Liability and Auto Liability Policies - High Deductible | | | |
| HDO G1 658518A Total Premium | $ 150.000[1] min. | Incl. | $204.751,973 payroll | minimum & adjustable upwards at .073259 per $100 payroll |
| ISA H0634887-7 Total Premium | $ 394,033[1] min | Incl. | 1,116 power units | minimum & adjustable upwards at 353.08 per power unit |
| Total | $ 544.033 min | Incl. | | |
| 10/1/93-10/1/94 | Workers' Compensation Policies - Deductible | | | |
| WLR C4 024417-7 Companies Expenses' General and Admin. Exp.[1] | | $ 375,660 | Estimated total WC payroll including captive and deductible: 115,431,973 | minimum & adjustable upwards at .47833 per $100 pay-roll |
| Insurance Charge[1] | | $ 273,929 | Estimated total WC payroll including captive and deductible: 115,431,973 | minimum & adjustable upwards at .32965 per $100 pay-roll |
| Non Subject Charges[5] | | AUDIT | | |
| Boards, Bureaus, Assessments | | $ 137,285[2] | | Percentage of referenced policies premium |
| Premium Taxes | | $ 201,335[3] | | Subject to any changes in state tax rate structures |
| Total | $ 1,084,234[4] | $ 988,209 | | |
| 10/1/93-10/1/94 | Workers' Compensation Policies - Captive Program | | | |
| RSC C4 04416-5 Companies Expenses' General and Admin. Exp.[1] | | $ 176,490 | Estimated total WC payroll including captive and deductible of $115,431,973 | minimum & adjustable upwards at .47833 per $100 pay-roll |
| Insurance Charge[1] | | $ 106,598 | Estimated total WC payroll including captive and deductible of $115,431,973 | minimum & adjustable upwards at .32965 per $100 pay-roll |
| Non Subject Charge[5] | | | | |
| Boards, Bureaus, Assessments | | $ 52,566[2] | | Percentage of referenced policies premium |
| Premium Taxes | | $ 135,294[3] | | Subject to any changes in state tax rate structures |
| Total | $1,763,943 | $ 470.948 | | |

1. All countersignature fees will be paid by Producer. No commission will be payable by the COMPANY to the Producer.

Insurance Charges and Company Expenses for Workers' Compensation included in initial Needed Expenses and Total Premium for Automobile and General Liability are minimum and adjustable upwards. Additional Insurance Charge and Company Expenses for Workers' Compensation and Total Premiums for Automobile and General Liability will be waived at audit for up to a 20% increase in Estimated Premium Base. If the premium base determined upon audit is more than 20% greater than the original estimated premium base for the policy period, the Insurance Charges, Company Expenses, and Total Premiums shall be increased by a percentage amount equal to the percentage increase in the premium base less 10 percentage points.

2. For WLR C4 024417-7

The initial expense amount includes a 0% estimated Texas Residual Market Factor and a 0% estimated Rhode Island Residual Market Factor. The initial expense amounts do not include any charges for the New York Second Injury Fund. At audit, and annually thereafter, the charge will be 26% of paid indemnity losses in the state of New York. Boards and Bureaus are .6% of deductible premium adjustable at audit. WC Treaty Assessments are .5% of discounted standard premium adjustable at audit. Fixed Residual Market Assessments are 4.3909% of fixed states deductible premium, adjustable at audit. Adjustable states are 20.9656% of adjustable states deductible premium adjustable as per the agreement (excl. TX, RI, including FL, MA, KY, NJ, VA).

For RSC C4 023316-5

Boards and Bureaus are 6% of discounted standard premium adjustable at audit. WC Treaty Assessments are .5% of discounted standard premium adjustable at audit. Fixed Residual Market Assessments are 1.88% of discounted standard premium adjustable at audit.

3. For WLR C4 024417-7

The premium Taxes are payable in advance based on estimates using a tax rate of 18.5693% applied to deductible premium and are adjustable at audit.

For RSC C4 023316-5

The premium Taxes are payable in advance based on estimates using a tax rate of 7.67% applied to discounted standard premium and are adjustable at audit.

4. For WLR C4 024417-7

Based on estimated discounted standard premium (including estimated experience modifications) of $6,558,942 for the states of CO, CT, FL, IL, IN, MA, MI, MS, NJ, NY, PA, RI, TX and on an estimated deductible policy premium of $1,084,234.

5. Non-subject charges and various state assessments will be collected at audit.

| EXHIBIT B. | To Casualty Insurance Program Agreement | | |
|---|---|---|---|
| EFFECTIVE: | October 1, 1993 | | ESTIMATED PREMIUM AND NEEDED EXPENSES |
| INSURED: | JWP Inc. | | |
| Companies: | Insurance Companies of North America | (INA) | |
| | Pacific Employers Insurance Companies | (PEIC) | |
| | Delaware Reinsurance Company | (DRC) | |

| 10/1/92-93 | First Installment | Installments #2–6 | Installment #7 | Installments #8–12 |
|---|---|---|---|---|
| HDO G1 403379-8 | $ 52,000 | $ 52,000 | $ 52,000 | $ 52,000 |
| ISA HO 502195-9 | $ 50,900 | $ 50,900 | $ 50,900 | $ 50,900 |
| WLR C2 044318-2 | $ 121,615 | $ 121,645 | $ 218,113 | $ 218,100 |
| WLR C2 044317-0 | Incl. | Incl. | Incl. | Incl. |
| RSC C2 044317-0 | $2,786,000 | $ 52,135 | $ 113,863 | $ 113,870 |
| **TOTAL** | $3,010,515 | $276,680 | $434,876 | $434,870 |

| 10/1/93-94 | First Installment | Installment #2 | Installments 3–12 |
|---|---|---|---|
| HDO G1 658518A | $ 12,500 | $ 12,500 | $ 12,500 |
| ISA H 0634887-7 | $ 32,793 | $ 32,840 | $ 32,840 |
| WLR C4 024417-7 | $ 83,174 | $ 73,185 | $ 83,185 |
| RSC C4 023316-5 | $1,314,748 | $ 39,245 | $ 39,245 |
| **TOTAL** | $1,443,215 | $ 157,770 | $ 167,770 |

Initial Blocks/Date

RT    9/8/94    HC    9/9/44

000037

| EXHIBIT C. | To Casualty Insurance Program Agreement | ADJUSTABLE RESIDUAL MARKET ASSESSMENTS |
|---|---|---|
| EFFECTIVE: | October 1, 1993 | |
| INSURED: | JWP In.c | |
| REINSURER: | Defender Indemnity Limited | |
| COMPANY: | Insurance Company of North America (INA) | |
| | Pacific Employers Insurance Company (PEIC) | |
| | Delaware Reinsurance Company     (DRC) | |

### RESIDUAL MARKET ASSESSMENTS – INITIAL ESTIMATE - Deductible Policies

| Policy Number 10/1/92- 93 | Applicable State(s) | Initial Premium | X Initial Residual Market Assessment Rate | ÷ Tax Factor | Initial Deposit Assessment Charge |
|---|---|---|---|---|---|
| WLR C2 044318-2 | TX | 106,724 | 12.2% | .9506 | 13,697 |
| | FL | 98,754 | 16.4% | .9346 | 17,329 |
| | MA | 234,500 | 21.7% | .9720 | 52,353 |

### RESIDUAL MARKET ASSESSMENTS – REDETERMINATION - Deductible Policies

| Policy Number 10/1/92- 93 | Applicable State(s) | Premium | Residual Market Assessment Rate | ÷ Tax Factor | Redetermined Assessment Charge |
|---|---|---|---|---|---|
| WLR C2 044318-2 | TX | | | | |
| | FL | | | | |
| | MA | | | | |

Total Redetermined Assessment Charge -
Initial Deposit Assessment Charge -
Additional Premium or Return Premium -

### RESIDUAL MARKET ASSESSMENTS – INITIAL ESTIMATE - Captive Reinsured Policies

| Policy Number 10/1/92- 93 | Applicable State(s) | Initial Premium | X Initial Residual Market Assessment Rate | Initial Deposit Assessment Charge |
|---|---|---|---|---|
| RSC C2 044317-0 | NJ | 378,462 | 4.6% | 17,409 |

### RESIDUAL MARKET ASSESSMENTS – REDETERMINATION - Captive Reinsured Policies

| Policy Number 10/1/92- 93 | Applicable State(s) | Premium | Residual Market Assessment Rate | Redetermined Assessment Charge |
|---|---|---|---|---|
| RSC C2 044317-0 | NJ | | | |

Total Redetermined Assessment Charge-
Initial Deposit Assessment Charge -
Additional Premium or Return Premium -

| EXHIBIT C. | To Casualty Insurance Program Agreement | ADJUSTABLE RESIDUAL MARKET ASSESSMENTS |
|---|---|---|
| **EFFECTIVE:** | October 1, 1993 | |
| **INSURED:** | JWP In.c | |
| **REINSURER:** | Defender Indemnity Limited | |
| **COMPANY:** | Insurance Company of North America (INA) Pacific Employers Insurance Company (PEIC) Delaware Reinsurance Company      (DRC) | |

### RESIDUAL MARKET ASSESSMENTS — INITIAL ESTIMATE - Deductible Policies

| Policy Number 10/1/93-94 | Applicable State(s) | Initial Premium | X Initial Residual Market Assessment | + Tax Factor | Initial Deposit Assessment |
|---|---|---|---|---|---|
| WLR C2 024417-7 | RI | $ 3,728 | 0.0% | 0 | 0 |
| | TX | $ 18,301 | 0.0% | .9506 | 0 |
| | FL | $ 15,828 | 34.2% | .9372 | 5,776 |
| | MA | $ 266,546 | 21.7% | .9720 | 59,507 |
| | NJ | $ 3,270 | 14.4% | .9635 | 489 |

-RMA are payable based on the audited premium.

### RESIDUAL MARKET ASSESSMENTS - REDETERMINATION - Deductible Policies

| Policy Number 10/1/93-94 | Applicable State(s) | Premium | Residual Market Assessment | + Tax Factor | Redeter-mined Assessment |
|---|---|---|---|---|---|
| WLR C4  024417-7 | RI | | | | |
| | TX | | | | |
| | DL | | | | |
| | MA | | | | |
| | NJ | | | | |

Initial Blocks/Date

RT    9/8/94    K/    9/9/94

Total Redetermined Assessment -

Initial Assessment -
Additional Premium or Return Premium -

000039

EXHIBIT D.    To Casualty Insurance Program Agreement  UNALLOCATED LOSS ADJUSTMENT EXPENSES

**EFFECTIVE:** October 1, 1993
**INSURED:** JWP, Inc.
**REINSURER:** Defender Indemnity Limited
**COMPANY:** Insurance Company of North America    (INA)
Pacific Employers Insurance Company  (PEIC)
Delaware Reinsurance Company        (DRC)

| Policy Period | Policy Number | Loss Conversion Factor | Unallocated Loss Adjustment Expense Deposit | | |
|---|---|---|---|---|---|
| | | | Minimum Charge[1] | Included Claims | Add'l Claims Composite Fee |
| 10/1/92-93 | ISA HO 502195-9 | NOT APPLICABLE | ESIS | ESIS | ESIS |
| | HDO G1 403379-8 | NOT APPLICABLE | ESIS | ESIS | ESIS |
| | WLR C2 044318-2 WLR C2 044390-A | NOT APPLICABLE | $ 500,000 Incl. | 1,500 Incl. | $ 355 Incl |
| | RSC C2 044317-0 | NOT APPLICABLE | Incl. | Incl. | Incl |
| Total | | | $ 500,000 | 1,500 | $ 355 |
| 10/1/93-94 | ISA HO 634887-7 | 1.12 applied to Paid Losses up to deductible and to all paid Allocated Loss Adjustment Expenses. | NOT APPLICABLE | | $ |
| | HD0 G1 658518-A | 1.12 applied to Paid Losses up to the deductible and to all paid Allocated Loss Adjustment Expenses; LCF will continue to be applied even after the exhaustion of any policy aggregates. | $NOT APPLICABLE | | $ |
| | WLR C4 024417-7 | 1.15 applied to Paid Losses up to loss retention and to all paid Allocated Loss Adjustment Expenses. | NOT APPLICABLE | | $ |
| | RSC C4 024417-7 | 1.15 applied to Paid Losses up to loss retention and to all paid Allocated Loss Adjustment Expenses; | NOT APPLICABLE | | $ |
| Total | | | NOT APPLICABLE | | $ |

1. $20,000 due 10/1/92 and $20,000 due on the first of the following 24 months.

Initial Blocks/Date

~~RT~~  9/8/94  ~~RC~~  9/6/~~c~~

SCF111693    Exh D-1

...... ........ Program Agreement

| EFFECTIVE: | October 1, 1993 |
| INSURED: | JWP Inc. |
| REINSURER: | Defender Indemnity Limited |
| COMPANY: | Insurance Company of North America (INA) |
| | Pacific Employers Insurance Company (PEIC) |
| | Delaware Reinsurance Company (DRC) |

RETENTION
PROGRAM AGGREGATE RETENTION LIMIT

| Policy Period | Policy Number | Loss Retention[a] | Program Aggregate Retention Limit |
|---|---|---|---|
| 1/92-93 | ISA IIO 502195-9 | $500,000 deductible per accident | **Program Aggregate Retention Limit of: $52,000,000** (excluding Allocated Loss Adjustment Expense). Losses under the Auto Liability, General Liability, Workers' Compensation Deductible Program and Workers' Compensation Captive Program contribute to the exhaustion of the overall program aggregate. |
| | IIDO G1 403379-8 | $500,000 deductible per occurrence | **Minimum aggregate based on** an estimated workers' compensation payroll of $471,242,731. The aggregate is adjustable upwards at audit on the Workers' Compensation payroll at a rate of $11.03 per $100 payroll. Company will waive any increase in the program aggregate based upon up to a 20% increase in the Workers' Compensation Payroll. Should payroll increase greater than 20%, the adjustment will be based upon the total audited Workers' Compensation Payroll. |
| | WLR C2 044318-2 WLR C2 044390-A | $500,000 deductible per accident one or more employees $500,000 deductible per occupational disease affecting any one employee | |
| | RSC C2 044317-0 | $500,000 reinsurance per accident one or more employees $500,000 reinsurance per occupational disease affecting any one employee | |

Exh.E-1

| | | Program Aggregate Retention Limit of: NOT APPLICABLE |
|---|---|---|
| ....., | $500,000 deductible per accident | |
| HDO G1 658518-A | $1,500,000 deductible per accident for All Other<br>$500,000 deductible per occurrence for Products Complet-<br>ed Operations | |
| WLR C4 024417-7 | $500,000 deductible per accident one or more employees<br>$500,000 deductible per occupational disease affecting any<br>one employee | |
| RSC C4 024416-5 | $500,000 reinsurance per accident one or more employees<br>$500,000 reinsurance per occupational disease affecting any<br>one employee | |

**The Loss Retention and Aggregate Retention Limit do not include either Allocated Loss Adjustment Expenses or Unallocated Loss Adjustment Expenses.**

The Insured under all General Liability policies as outlined above will be responsible for the same deductible limits for each respective policy period plus all allocated ...s expenses under any Owners' Contractors, Protective, Railroad Protective, and Highway Protective policies issued during the concurrent period. However, it is agreed ...t both the Products/Completed Operations and the All Other deductible for OCP's, RRP's and HHP's issued concurrent with policy HDO G1 658518-A will be $500,000 ...s all allocated loss expenses.

Blocks/Date

[signature]    9/9/94

**EFFECTIVE:** October 1, 1993

**INSURED:** JWP Inc.

**REINSURER:** Defender Indemnity Limited

**COMPANY:**
Insurance Company of North America (INA)
Pacific Employers Insurance Company (PEIC)
Delaware Reinsurance Company (DRC)

PAID LOSS DEPOSIT FUND

| Policy Period | Policy Number | Required PLDF Insured | Required PLDF Reinsurer | Extraordinary Loss Payment Threshold |
|---|---|---|---|---|
| 0/1/1992-93 | ISA 110 502195-9 | ESIS | N/A | ESIS |
| | IIDO G1 403379-8 | ESIS | N/A | ESIS |
| | WLR C2 044318-2 | $75,000 | N/A | $100,000 |
| | WLR C2 044390-A | Incl. | N/A | $100,000 |
| | RSC C2 044317-0 | N/A | $75,000 | $100,000 |
| /1/1993-94 | ISA 110 634887-7 | ESIS | N/A | ESIS |
| | IIDO G1 658518-A | ESIS | N/A | ESIS |
| | WLR C4 024417-7 | $52,500 | N/A | $100,000 |
| | RSC C4 024416-5 | N/A | $17,500 | $100,000 |
| tal | | $127,500 | $92,500 | |

1. Claims handling for ISA 110 502195-9, IIDO G1 403379-8, ISA HO 634887-7, HDO G1 658518-A is dealt with under separate agreement with the INSURED and ESIS, Inc.

al Blocks/Date

T___ 1/6/94  AC  6/5/94

000043

Exhb.F-1

| EXHIBIT G. | Specialty Insurance Program Agreement | COLLATERAL |
|---|---|---|
| EFFECTIVE: | October 1, 1993 | |
| INSURED: | JWP Inc. | |
| Companies: | Insurance Company of North America (INA) | |
| | Pacific Employers Insurance Company (PEIC) | |
| | Delaware Reinsurance Company (DRC) | |

| INSURED'S/REINSURER'S COLLATERAL | |
|---|---|
| 1993-94 | |
| WLR C4 024417-7; RSC C4 024416-5 | |
| ISA H0 634887-7; HDO G1 658518-A | |
| Total | |
| Collateral held as of 10/1/93 | $ 11,555,716 |
| Total Collateral | $ 16,420,813 |
| | $ 27,976,529 |
| Form of Security | |
| Letters of Credit | |
| Cash Collateral | |
| Total Collateral | $27,976,529 |
| | $27,976,529 |

### INSURER'S CASH COLLATERAL INSTALLMENT PAYMENTS

| Payment Date | | Payment Date | |
|---|---|---|---|
| 10/01/93 | $ 979,621 | 4/25/94 | $ 489,822 |
| 11/01/93 | $ 489,823 | 5/1/94 | $ 489,823 |
| 11/22/93 | $ 289,822 | 5/23/94 | $ 489,822 |
| 12/01/93 | $ 489,823 | 6/1/94 | $ 489,823 |
| 12/27/93 | $ 489,822 | 6/27/94 | $ 489,822 |
| 1/1/94 | $ 489,823 | 7/1/94 | $ 489,823 |
| 1/24/93 | $ 489,822 | 7/25/94 | $ 489,822 |
| 2/1/94 | $ 489,823 | 8/1/94 | $ 489,823 |
| 2/21/94 | $ 489,822 | 8/22/94 | $ 489,822 |
| 3/1/94 | $ 489,823 | 9/1/94 | $ 489,823 |
| 3/28/94 | $ 489,822 | 9/26/94 | $ 489,822 |
| 4/1/94 | $ 489,823 | | |
| Total | | | $ 11,555,716 |

| EXHIBIT G. To Casualty Insurance Program Agreement | COLLATERAL |
|---|---|
| **EFFECTIVE:** October 1, 1993<br>**INSURED:** JWP Inc.<br>**REINSURER:** Defender Indemnity Limited<br>**COMPANY:** Insurance Company of North America (INA)<br>Pacific Employers Insurance Company (PEIC)<br>Delaware Reinsurance Company (DRC) | |

1. Investment income on the Cash Collateral Fund balance will be credited to the Companies.

2. The INSURED's/REINSURER's collateral of $27,976,529 shall secure the obligations of the following policies which shall include the obligations of **Dynalectric** under its insurance program with the Company effective 10/1/93 so long as Dynalectric Company remains a direct or indirect subsidiary of JWP, Inc.

WLR C2 044318-2 (PEIC)
WLR C2 044390-A (DRE)
RSC C2 044317-0 (INA)
HDO G1 403379-8 (INA)
ISA H0 502195-9 (INA)


WLR C4 024417-7 (PEIC)
RSC C4 024416-5 (INA)
HDO G1 658518-A (INA)
ISA HO 634887-7 (INA)


WLR C2 044671-7 (PEIC)
SCF C2 044672-9 (PEIC)
SCF C2 044673-0 (PEIC)
HDO G1 658473-3 (INA)
ISA H0 634888-9 (INA)

Initial Blocks/Date

RJ   9/8/94   ___   4/6/6J

1993 to September 30, 1994, ULAE pursuant to §3.03 of the EMCOR Agreement; provided that the amount of the Paid Losses, ALAE and ULAE which become reimbursable after the effective date of this amendment but is not reimbursed pursuant to this Section 3, is equal to or less than thirty-two million, five hundred thousand dollars ($32,500,000.00).

4.   Except as otherwise provided in this Amendment, the INSUREDS and the REINSURER shall be relieved of their obligations under Article 5 of these Agreements to provide collateral to the extent that the INSUREDs and the REINSURER are relieved of their obligation to reimburse the COMPANY pursuant to Section 3 of this Amendment.

5.   Except as specifically provided in this Amendment, nothing herein shall be construed to change the terms of these Agreements. More specifically, but not as a limitation, nothing in this amendment shall be construed:

   a.   to relieve the INSUREDs or the REINSURER of any obligations with respect to periods other than October 1, 1992 to September 30, 1995;

   b.   to relieve the INSUREDs or the REINSURER of any obligations to reimburse the COMPANY after the effective date of this Amendment for Paid Claims and ALAE relating to claims incurred between October 1, 1992 and September 30, 1995 or for ULAE relating to claims incurred between October 1, 1993 and September 30, 1994 to the extent that such obligations exceed $32,500,000.00 or to provide collateral to secure the reimbursement of such excess or to fund the paid loss deposit funds with respect to such excess; and

   c.   other than as stated in Section 3 of this Amendment, to relieve the INSUREDs or the REINSURER of the obligation to pay amounts due or to become due to the COMPANY under these Agreements including Needed Expenses, Estimated Premium, insurance charges, premium taxes, variable expenses, adjustable residual market assessments and unallocated adjustment expenses.

6.   Nothing in this Amendment will relieve the INSUREDs of their obligations under contracts with ESIS, Inc. or otherwise affect the INSUREDs' rights and obligations to involvement and participation in claims management and review processes.

7.   The INSUREDs and REINSURER shall have the option to commute this Amendment effective December 31, 2000 or any December 31 thereafter. Upon commutation of this Amendment:

   a.   The COMPANY shall pay to EMCOR an amount equal to the difference between the payment it received under Section 1 of this Agreement less the Paid Losses and ALAE paid by the COMPANY after the effective date of this Amendment and on or before the commutation date and related ULAE which the INSUREDs and REINSURER were relieved from paying under Section 3 of this Amendment, multiplied by 60% [($22,500,000.00 - Paid Loss, ALAE, ULAE) x 60%].

   b.   The INSUREDS and REINSURER shall provide the COMPANY with the collateral which they would be required to provide under these Agreements if this Amendment

2 OF 3 Pages

000077

did not exist. The COMPANY shall hold the amounts it is required to pay EMCOR under Subsection 7.a. of this Amendment towards the amount of the required collateral. Nothing in this paragraph shall affect the Insured's or Reinsurer's rights to provide substitute collateral pursuant to these Agreements.

c. The relief granted to the INSUREDs and REINSURER from making payments and providing collateral under Sections 3 and 4 of this Amendment shall terminate and the INSUREDs and the REINSURER shall have the same obligations as if this Amendment had not been adopted.

d. The commutation shall be evidenced by an amendment to these Agreements executed by the parties.

**IN WITNESS WHEREOF**, this Amendment has been executed by the parties hereto to be effective March 27, 1996.

THE INSUREDs:       EMCOR Group, Inc.
                    Dynalectric Company

                    By:_____
                    Name:       Rex Thrasher
                    Title:      Staff Vice President of Risk Management
                    Date:       6 - 13 - 9 6

THE COMPANY:        Insurance Company of North America
                    Pacific Employers Insurance Company, and
                    Delaware Reinsurance Company

                    By: _Angelo Sama_____
                    Name:       Angelo Sama
                    Title:      Senior Vice President, Special Risk Facility
                    Date:

THE REINSURER:      Defender Indemnity Limited

                    By:_____
                    Name:       Rex Thrasher
                    Title:      Chairman of the Board
                    Date:       6 - 13 - 9 6

000078