IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - -x

EMCOR GROUP, INC.                          :

                                           :
                                           :
                                           :
VS                                         : 3:00 CV
                                           : 2211 (AVC)
                                           :
                                           :

INSURANCE COMPANY OF NORTH AMERICA         :

- - - - - - - - - - - - - - - - - - -x


   Deposition of SUSAN REINHARD taken pursuant to

subpoena and the Federal Rules of Civil Procedure,

before Jacinda A. Grigaitis, Licensed Shorthand

Reporter #00381 and Notary Public within and for the

State of Connecticut, held at the offices of Saxe,

Doernberger & Vita, 1952 Whitney Avenue, Hamden,

Connecticut, on February 3, 2004, at 9:42 a.m.


            DEL VECCHIO REPORTING SERVICES, LLC
               PROFESSIONAL SHORTHAND REPORTER
                       117 RANDI DRIVE
                     MADISON, CT 06443
                       (203) 245-9583
HARTFORD                                            STAMFORD

205

1 Q. But you can't be more defined of whether it was
2 1999 or 2000?
3 A. I cannot. I cannot and it's...
4 Q. Okay. Do you know what limit of -- withdrawn.
5 It was a policy that covered the multiple
6 years, three years?
7 A. Yes.
8 Q. One policy?
9 A. Yes.
10 Q. Did it have one per occurrence limit or was
11 there a single limit applicable to each year?
12 A. The limit and the deductible were equal and
13 they applied to all the claims.
14 Q. Do you know what the limit was?
15 A. The per occurrence limit and the deductible I
16 believe were both $1.5 million?
17 Q. Is that both for general liability and
18 completed operation?
19 A. Yes. I would need to check that out. I don't
20 know.
21 Q. Okay.
22     MR. VITA: We got to take a quick bathroom
23 break.
24     MR. MARCELLINO: Sure.
25     THE WITNESS: Yeah. That would be great.

206

1     THE VIDEOGRAPHER: Going off record. The
2 time is 4:19 p.m.
3 (There was a recess taken from 4:18 to 4:34 p.m.)
4     THE VIDEOGRAPHER: Back on record. The
5 time is 4:34 p.m.
6 BY MR. MARCELLINO:
7 Q. Thanks. If I asked you this, I apologize. But
8 the -- on the '92 INA policy, did that policy have a
9 duty to defend?
10 A. Yes.
11 Q. Okay. On the 1993 INA policy, did that policy
12 have a duty to defend?
13 A. Yes.
14 Q. And on the 1994 policy, did that policy have a
15 duty to defend?
16 A. Yes.
17 Q. Now, when you went to CNA for insurance, excuse
18 me, did you send an application for the policy?
19 A. I don't know.
20 Q. Have you yourself ever been party to EMCOR's
21 application for policies?
22 A. Yes.
23 Q. Do you help fill them out?
24 A. Yes.
25 Q. Are they maintained in a central file?

207

1 A. I don't know.
2     MR. MARCELLINO: Okay. I'd like you to
3 take as a formal request for production, Jeff,
4 if you would, please, by the next deposition
5 please bring me the copy of the application
6 submitted to CNA together with all supporting
7 letters and documentation.
8     MR. VITA: Okay. Just so you know, EMCOR
9 obviously is a large company. Its broker is
10 more likely to have that information than it
11 is. We will ask and find out where it is. But
12 typically a company this size, its broker,
13 Marsh, would keep all this type of
14 administrative stuff in their file.
15     MR. MARCELLINO: With your authorization,
16 we'd be happy to contact Marsh provided you
17 give a release to do it.
18     MR. VITA: No. We will do that and find
19 out where it is.
20     MR. MARCELLINO: Okay. That's fine.
21     MR. VITA: You're talking about the CNA?
22     MR. MARCELLINO: The CNA policy, the one
23 policy she's been testifying to that ran from
24 '92 to '93 to '94. I'm not concerned about the
25 excess policies on the upper levels, Jeff, just

208

1 the one we're talking about here.
2     THE VIDEOGRAPHER: Attorney Vita, could
3 you place your microphone on? Thank you.
4 BY MR. MARCELLINO:
5 Q. Now, Ms. Reinhard. When I first asked you the
6 question about the CNA policy, you used the phrase,
7 The policy was subject to this litigation. What did
8 you mean by that?
9 A. I don't -- I don't recall saying those words --
10 I don't view. I'm not saying I didn't say them.
11 There may be misunderstanding. This -- the policy we
12 bought, we bought to replace limit. To the outside
13 world, it's a fully fronted policy because the '92,
14 '93, '94 limit was exhausted. I don't know that we
15 filled out an application for that. It was designed
16 to represent to the world that we had insurance for
17 which we needed the protection for.
18     And the funding behind that was EMCOR's --
19 EMCOR's responsibility. So when you say to me the
20 phrase that I -- that you say I just said, I'm not
21 sure that this policy is related to the litigation
22 except that EMCOR incurred the expense of having to
23 produce such a policy because the aggregates were
24 prematurely exhausted by CIGNA and had to go through
25 that process to have that policy to begin with. The

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF CONNECTICUT
 3
 4
 5   EMCOR GROUP, INC.               x         ORIGINAL
 6                                   :
     VS                              :
 7                                   : 3:00 CV
                                     : 2211 (AVC)
 8   INSURANCE COMPANY OF NORTH AMERICA :
                                      x
 9
10                         VOLUME II
11
12           Continued deposition of SUSAN REINHARD taken
13   pursuant to subpoena and the Federal Rules of
14   Civil Procedure, before Amy C. Brewer, LSR,
15   License #164, and Notary Public within and for
16   the State of Connecticut, held at the law
17   offices of Saxe, Doernberger & Vita, 1952
18   Whitney Avenue, Hamden, Connecticut, on
19   February 12, 2004 at 9:59 a.m.
20
21
22          DEL VECCHIO REPORTING SERVICES, LLC
23            PROFESSIONAL SHORTHAND REPORTERS
                       117 RANDI DRIVE
24                    MADISON, CT 06443
                        203 245-9583
25                      800 839-6867
     HARTFORD                                    STAMFORD
```

**Page 113**

1    MR. OELSNER: Then use this.
2  BY MR. OELSNER:
3    Q. I'm going show you Plaintiff's 31 again. Review
4  whatever you need to, and tell me where in this document it
5  refers to any one of the three policies, in particular the
6  deductible endorsement which I believe is endorsement number
7  32 to the policies. And just so we're clear, Miss Reinhard,
8  I'm looking for specific words in this Plaintiff's 31 that
9  refers to either one of the three policies or all the
10  policies or deductible 32, endorsement 32 or the deductible
11  endorsement. Where are those terms used?
12    A. Would you be so kind as to read that whole
13  paragraph back to me, please.
14    Q. Let me try to rephrase it. Miss Reinhard, I would
15  like you to review Exhibit 31 and point out to us where
16  Exhibit 31 by word refers to any one or all of the three
17  policies or specifically to the deductible endorsement found
18  in the three policies.
19        MR. VITA: Object to the form of the
20    question.
21        MR. OELSNER: And your objection is
22    because it's compound?
23        MR. VITA: Yes.
24        MR. OELSNER: Well --
25    A. This document that I'm looking at which is
        DEL VECCHIO REPORTING SERVICES   203-245-9583

**Page 114**

1  Plaintiff's Exhibit 31 refers to the policies. The policies
2  are listed in this document.
3  BY MR. OELSNER:
4    Q. And is that on the last page?
5    A. No.
6    Q. What page is that, if you refer to the page number?
7    A. The one place I'm seeing it now, there may be other
8  places, is page five.
9    Q. On page five, does that indicate that the three
10  policies at issue, in particular endorsement number 32, the
11  deductible endorsement is being modified? Does it refer to
12  those, that endorsement by specific name?
13    A. I don't see deductible 32 referenced on page five.
14    Q. It's actually endorsement 32 or deductible
15  endorsement?
16    A. I apologize.
17    Q. That's all right. Are those terms used in any
18  other portion or the pages of Exhibit 31, the claims
19  bulletin?
20    A. I've scanned this document and I do not see
21  reference to the endorsement 32 in this document.
22    Q. Okay. If you feel you need more time to read it
23  rather than just scanning it, we'll take the time for you to
24  do that because I do want to be very clear that I would like
25  you to show me where that document refers to the deductible
        DEL VECCHIO REPORTING SERVICES   203-245-9583

**Page 115**

1  endorsement or endorsement number 32. So if you need more
2  time to look at it, please feel free to do so.
3    A. The endorsement you're calling the deductible
4  endorsement is endorsement 32, is that --
5    Q. I'm sorry if I was unclear about that.
6    A. I don't see specific reference to this endorsement
7  per se. I do see that Cigna was obligated to get EMCOR's
8  authority to settle cases for example above $25,000.
9    Q. But it did not refer to modification of the
10  deductible endorsement? It doesn't use those terms, correct?
11    A. It does not talk about endorsement 32 specifically.
12    Q. Thank you. I think you can give that back to me.
13  So I don't lose it, thanks. Miss Reinhard, I believe last
14  week you talked a little bit about some coding issues with
15  respect to the prior Zurich policy?
16    A. Yes.
17    Q. There was a lot of testimony about that. Did you
18  personally have any involvement in that review of the Zurich
19  claims to see whether they were properly coded one way or the
20  other?
21    A. I did not personally review physical files, no.
22    Q. Okay. Again, just with respect to the coding
23  project for Zurich, not INA, just talking about that, did you
24  make any, you personally, make any recommendations whether a
25  claim should be coded as GL or Completed Operations?
        DEL VECCHIO REPORTING SERVICES   203-245-9583

**Page 116**

1    A. No.
2    Q. Okay. Miss Reinhard, prior to the work that you
3  did with respect to the coding project, if I can use that
4  term, on the INA claims, had you reviewed any treatises with
5  respect to coding of claims as either GL or Completed
6  Operations?
7        MR. VITA: Objection. Asked and
8    answered.
9        MR. OELSNER: No, it was not.
10        MR. VITA: I think it was. Go ahead
11    and answer.
12    A. I actually think it was also. And for
13  treatises I assume you mean some insurance documents or what
14  have you but the answer is no.
15  BY MR. OELSNER:
16    Q. And treatises, let me ask you this, did you review
17  any articles, any case law, any books, any publications
18  discussing the coding of claims as either General Liability
19  or Completed Operations?
20        MR. VITA: Objection. Asked and
21    answered.
22    A. When? What time frame are you speaking of?
23  BY MR. OELSNER:
24    Q. I will say before you began your project.
25    A. No.
        DEL VECCHIO REPORTING SERVICES   203-245-9583

Page 121

1  A. I didn't review their files, no.
2  Q. Did you review files, and I mean either paper
3  documents or files contained in electronic format maintained
4  by ESIS?
5  A. It's possible I did that, yes.
6  Q. Do you recall having done that as we sit here
7  today?
8  A. Just so I'm clear, can you read that question back
9  one more time? The two questions ago.
10          (Whereupon, the referred to question was read
11          back by the court reporter.)
12 A. I don't recall specifically sitting at my desk
13 reviewing ESIS documents but I know that in this process
14 generally that I may have had documents that Cigna had sent
15 to us, reports or information or things from a claim review
16 for example. And sometimes I also called the claim adjuster
17 and would ask them, tell me about the facts of this accident,
18 what happened, or what took place. So in that respect, I got
19 some information from Cigna.
20 Q. My question I think was poor so let me rephrase it.
21 During your work on the coding project did you ask ESIS to
22 provide you either documents or access to their database,
23 either paper database or electronic database?
24 A. During the whole process from beginning to end?
25 Q. Correct.
          DEL VECCHIO REPORTING SERVICES   203-245-9583

Page 122

1  A. I don't recall if I specifically did. I know we
2  did access ESIS documents and claim files and perhaps also
3  electronic files. Marsh did that. I don't know who
4  physically asked for that but I know Marsh went to Cigna and
5  it was in Voorhees, New Jersey and the ESIS office is located
6  right in that Cigna office and looked at those files.
7  Q. So you believe someone at Marsh actually sat down
8  and looked at ESIS files for information to decide whether or
9  not claims were properly coded as General Liability or
10 Completed Operations?
11 A. Yes.
12 Q. Miss Reinhard, do you know -- strike that. Miss
13 Reinhard, for the 92-93 policy how many claims were submitted
14 for coverage to INA?
15 A. What was the time frame?
16 Q. Just in 92-93 policy?
17          MR. VITA: Objection. Do you mean
18          outside the context of this litigation,
19          including this litigation?
20 A. In the policy term?
21          MR. VITA: Generally?
22          MR. OELSNER: Generally, sure.
23 BY MR. OELSNER:
24 Q. How many claims were submitted for coverage for the
25 92-93 policy?
          DEL VECCHIO REPORTING SERVICES   203-245-9583

Page 123

1  A. I'm assuming you mean the General Liability policy.
2  Q. Correct, the General Liability policy?
3  A. Policy I said, yes.
4  Q. Just to be clear, wherever I say 92-93 policy,
5  93-94, 94-95, those are the policies in litigation. Those
6  are the General Liability policies or the CGL policies. I am
7  not referring to auto policies or workers' comp policies and
8  you understand that during the course of this examination,
9  correct?
10 A. I can't think of a moment where I didn't understand
11 that if your question was not broader in scope but I wanted
12 to make clear this time and so I asked you.
13 Q. That's fine.
14 A. I don't know the answer to that question.
15 Q. Is it more than 500 claims?
16 A. It may have been, I don't know.
17 Q. Do you know how many claims were reported for
18 coverage on the 93-94 General Liability policy?
19 A. I don't know the number.
20 Q. What about for the 94-95 CGL policy, how many
21 claims were reported for coverage?
22 A. I also don't know the number.
23 Q. Do you know the number of total claims reported for
24 coverage collectively under the three policies?
25 A. I don't know the combined number.
          DEL VECCHIO REPORTING SERVICES   203-245-9583

Page 124

1  Q. It was more than a thousand, wasn't it?
2          MR. VITA: Object to the form of the
3          question.
4  A. I don't want to estimate.
5  BY MR. OELSNER:
6  Q. Was it more or less than a thousand?
7  A. It was a lot of claims, I don't know the number.
8  Q. As claims manager or former claims manager you
9  don't know the number of claims reported?
10         MR. VITA: Object to the form of the
11         question.
12         MR. OELSNER: You can object.
13         MR. VITA: How on God's earth would
14         she know the number of claims reported under a
15         policy going back eight years now? How would
16         she know that? You can answer.
17 A. 12 years.
18         MR. OELSNER: Well, Jeff, I don't know
19         what to tell you again, except, again you are
20         consistently in violation of the federal rules
21         on doing speaking objections.
22         MR. VITA: I am not in violation of
23         the rules. Ask the question.
24         MR. OELSNER: Fine. And don't have
25         speaking objections. You can object to your
          DEL VECCHIO REPORTING SERVICES   203-245-9583

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF CONNECTICUT

 3

 4
      - - - - - - - - - - - - - - - - -x
 5    EMCOR GROUP, INC.                 :
                                        :
 6                                      :
      VS                                :
                                        :  3:00 CV
 7                                      :  2211 (AVC)
                                        :
 8    INSURANCE COMPANY OF NORTH AMERICA :
      - - - - - - - - - - - - - - - - -x
 9
                                           ORIGINAL
10                     VOLUME III

11

12           Continued deposition of SUSAN REINHARD taken

13      pursuant to subpoena and the Federal Rules of

14      Civil Procedure, before Amy C. Brewer, LSR,

15      License #164, and Notary Public within and for

16      the State of Connecticut, held at the law

17      offices of Saxe, Doernberger & Vita, 1952

18      Whitney Avenue, Hamden, Connecticut, on

19      February 23, 2004 at 10:10 a.m.

20

21

22              DEL VECCHIO REPORTING SERVICES, LLC
                 PROFESSIONAL SHORTHAND REPORTERS
23                       117 RANDI DRIVE
                        MADISON, CT 06443
24                        203 245-9583
                          800 839-6867
25    HARTFORD                                      STAMFORD
```

Page 49

1  continuing dialog in May of 2000 with Bud London about the
2  review of the 94/95 year?
3      A.  Well, I'm writing Doug here, Doug Willis of Marsh,
4  and I don't remember this email specifically.
5      Q.  But generally?
6      A.  Okay.  Can you repeat the question?
7      Q.  Were you communicating with Doug and Bud London
8  about their review in May of 2000?
9      A.  It looks to be that that's what I was doing based
10 on this document.
11     Q.  Okay.  By the way, you testified a few moments ago
12 that ESIS changed coding of files at your request, is that
13 correct?
14         MR. VITA:  Objection.  I don't know that
15     accurately characterizes her testimony.
16 BY MR. MARCELLINO:
17     Q.  Withdrawn.  Perhaps let me phrase it this way so we
18 don't have the objection.  Did ESIS ever change any files --
19 withdrawn.  Did ESIS ever change the coding of any files at
20 your request?
21     A.  Yes.
22     Q.  Did Cigna ever change the coding of any files at
23 your request?
24     A.  Well, to the extent that ESIS changed the files
25 Cigna changed it, yes.
         DEL VECCHIO REPORTING SERVICES   203-245-9583

Page 50

1      Q.  Do you know if Cigna relied upon the ESIS coding?
2      A.  I am not sure what you mean by that question.
3      Q.  Did Cigna adopt the ESIS coding or did they do
4  their own coding, if you know?
5      A.  I think the Cigna ESIS -- there was a Cigna ESIS
6  claim file that had information in it.  Likewise, there was
7  INA adjusters also worked for Cigna that had their files, and
8  I'm assuming also has similar information in the file setup
9  the same way.  I don't know if that answers your question.
10     Q.  ESIS established codes, is that correct?
11     A.  Someone at Cigna did.  I believe it was ESIS, yes.
12     Q.  Did ESIS establish a code?
13     A.  I wasn't there when it took place.  I believe that
14 a Cigna employee and it was likely ESIS but I don't know
15 that.
16     Q.  You know the difference between ESIS and INA, don't
17 you?
18     A.  I know that they're two Cigna companies, yes.
19     Q.  Now the ESIS company, did they establish codes?
20     A.  I thought I just answered your question.  I thought
21 I just said -- I gave my answer to that.  I physically wasn't
22 there when these files were setup.  I can tell you that there
23 are people at Cigna who did this --
24     Q.  Move to strike as nonresponsive.  Miss Reinhard,
25 I'm trying to get through the deposition, okay.  Please
         DEL VECCHIO REPORTING SERVICES   203-245-9583

Page 51

1  indulge me.  A very simple question.  I apologize if my
2  question was misleading before.  Just to set this properly
3  for the purpose of judicial review, I'm going have to ask you
4  a couple questions again.  Was ESIS your TPA?
5          MR. VITA:  Objection.  Asked and
6      answered.
7      A.  ESIS was the organization that Cigna held out
8  to do the claims service, yes.
9  BY MR. MARCELLINO:
10     Q.  ESIS was your TPA, correct?
11         MR. VITA:  Objection.  Asked and answered
12     and to the form of the question.
13     A.  If those things are equivalent in all ways,
14 legally and otherwise and in the documents the answer is yes
15 but I don't know that.
16 BY MR. MARCELLINO:
17     Q.  Now did ESIS establish claim codes?
18     A.  I wasn't there when this happened, one.  Two, when
19 many of these cases were setup, the employees who were doing
20 this were at the same time Cigna employees, INA employees and
21 ESIS employee.  They identified themselves as wearing
22 different hats.  So what hat they were wearing at the time
23 they set up this code in 92, 93, 94 and 95 and so forth, I
24 don't know.  At the end of the day Cigna had the obligation
25 to code the cases properly.
         DEL VECCHIO REPORTING SERVICES   203-245-9583

Page 52

1      Q.  Move to strike as nonresponsive.  Do you know if
2  ESIS ever established any claims codes for you in the course
3  of your entire relationship with ESIS?
4      A.  ESIS --
5      Q.  It's capable of a yes or no answer, Miss Reinhard.
6      A.  ESIS set up files and if that included claims,
7  codes yes.
8      Q.  Did INA ever establish a separate file, separate
9  and apart from ESIS to the best of your knowledge?
10     A.  On certain cases they did, yes.
11     Q.  Do you know if INA used ESIS codes or setup new
12 codes when INA established the files?
13     A.  Well, things like policy number I would assume --
14     Q.  I'm sorry, just listen to my question so it's
15 clear.  I'm referring only to claim codes.  Do you know if
16 INA used ESIS claim codes or did their own?
17     A.  When you say claim codes you mean PR or GL, is that
18 what you mean?
19     Q.  That's correct, yes.
20     A.  I don't know the answer to that question.
21         MR. VITA:  I have to take a quick
22     bathroom break.
23
24         (Whereupon, a brief recess was taken.)
25
         DEL VECCHIO REPORTING SERVICES   203-245-9583

65

1  you see any reference to Cigna on this letter, yes or no?
2           MR. VITA: Object to the harassing tone
3       of your question.
4    A. I don't see that Cigna is, the name Cigna, the
5  word Cigna is on this letter. I can tell you by that around
6  this time Ann Marie was telling me that she had to get Ginny
7  Loyd involved because it was their money and they were
8  calling the shots. So I believe that everything that they
9  sent to me ran through or was approved by ultimately Ginny
10 because that was the approach that was being taken.
11 BY MR. MARCELLINO:
12   Q. You just gave a very serious piece of testimony,
13 Miss Reinhard. You said you believe. I'm going to ask you a
14 very direct question. Do you know if what you said is true,
15 what you just said? Do you know what I mean by true? Do you
16 have a personal knowledge that Miss Marson ran everything
17 through Cigna before she communicated with you?
18          MR. VITA: Objection. I believe her
19      testimony was she believed that to be the case.
20   A. Ann Marie told me that she needed to get
21 Ginny's approval on things and Ginny represented herself as
22 being involved and having to approve.
23 BY MR. MARCELLINO:
24   Q. My question was you testified earlier that you
25 believed she ran everything through Cigna. My question is do
           DEL VECCHIO REPORTING SERVICES   203-245-9583

66

1  you know that for a fact or is it just speculation by you?
2           MR. VITA: Objection. Asked and
3       answered.
4    A. I don't know every conversation that took place
5  between them.
6  BY MR. MARCELLINO:
7    Q. So you don't know if she ran everything through
8  Cigna, do you?
9           MR. VITA: Object to the form of the
10      question.
11   A. I don't know every conversation that took place
12 between them. I know that Ann Marie told me whatever the
13 position was on any of the cases that ultimately it was Ginny
14 that was going to approve those decisions. And it's
15 reasonable for me to assume that a written document would be
16 something that Ginny had seen.
17 BY MR. MARCELLINO:
18   Q. But you don't know that, do you?
19          MR. VITA: Object to the form of the
20      question.
21   A. I know she did see it at one point. Yes, I
22 believe she did see it.
23 BY MR. MARCELLINO:
24   Q. During her deposition perhaps?
25   A. I don't recall now how I know that.
           DEL VECCHIO REPORTING SERVICES   203-245-9583

67

1    Q. Now there came a time, did there not, that you went
2  and reviewed the ESIS files in July of 1999?
3           MR. VITA: Object to the form of the
4       question.
5  BY MR. MARCELLINO:
6    Q. Withdrawn. In July 1999 did you review the ESIS
7  files?
8    A. I don't recall reviewing the ESIS files in July of
9  1999.
10   Q. If you notice in the prior documents we went
11 through, Miss Reinhard, there was meeting scheduled in July
12 9, 1999 to review the ESIS files. You have no recollection
13 whatsoever about that at this point?
14          MR. VITA: Object to the form of the
15      question.
16   A. I will be happy to look at the documents if you
17 wants the see if it refreshes my recollection, but as I sit
18 here now I don't recall.
19 BY MR. MARCELLINO:
20   Q. So you don't recall whether or not anyone from
21 EMCOR or EMCOR's behalf ever undertook a review of ESIS files
22 in July of 1999?
23          MR. VITA: Object to the form of the
24      question.
25   A. I know we undertook review of the files, I
           DEL VECCHIO REPORTING SERVICES   203-245-9583

68

1  don't know what the dates were.
2  BY MR. MARCELLINO:
3    Q. Okay. Do you recollect a meeting that took place
4  in the end of July or early August 1998?
5    A. I don't specifically recollect that as I sit here
6  about the dates or the times, no.
7    Q. Do you know if you ever attended a meeting with
8  Richard Shore as your counsel and representatives from Willis
9  at ESIS's office in Marlton, New Jersey in midsummer, 1998?
10   A. When you say Willis you mean Marsh, right.
11   Q. I'm sorry, Doug Willis from Marsh, thank you.
12   A. Can you repeat the whole question for me?
13   Q. Withdrawn. We'll try it again. In late July,
14 early August 1998 do you have any recollection whatsoever of
15 attending a meeting in Marlton, New Jersey with
16 representatives of ESIS and others?
17   A. I attended meetings, I don't know the dates. ESIS
18 was there at some of those meetings concerning these issues,
19 yes.
20   Q. Do you recollect anything at all about a meeting
21 that took place in July, late July, early August 1998?
22          MR. VITA: Objection. Asked and
23      answered.
24   A. I don't recollect the meetings by dates.
25 BY MR. MARCELLINO:
           DEL VECCHIO REPORTING SERVICES   203-245-9583

```
                                                                    1
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF CONNECTICUT
 3
 4   ---------------------------------X
 5   EMCOR GROUP INC.
 6
 7   VS                    3:00 CV 2211(AVC)
 8
 9   INSURANCE COMPANY OF NORTH AMERICA
10   ---------------------------------X
11
12
13
14        Deposition of Susan Reinhard taken in
15   accordance with the Connecticut Practice Book at the
16   Law Offices of Saxe Doernberger & Vita, 1952 Whitney
17   Avenue, Hamden, Connecticut, Before Holly M. Murphy, a
18   Licensed Shorthand Reporter and Notary Public, in and
19   for the State of Connecticut at 9:30 AM on June 3,
20   2004.
21
22           Holly Murphy, License No. 177
             DEL VECCHIO REPORTING SERVICES
23           PROFESSIONAL SHORTHAND REPORTERS
             117 RANDI DRIVE, MADISON, CT  06443
24              203 245-9583   800 839-6867
                     FAX 203 245-2760
25   HARTFORD                         STAMFORD
```

```
                                                                    2
 1   APPEARANCES:
     ON BEHALF OF THE PLAINTIFF:
 2   RICHARD OELSNER, ESQ.
     WILSON ELSER MOSKOWITZ EDELMAN DICKER
 3   3 GANNETT DRIVE
     WHITE PLAINS, NY  10604
 4
     ON BEHALF OF THE DEFENDANT:
 5   JEFFREY VITA, ESQ.
     SAXE DOERNBERGER & VITA
 6   1952 WHITNEY AVENUE
     HAMDEN, CT  06517
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                                    3
 1                    STIPULATIONS
 2
 3        IT IS HEREBY STIPULATED AND AGREED by and
 4   between counsel representing the parties that each
 5   party reserves the right to make specific objections
 6   at the trial of the case to each and every question
 7   asked of and the answers given thereto by the
 8   deponent, reserving the right to move to strike out
 9   where applicable, except as to such objections as are
10   direct to the form of the question.
11        IT IS FURTHER STIPULATED AND AGREED by and
12   between counsel representing the respective parties
13   that proof of the official authority of the
14   Commissioner of Deeds before whom this deposition is
15   taken is waived.
16        IT IS FURTHER STIPULATED AND AGREED by and
17   between counsel representing the respective parties
18   that the reading and signing of the deposition by the
19   deponent is NOT WAIVED.
20        IT IS FURTHER STIPULATED AND AGREED by and
21   between counsel representing parties that all defects,
22   if any, as to the notice of the taking of the
23   deposition are waived.
24        Filing of the Notice of Deposition with the
25   original transcript is waived.
```

```
                                                                    4
 1              S U S A N   R E I N H A R D
 2   Address 301 Merritt Seven, Norwalk, Connecticut,
 3   06851, having been duly sworn, was deposed and
 4   testified as follows:
 5
 6              DIRECT EXAMINATION
 7   BY MR. OELSNER:
 8        Q.   Good morning, again, Miss Reinhard. You
 9   have been deposed previously in this case; correct?
10        A.   Yes.
11        Q.   At that time we went over some of the
12   ground rules for deposition. Do you have any questions
13   on those ground rules or do you need to have them
14   repeated?
15        A.   I don't have any questions I can think of
16   at the moment, no.
17             (Whereupon, Defendant's Exhibit No. 76 was
18   marked for identification.)
19             MR. OELSNER: For the record, Defendant's
20   76 is INA Rule 30(B)(6) notice, if you could share a
21   copy.
22             MR. VITA: Let's make a copy.
23   BY MR. OELSNER:
24        Q.   Miss Reinhard, I direct your attention to
25   Defendant's Exhibit 76. Can you first tell me when is
```

## Page 129

1 operations case or a general liability case.
2   Q. Why is it not pertinent?
3   A. Because the work that's being -- it's work
4 that was put to its intended use as now being
5 implicated in a lawsuit. That's the pertinent piece.
6     If the plaintiff is wrong about a green light
7 bulb versus a red light bulb, that is not the issue.
8 We had done the work. It was put to its intended had
9 use. Later on that work was implicated and that meets
10 the definition of the insurance policy.
11  Q. Were there any claims that EMCOR or Marsh
12 reviewed in which the prior work on the traffic light
13 was on one part of the traffic light and the
14 allegations were that another part of the traffic
15 light was involved in the accident?
16  A. I don't know that. I don't recall that.
17  Q. In its investigation at least of the
18 traffic light claims whether they were GL or completed
19 operations, did EMCOR Marsh investigate whether the
20 work on the traffic light was, for instance on one
21 part, was the part that was involved in the accident
22 that was alleged?
23  A. Our basic focus was looking at the
24 definition of the insurance policy which said that
25 bodily injury or property damage involving work

## Page 130

1 performed away from the premises, and that's
2 implicated, if that work is put to its intended use,
3 it's a completed operations case.
4     So we focused on the definition of the policy
5 and the allegations and the intersection history, all
6 of the things that I mentioned, the police reports,
7 the underlying fact.
8   Q. So is the answer to that question no? I'm
9 not asking for the rationale. Your rational is what
10 your rational was.
11  A. If it was a red light bulb or a green light
12 bulb, if we had worked on a red light bulb and the
13 green light bulb was out, that is not pertinent to
14 whether the case is a completed operations case.
15  Q. Fine. Do you want to finish?
16  A. That wasn't a determining factor.
17  Q. That was not a distinction that you looked
18 at?
19  A. If that was something that came out in the
20 documents, that was something that came out in the
21 documents. But it wasn't a determining factor.
22  Q. Fine. In what way did INA and ESIS team up
23 against EMCOR on the coding and Dynalectric issues?
24  A. Well, EMCOR approached ESIS who had a
25 responsibility to code the cases or CIGNA who had the

## Page 131

1 responsibility to code the cases. They approach them
2 in any event.
3     We approached Anne Marie Marson which is
4 tough because she turned out to be an INA employee.
5 We approached who we thought was the right person to
6 approach.
7     We said that cases appear to be completed
8 operations cases. And from the moment I guess at
9 which they began to realize the scope of the amount of
10 cases, it was something that ESIS would need to always
11 to go to INA to get permission to do things.
12    I testified to that, that Anne Marie had
13 basically told me that she can't change these cases
14 even though we sent her a letter. We discussed it
15 with her. It was up to Ginny Lloyd. It was their
16 money.
17    So we then embarked on an attempt to get
18 information and to share it and to do things like have
19 Marsh go down and pull files from CIGNA's office and
20 look at them. There were a lot of road blocks set up
21 and that just became difficult to deal with.
22    For example, at one of my last depositions
23 you asked me, "Do you have any information on the
24 Dynalectric cases?" I said, "No, but ESIS has the
25 complete file because they were litigated cases."

## Page 132

1     Then you asked me, "Did you request from ESIS
2 the information?" I sent them three letters. I left
3 voice mails. I haven't heard a thing back from them.
4 That is a very good example of what happened.
5     The organization shut down and kind of teamed
6 up. I use that term, team up and didn't help us even
7 get basic information like file information.
8   Q. Did EMCOR make a request of INA to review
9 INA files before this litigation commenced?
10  A. When you say INA files, what are you
11 referring to?
12  Q. Did you make a request to INA to review any
13 file that they may have with respect to any of claims
14 that EMCOR was investigating?
15    I don't mean ESIS. I don't mean CIGNA. I
16 mean someone at INA. INA was the issuing entity of
17 those three policies; correct?
18  A. You asked me two questions there.
19  Q. Who was the issuing entity for these three
20 policies in dispute in this case?
21  A. I don't have the policy in front of me, but
22 I recall it had the CIGNA logo on it, things like that
23 as well as it has various names of various insurers on
24 it.
25  Q. You don't recall that it's an INA policy

**169**

1 Q. Do you know whether Forest ever moved to
2 reargue or renew Judge Gammerman's decision?
3 A. No.
4 (Whereupon, Defendant's Exhibit No. 89 was
5 marked for identification.)
6 Q. When was Dickstein Shapiro retained by
7 EMCOR with respect to the coding issues which are part
8 of this litigation?
9 A. The week if not the day that I thought
10 there may have been miscodings.
11 Q. When was that?
12 A. I believe that was November of 1997,
13 December of '97 or January of 1998.
14 MR. VITA: Don't guess, Miss Reinhard.
15 Q. Some time in '97 or maybe early 1998,
16 something like that?
17 A. Yes.
18 Q. Take a look at this. While we're waiting,
19 number 89 is a transcript and order again by Judge
20 Gammerman. It's dated April 1, 1999. It's in the
21 trial term of the Supreme Court of the State of New
22 York.
23 Miss Reinhard, in this litigation again
24 Forest is a defendant; correct?
25 A. Yes.

**170**

1 Q. As well as Insurance Company of North
2 America; correct?
3 A. Yes.
4 Q. Here INA was represented by Hodgson Russ;
5 correct?
6 A. Yes.
7 Q. And Forest actually have two counsel
8 present. One, someone from London Fisher on the
9 second page. And they were represented in the
10 litigation by Dickstein Shapiro; right?
11 A. Yes.
12 Q. At the time in 1999, April 1, 1999,
13 Dickstein's firm was still retained by EMCOR with
14 respect to the coding issues which are part of this
15 litigation; correct?
16 A. I don't know.
17 Q. When was Dickstein Shapiro firm discharged?
18 A. I don't recall the day.
19 Q. At some point they represented EMCOR with
20 respect to the coding issues?
21 A. Yes.
22 Q. And at least as of April 1, 1999
23 represented Forest in this litigation; correct?
24 A. Yes.
25 Q. Starting on page four indicates, the Court

**171**

1 quotes, page four of the decision in the transcript,
2 the Court states, "The material submitted on the
3 motion that I have, a motion to dismiss and a motion
4 for summary judgment by both Forest Electric Crop.,
5 and INA reflects that the INA policy coverage was
6 exhausted.
7 The coverage as I understand it was one and a
8 half million per occurrence, two million in
9 aggregate."
10 The Court goes on and says, "Under those
11 circumstances, there would be no obligation on the
12 part of INA to make any further payments under that
13 policy."
14 Do you know what material was furnished by
15 Forest Electric in support of this motion to dismiss
16 the motion of summary judgement?
17 A. I don't.
18 MR. VITA: Objection. From reading this, I
19 can't tell who filed the motion to dismiss and who
20 filed the motion for summary judgement.
21 MR. OELSNER: Well, the decision indicates
22 that a motion to dismiss or a motion for summary
23 judgment, which ever or both, was filed.
24 MR. VITA: Right. Or both is my point.
25 MR. OELSNER: Was filed by Forest Electric.

**172**

1 MR. VITA: No. It says by both Forest
2 Electric and INA, so.
3 MR. OELSNER: Well, Forest Electric and INA
4 submitted a motion to dismiss or a motion for summary
5 judgment or both according to this decision; correct?
6 MR. VITA: Objection. Or one filed one
7 motion and the other filed the other motion
8 BY MR. OELSNER:
9 Q. Some motion was filed by Forest; correct?
10 According to the Court?
11 A. Yes.
12 Q. Do you know what papers were submitted by
13 Forest?
14 A. I do not.
15 Q. Do you know whether Forest took the
16 position that the policy was exhausted?
17 A. I don't have information on this by which
18 to help you with your inquiry.
19 Q. Do you know whether Forest ever appealed
20 this decision?
21 A. Same answer.
22 Q. Do you know whether Forest ever moved to
23 renew or reargue this decision by Judge Gammerman?
24 A. Same answer.
25 Q. By the time of this decision, April 1, 1999

**173**

1  had EMCOR been advised by the Dickstein Shapiro firm
2  that certain of the claims under one or more of the
3  policies that are at issue in this case had been
4  improperly classified as general liability claims?
5    A.  I don't know.
6    Q.  Well, by April 1, 1999 had you told the
7  Dickstein Shapiro firm at least of your opinion that
8  certain claims under the policy had been improperly
9  coded as general liability claims?
10   A.  I don't know that I gave them my opinion.
11   Q.  From 1997 to April 1, 1999 you never gave
12 them your opinion that certain of the claims had been
13 improperly coded as general liability claims?
14       MR. VITA:  Objection to the form of
15 question.
16   A.  I don't recall giving them my opinion on
17 individual cases.
18   Q.  How about collectively your opinion that
19 some claims had been improperly coded?
20   A.  I'm having some difficulty with the dates,
21 so I don't want to guess here.
22   Q.  I don't want you to guess.
23   A.  That sounds reasonable, but the dates may
24 bear out some different information if I look at
25 documents.

**174**

1    Q.  Did you ever tell them about Marsh's
2  opinion?
3    A.  Yes.
4    Q.  So they knew, even if they didn't know your
5  opinion, they knew at least Marsh had opined that some
6  claims under some of the policies, the three at issue,
7  had been improperly coded as GL claims?
8        MR. VITA:  Objection.  When.
9        MR. OELSNER:  From when they were first
10 retained somewhere in late '97, early '98 until April
11 1, 1999.
12   A.  At some point they became aware of Marsh's
13 review and I think that was before April 1, 1999.
14   Q.  Are you personally familiar with this case?
15 Does it ring a bell?
16   A.  Yes.
17   Q.  Were you consulted whether or not Forest
18 Electric should move either to dismiss or for summary
19 judgment?
20   A.  I don't remember this at all.  I do
21 remember that we actually paid money on this case.
22   Q.  Do you recall being part of the decision
23 making process whether or not Forest Electric should
24 take the position and the policy at issue in the HRH
25 case was exhausted?

**175**

1    A.  I have no recollection of this, things that
2  would be around this document.  My recollection is the
3  Farioli case and the ultimate result.
4        I'm not saying that I did not, I was not
5  involved.  I just don't know the answer to your answer
6  right now.
7    Q.  That's fine.  I mean, I realize you have
8  not read the decision, ever.
9    A.  Ever.
10   Q.  Or recently.  I appreciate that.  Well,
11 before an attorney on behalf of Forest Electric would
12 take a position in a coverage matter such as the one
13 involved in HRH case, would that be reviewed with
14 either you or someone in your department?
15   A.  I can't say absolutely yes to that or
16 absolutely no.  I would have to look at the individual
17 case and the circumstances.
18   Q.  Did EMCOR have a custom and practice back
19 in 1999 of allowing attorneys to take positions on its
20 behalf in coverage matters without reviewing it first
21 with someone at EMCOR?
22   A.  What's the time frame?  Prior to April 1,
23 1999?
24   Q.  Right.
25   A.  I think there were circumstances that the

**176**

1  insurer for example was the primary party involved in
2  consulting with defense counsel.  So I can't say that
3  what you're asking me to say, did I see this or did I
4  know about this.
5    Q.  What position that would be taken on
6  exhaustion of the policy, such as a position in
7  reference to this decision, would be discussed with
8  someone in risk management from EMCOR; would it not
9  be?
10       MR. VITA:  Objection to the form of the
11 question.  You're asking a hypothetical question
12 again.
13   Q.  Let me restate it.  On an issue whether or
14 not EMCOR, an EMCOR subsidiary should take a position
15 on the exhaustion of the aggregate limits in an INA
16 policy, would that first be reviewed by someone in
17 risk management at EMCOR?
18       MR. VITA:  Object to the form of the
19 question.  It's hypothetical in nature.  If you've got
20 a specific question regarding this case, you should
21 ask it.
22       MR. OELSNER:  I'm trying to flush out
23 because she doesn't have much memory about this case.
24   A.  I don't recall right now the answer to your
25 question.