IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------------------------ x

| | |
|---|---|
| EMCOR GROUP, INC., | : Civil Action No. |
| | Docket 3:00-CV-2211 (AVC) |
| Plaintiff, | : |
| | Judge Alfred V. Covello |
| vs. | : |
| | |
| INSURANCE COMPANY OF NORTH AMERICA. | : |
| | December 6, 2004 |
| Defendant. | : |

------------------------------------------------------------------------ x

## INSURANCE COMPANY OF NORTH AMERICA'S
## LOCAL RULE 56 (a)(1) COUNTER-STATEMENT

Pursuant to the proposed L. Civ. R. 56 defendant INA, for purposes of its cross-motion for summary judgment, contend that there is no genuine issue to be tried as to the following material facts.

1. The claims submitted in Exhibit "A" were properly classified as general liability claims.

2. In the Decision and Order of Judge Allan L. Winick, New York Supreme Court, Nassau County, dated November 13, 1995, granting Welsbach's motion to dismiss the complaint in Barnett/Connolly v. Sikorsky (Reinhard Aff'd ¶ 30.2.[1]), Judge Winick held that "Since there was a working red light for the westbound direction of traffic on East Merrick Road at the time of the accident, the traffic light would not as a matter of law have been a proximate cause of the accident." Exh. "A-1."

3. The Affidavit of Brandon Friederich, sworn to on February 7, 1996, in the action entitled, Bernard v. The County of Nassau (Reinhard Aff'd ¶ 30.4), stating that "…the replacement of the cabinet door handle clearly did not cause or contribute to the November 11, 1993 and it did not provide any warning of the traffic signal malfunction on that date." Exh. "A-2."

4. The Affidavit of Brandon Friederich, sworn to on October 30, 1997, in the action entitled, Feo v. The County of Nassau (Reinhard Aff'd ¶ 30.10), states that "…Welsbach L.I.'s performance was completely unrelated to any signal malfunction on the date of plaintiff's accident." Exh. "A-3."

5. The Reply Affidavit of Andrew Konopka, Esq., sworn to on July 21, 1997, in the action entitled, Aschoff/Polichetti v. The City of New York (Reinhard Aff'd ¶

---

[1] "Reinhard Aff'd" refers to the Affidavit of Susan Reinhard, sworn to on November 12, 2004, submitted by EMCOR in support of their motion for summary judgment.

1

819541.3

30.1), states that "…the City has not offered any proof whatsoever in admissible form that even suggests that Welsbach's performance of its contractual obligations was in any manner deficient or otherwise related to the traffic signal condition which allegedly existed at the intersection of Avenue 'P' and West 9th Street at the time of the subject accident." Exh. "A-4."

6. The Report from Daniel Zemann, Jr., of London Fisher, attorneys for JWP Welsbach, dated December 7, 1994, regarding the action entitled, Gartenberg v. Lyons Dodge (Reinhard Aff'd ¶ 30.13), states that prior to the car accident, Welsbach "effected temporary repairs by hanging stop signs" as a result of a power failure by Con Ed. (p. 1). The signs remained at the location until after the accident occurred. "On January 9, 1994, the day after the collision, Welsbach workers were dispatched to effect a 'more permanent temporary repair'." Welsbach installed a temporary line at the intersection connected to electrical source at another corner. Exh. "A-5."

7. The Decision and Order of Judge Alfred D. Lerner, New York Supreme Court, Queens County, dated September 14, 1995, in the action entitled, Glassman v. Dorfman (Reinhard Aff'd ¶ 30.14), granting Welsbach summary judgment held that "There is no evidence that defendant Welsbach Electric Corp. was negligent in its manner of inspection of the subject street lamp." Exh. "A-6."

8. The Reply Affidavit of Robert L. Honig, sworn to on February 2, 1995, in the action entitled, Griffith v. Aghabi (Reinhard Aff'd ¶ 30.15), states that "…the pedestrian signals at the subject intersection were functioning as they were intended to function. Even more obvious is the fact that Welsbach and the County of Nassau do not belong in this action. Because the pedestrian pushbutton was not pressed, the pedestrian signals remained a steady 'Don't Walk' as they properly should have." Exh. "A-7."

9. The Report from Richard S. Endres, Esq. of London Fischer, attorneys for the insured Welsbach, dated July 9, 1996, in the action entitled, Freda v. Welsbach Corp. (Reinhard Aff'd ¶ 30.11), states that "Based upon the Welsbach records and the repairs effectuated by Welsbach following this accident, we have been advised by Welsbach that a green/green condition could not have existed at this intersection." Exh. "A-8."

10. The Reply Affidavit of Daniel Zemann, sworn to on December 21, 1995, in the action entitled, Hans v. Budin Contracting Corp. (Reinhard Aff'd ¶ 30.16), states that "Plaintiff's negligence caused the collision not the flashing yellow light for the plaintiff's direction of traffic." Exh. "A-9."

11. The Decision and Order of Judge Joseph F. Bruno, New York Supreme Court, Kings County, dated September 30, 2003, in the action entitled, Kull v. Welsbach Electric Corp. (Reinhard Aff'd ¶ 30.22), held that "…the reliance by plaintiffs upon the deposition testimony of two individuals who were injured at the intersection earlier in the day is unavailing, as is their submission of the police report of that accident." He further stated, "In addition, the police accident report made no reference to a defective signal and identified 'other human' as the cause of the collision." Exh. "A-10."

12. The Decision and Order of Judge Thomas V. Polizzi, New York Supreme Court, Queens County, dated May 5, 1997, in the action entitled, LaRosa v. Jenkins (Reinhard Aff'd ¶ 30.23), held that "Defendant Welsbach has also proffered evidence sufficient to show, prima facie, that its prior repair to the subject traffic signal, performed over three weeks before plaintiff's accident, involved a condition which was completely unrelated to the malfunction which existed on the date of the accident herein." Exh. "A-11."

13. The Decision and Order of Judge Harry H. Kutner, New York Supreme Court, Nassau County, dated March 29, 1996, in the action entitled, Lux/Keanna v. The Board of Education of the City of New York (Reinhard Aff'd ¶ 30.2), determined that "There is no evidence to suggest that J.W.P. Welsbach failed to inspect the traffic control apparatus when required under the contract prior to the accident or that it failed to properly repair the traffic control apparatus on a prior occasion." Judge Kutner held that "…in the absence of any connection to the alleged failure of the traffic control signals to operate properly, J.W.P. Welsbach may not be liable for contractual indemnity." Exh. "A-12."

14. The Decision and Order of Sandra J. Feuerstein, New York Supreme Court, Nassau County, dated December 20, 1995, in the action entitled, Mazzeo v. County of Nassau (Reinhard Aff'd ¶ 30.28), noted that "Other than alleged hearsay statements by unidentified police officers, all the proof in the record shows that the traffic light was operating properly." Exh. "A-13."

15. The Report from Richard Endres of London Fischer, attorneys for Welsbach, dated September 9, 1996, regarding the action entitled, State Farm Mutual Auto. Ins. Co. a/s/o Robert Napolitano v. The City of New York (Reinhard Aff'd ¶ 30.30), states that "Upon arrival, Welsbach repairman determined that an underground conduit and cable had been damaged by digging which had been performed at the intersection in conjunction with on-going construction of some sort. As a result of this damage, traffic signals located at this intersection were not functioning properly." Exh. "A-14."

16. The Affidavit of Edward Stregar, sworn to on August 26, 1997, in the action entitled, Pacombe v. The City of New York (Reinhard Aff'd 30.31), states that Welsbach's previous repairs were completely unrelated to the condition observed on the date of plaintiff's accident and unrelated to the repairs performed after the accident. Attached as Exhibit "A-15."

17. The Affidavit of Richard S. Endres, sworn to on October 20, 1995, in the action entitled, Roth v. Welsh (Reinhard Aff'd ¶ 30.37), states that "…the sole proximate cause of this accident was the Welsh vehicle having traveled through a flashing red traffic signal without first stopping." Exh. "A-16."

18. The Affidavit of Candace Carrabus, sworn to on August 31, 1995, and the Affidavit of Chris Lengyel, sworn to on August 31, 1995, in the action entitled, Roth v. Welsh (Reinhard Aff'd ¶ 30.37), state "I witnessed an Izuzu Trooper travelling on

County Rd 101 and its intersection with Woodside Avenue. This Izuzu traveled through a flashing red signal without stopping." Exh. "A-16."

19. The Report from Evan David Lieberman, from London Fisher attorneys for Welsbach, dated February 16, 1997 in the action entitled, <u>Thercier v. Pierre</u> (Reinhard Aff'd ¶ 30.4), states that a Welsbach repairman's work was in progress when he witnessed a vehicle strike a car, which propelled into the rear of the Welsbach truck. Exh. "A-17."

20. The Affidavit of Edward Streger, Supervisor of Traffic Signal Maintenance for Welsbach, sworn to on May 20, 1996, regarding the action entitled, <u>Skulsky v. Welsbach Electric Corp</u>. (Reinhard Aff'd ¶ 30.41), states that "Welsbach's involvement with the traffic signals at this intersection had no connection whatsoever to the 'all out' condition allegedly causing plaintiff's accident on August 2, 1994." Exh. "A-18."

21. The Decision and Order of Judge Nathan L. Berke, New York Supreme Court, Queens County, dated September 24, 1996, in the action entitled, <u>Skulsky v. Welsbach Electric Corp</u>. (Reinhard Aff'd ¶ 30.41), granting Welsbach's motion for summary judgment held that, "The plaintiff has failed to set forth any evidentiary facts in admissible form to show that Welsbach was negligent or otherwise breached the provisions of its contract with the city which contributed to causing the accident." Exh. "A-18."

22. The Report from Daniel Zemann, Esq. of London Fischer, Welsbach's attorneys, dated January 9, 1998 regarding the action entitled, <u>Jean-Baptiste v. The City of New York</u> (Reinhard Aff'd ¶ 30.18), states that "…the condition at the time of the alleged collision was not related to Welsbach's prior repair." Exh. "A-19."

23. The ESIS' reporting diary, entry dated October 27, 1997 and January 28, 1998 regarding the action entitled, <u>Jean-Baptiste v. The City of New York</u> (Reinhard Aff'd ¶ 30.18), states "…the condition at the time of the alleged collision was not related to Welsbach's prior repair." Exh. "A-19."

24. The Affidavit of Edward Stregar, sworn to on May 26, 1995, in the action entitled, <u>Khatib v. Welsbach Electric Corp</u>. (Reinhard Aff'd ¶ 30.21), states that "…any repairs previously performed by Welsbach at this intersection were completely unrelated to the condition found on April 28, 1993…." Exh. "A-20."

25. The Affidavit of Walter Dondero, sworn to on January 17, 2000, regarding the action entitled, <u>Lopez v. Thrifty Car Rental</u> (Reinhard Aff'd ¶ 30.26), states that "Welsbach's repairs performed on January 21, February 19 and February 20, 1993 did not cause or contribute to plaintiff's collision on March 7, 1993." Exh. "A-21."

26. The ESIS reporting diary, entry date February 21, 2000, regarding the action entitled, <u>Lopez v. Thrifty Car Rental</u> (Reinhard Aff'd ¶ 30.26), states that "…in speaking with the attys for the other parties they advised that there is no evidence that the traffic signal malfunction of the time of the accident." Exh. "A-21."

819541.3

27. The Affidavit of Walter Dondero, sworn to in May 2000, in the action entitled, <u>Messina v. The City of New York</u> (Reinhard Aff'd ¶ 30.29), states, "…any work Welsbach performed at the Intersection, neither caused or contributed to the alleged traffic signal malfunction at the time of the collision." Exh. "A-22."

28. The Reply Affidavit of Stephanie L. Bross, Esq., sworn to on June 2, 2000, in the action entitled, <u>Pera v. The City of New York</u> (Reinhard Aff'd ¶ 30.34), states that the "…repairs to the traffic signal controller on the day prior to plaintiff's accident were absolutely unrelated to the condition that the undisputed evidence in the case has established existed at the time of the accident…." Exh. "A-23."

29. The Reply Affidavit of Walter Dondero, sworn to on June 1, 2000, in the action entitled, <u>Pera v. The City of New York</u> (Reinhard Aff'd ¶ 30.34), states that "…if Welsbach had somehow caused a malfunction in the controller, all traffic signals in all direction would have been out." Exh. "A-23."

30. The Report from John E. Sparling, Esq. of London Fischer, dated October 17, 1996, regarding the action entitled, <u>Polichetti v. The City of New York</u> (Reinhard Aff'd ¶ 30.36), states that "…it appears that there may not have existed the 'all green' condition, as we have been advised by Welsbach in the past that such a condition is a virtual impossibility." Exh. "A-24."

31. The Report from Richard S. Endres of London Fischer, dated October 12, 2000, regarding the action entitled, <u>Saywack v. Scott</u> (Reinhard Aff'd ¶ 30.38), states "It is also established that such a condition could not have been the result of Welsbach's failure to maintain the traffic signals as the intersection could only have been on flash if it had been deliberately set that way." Exh. "A-25."

32. The Report from John J. Peplinski of London Fischer, dated June 26, 2000 regarding the action entitled, <u>Siag/Hadash v. The City of New York</u>, (Reinhard Aff'd ¶ 30.39), states "…all parties conceded at their deposition that the light apparently was functioning immediately prior to the collision, with only Mr. Hadash claiming an all out condition approximately ten to fifteen minutes after the collision." Exh. "A-26."

33. The Affidavit of Walter Dondero, sworn to on February 16, 1999, in the action entitled, <u>Surrency v. The City of New York</u> (Reinhard Aff'd ¶ 30.42), states "The controller is a unit separate and apart from the vehicle lamp." Exh. "A-27."

34. The Memorandum of Law of Defendant Welsbach Electric Corp. in Support of its Motion for Summary Judgment, dated December 12, 2000, in the action entitled, <u>Tahal v. The City of New York</u> (Reinhard Aff'd ¶ 30.43), states that "Mr. Dondero has stated unequivocally that Welsbach's prior repairs of December 30, 1992 and January 26, 1993 were in no way related to the defect which the plaintiff claims caused the accident and which was observed by Welsbach after the accident." Exh. "A-28."

35. The Report from John E. Sparling, of London Fischer, attorneys for JWP Welsbach, dated January 10, 2002, regarding the action entitled, <u>Waldron v. The City of

New York (Reinhard Aff'd ¶ 30.45), states that "…the above documents seem to confirm that no reported defective condition was in place on the date of the alleged accident." Exh. "A-29."

36. The Affidavit of Edward Stregar, sworn to on September 1, 1996 in the action entitled, <u>Williams v. Emmanuel Brunot</u> (Reinhard Aff'd ¶ 30.46), states that "Welsbach's performance of its contractual obligations to the City with respect to the repair of traffic signals located at the intersection of Brooklyn Avenue and Park Place, Brooklyn, New York had nothing to do with the cause of plaintiff's accident…." Exh. "A-30."

37. The Letter from Sharon Irwin, Claims Representative of JWP Welsbach Electric Corp., dated February 28, 1994, regarding the claim entitled, <u>Clerge v. JWP Welsbach Electric Corp.</u> (Reinhard Aff'd ¶ 30.8), states that "… all maintenance reports refer to a severe storm that had been happening for most of the day. Police had called this location in as 'controller not operating properly' but when our men arrived there in fact was a pole down." Exh. "A-31."

38. The Affirmation of James E. Minniti, Esq., dated July 5, 2000, in the action entitled, <u>Pellot v. The City of New York</u> (Reinhard Aff'd ¶ 30.33), states that Welsbach's "…last repair visit on April 22, 1994, six (6) weeks before the subject collision, was clearly unrelated to any alleged malfunction of the traffic signal on June 6, 1994." Exh. "A-32."

39. The declarations page of each policy states that JWP was located in Rye Brook, New York at the time that each of the three policies was issued. Exhs. 3, 4 and 5 that were submitted in connection with INA's initial motion.

40. The overwhelming majority of these claims involve EMCOR's wholly owned indirect subsidiary, Welsbach Electric Corporation," which is a "company that contracts with municipalities in and around the New York area to install, maintain, and repair all traffic signals, street lights, and pedestrian walk signals within the municipality for a specified period of time. EMCOR's Memorandum in Support of its Motion for Summary Judgment at pp. 3-4.

41. The insurance contracts were negotiated, executed, placed, underwritten and delivered in New York and Marsh & McLennan – EMCOR's insurance broker – was located there. Exh. "E," the Affidavit of Rona Taylor, the INA underwriter for the policies at issue; Exh. "F," the Affidavit of Michael S. Kelly, a Vice President of Marsh & McLennan.

42. Mr. Kelly, Vice President of EMCOR's own broker, Marsh & McLennan, swore under oath to a New York court that, commencing in 1992, Marsh & McLennan, JWP, Inc.'s broker, represented JWP's interest in the negotiation, placement, and funding of a comprehensive, multi-risk insurance program which included, among other things, JWP's purchase of the 1992-1993 general liability policy. Exh. "F," the Affidavit of Michael S. Kelly.

6

819541.3

43. Mr. Kelly swore under oath to a New York court that Marsh & McLennan was in 1992 headquartered in New York County and maintained its principal place of business at 1166 Avenue of the Americas, New York, New York 10036. Exh. "F," the Affidavit of Michael S. Kelly.

44. Mr. Kelly swore under oath to a New York court that Marsh & McLennan participated in the negotiation of the terms, conditions, nature, scope and extent of coverages afforded under the INA contract with executives and representatives of INA's Special Risk underwriting division which was headquartered in New York County and was located at 195 Broadway, New York, New York. Exh. "F," the Affidavit of Michael S. Kelly.

45. Mr. Kelly swore under oath to a New York court that the discussions and negotiations concerning the nature, scope and extent of coverages afforded under the INA contract took place principally in New York County, discussions and negotiations concerning the extent of the self-insured retentions assumed by the insureds under the INA contract took place in New York County, discussions and negotiations concerning which JWP-affiliated entities and other entities entitled to seek insurance coverage under the INA contract took place in New York County. Exh. "F," the Affidavit of Michael S. Kelly.

46. Mr. Kelly swore under oath to a New York court that INA issued the INA contract to JWP in New York County. Exh. "F," the Affidavit of Michael S. Kelly.

47. Mr. Kelly swore under oath to a New York court that the INA contract issued to JWP in New York County was executed by INA executives in New York County and JWP paid its premiums to INA in New York County. Exh. "F," the Affidavit of Michael S. Kelly.

48. Mr. Kelly swore under oath to a New York court that most of the Marsh & McLennan brokers who worked on the placement of the INA contract and the JWP insurance program for the 1992-93 policy year are currently located in New York County. Exh. "F," the Affidavit of Michael S. Kelly.

49. Rona Taylor was responsible for the negotiation, placement and underwriting of the three subject policies for INA. The negotiation, placement, underwriting and issuance of the three subject policies took place in New York. Exh. "E," the affidavit of Rona Taylor.

50. Ms. Susan Reinhard testified that INA has been sued on the basis that it violated the three policies and the policies are the subject of the litigation. Exh. "I," Reinhard deposition, dated February 3, 2004, at 163.

51. Mr. Thrasher testified that JWP's only consideration for selecting the general aggregate limit of $2,000,000 and the aggregate completed operations limit of $3,000,000 was the cash collateral that JWP would be required by CIGNA to make. Exh. "H" at pp. 26, 28, Thrasher deposition, dated June 4, 2004.

819541.3

52. Mr. Thrasher testified that the goal at the time of the first policy was to have a low general aggregate limit because of the required cash collateral and that resulted in the $2,000,000 limit. Exh. "H" at pp. 26, Thrasher deposition, dated June 4, 2004.

53. Mr. Thrasher testified that he did not know whether EMCOR or JWP considered the nature of its business in its evaluation of the limits it wanted for the general aggregate limit. Exh. "H" at pp. 27-28, Thrasher deposition, dated June 4, 2004.

54. Mr. Thrasher testified that he did not know of any other considerations that EMCOR/JWP had in determining the general aggregate limit other than the collateral requirements. Exh. "H" at p. 28, Thrasher deposition, dated June 4, 2004.

55. Mr. Thrasher testified that the same criteria was used by EMCOR/JWP with respect to its evaluation of the product completed operations aggregate limit. Exh. "H" at p. 28, Thrasher deposition, dated June 4, 2004.

56. Mr. Thrasher testified that he did not know why the aggregate limit for products completed operations was higher than the general aggregate limit. Exh. "H" at pp. 30, 36, Thrasher deposition, dated June 4, 2004.

57. Mr. Thrasher testified that the same considerations were considered with respect to the 1993-1994 policy as were used for the 1992-1993 policy. Exh. "H" at pp. 31, 32, 40-41, Thrasher deposition, dated June 4, 2004.

58. Mr. Thrasher testified that EMCOR had the same consideration, the collateral, with respect to the 1994-1995 aggregate limits. Exh. "H" at pp. 35-36, Thrasher deposition, dated June 4, 2004.

59. Ms. Susan Reinhard was not involved in the negotiations of any of these three policies since she joined EMCOR in February or March 1995, after the date the 1994-1995 policy was issued. Exh. "I" at p. 37, Reinhard deposition, dated February 3, 2004.

60. Ms. Susan Reinhard's job did not involve the negotiations of the policies. Reinhard deposition dated February 3, 2004 at p. 41, 44-45. Reinhard testified that she has never fully read each of the policies. Exh. "J" at p.105, Reinhard deposition, dated February 12, 2004.

61. Mr. Thrasher, who was with EMCOR/JWP at the time these policies were issued, was involved in the negotiation of the last policy and was EMCOR's corporate designee to testify about the policies, could not identify any business reasons for why the limits were established as they were and did not know why there was a higher limit for completed operations coverage, but could only state that the need for collateral was EMCOR's sole criteria in selecting the limits. Exh. "H" at pp. 26-28, 30-31, 32, 35-36, 40-41, Thrasher deposition, dated June 4, 2004.

819541.3

62. EMCOR's work was ongoing at the time of the accident in the Gartenberg and Thercier claims. Exh. "A". and Exhibits attached to INA's motion for partial summary judgment.

63. With respect to the limits contained in the 1992-1993 policy, only loss payments (i.e. payments made to settle a case or to pay a judgment) exhausted the limits. Expenditures in the defense of EMCOR did not. See Exhibit 3, Bates No. 000143, INA Motion of Partial Summary Judgment; Exh. "H" at p. 43; Exh. "B;" Thrasher deposition dated June 4, 2004 at p. 3.

63. The claims listed in Exhibit "B" are claims that were submitted for coverage under policy year 1992-1993 for which there are no loss payments and EMCOR did not pay the defense costs.

64. The loss run prepared by INA from its Risk Advantage database and served upon EMCOR in this case shows the lack of any loss payments in the column captioned "Loss Paid" with respect to the claims listed in Exhibit "B". Exh. "L."

65. The claims listed in Exhibit "C" is the list of claims submitted for coverage under the 1993-1994 and 1994-1995 policies.

66. Attached as Exhibit "D" are the three claims which EMCOR did not include, in its Third Amended Complaint due to its failure to seek leave to amend.

Dated: White Plains, New York
December 6, 2004

Respectfully submitted,

*Thomas A. Leghorn*
Thomas Leghorn (CT #22106)
Wilson, Elser, Moskowitz, Edelman
& Dicker, LLP.
Attorneys for Defendant
INSURANCE COMPANY
OF NORTH AMERICA
3 Gannett Drive
White Plains, New York 10604
Phone: (914) 323-7000
Fax: (914) 323-7001

*Co-counsel:*
Joseph Burns
Rome McGuigan Sabanosh, P.C.
One State Street
Hartford CT 06103-3101

819541.3